No. 2015-1365

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

IN RE CREE, INC.,

*Appellant.*

Appeal from the United States Patent and Trademark Office, Patent Trial and Appeal Board in Reexamination Control No. 90/010,940

## BRIEF FOR APPELLANT CREE, INC.

HEATHER PETRUZZI
BRITTANY BLUEITT AMADI
WILMER CUTLER PICKERING
   HALE AND DORR LLP
1875 Pennsylvania Avenue, NW
Washington, DC  20006
(202) 663-6000

WILLIAM F. LEE
CYNTHIA D. VREELAND
PETER M. DICHIARA
MARK C. FLEMING
SYDENHAM B. ALEXANDER, III
WILMER CUTLER PICKERING
   HALE AND DORR LLP
60 State Street
Boston, MA  02109
(617) 526-6000

*Attorneys for Appellant Cree, Inc.*

May 22, 2015

## CERTIFICATE OF INTEREST

Counsel for Appellant Cree, Inc. certifies the following:

1.      The full name of every party or *amicus* represented by us is:

Cree, Inc.

2.      The names of the real party in interest represented by us is:

Not applicable.

3.      All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

None.

4.      The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

WILMER CUTLER PICKERING HALE AND DORR LLP:  Sydenham B. Alexander, III, Brittany B. Amadi, Peter M. Dichiara, Mark C. Fleming, William F. Lee, Heather Petruzzi, Cynthia D. Vreeland

Dated:  May 22, 2015                    /s/ William F. Lee
                                        WILLIAM F. LEE
                                        WILMER CUTLER PICKERING
                                            HALE AND DORR LLP
                                        60 State Street
                                        Boston, MA  02109
                                        (617) 526-6000

# TABLE OF CONTENTS

Page

CERTIFICATE OF INTEREST ...................................................................i

TABLE OF AUTHORITIES ........................................................................v

STATEMENT OF RELATED CASES .......................................................1

INTRODUCTION ........................................................................................1

JURISDICTIONAL STATEMENT ...........................................................3

STATEMENT OF ISSUE ON APPEAL....................................................4

STATEMENT OF CASE AND FACTS .....................................................4

    A.    Cree, Inc. .........................................................................4

    B.    Technology Background ...................................................4

        1.    LED technology .......................................................4

        2.    The blue LED and use of triplets to create white light .............................................................5

        3.    Down-conversion of light .........................................9

    C.    Drs. Baretz's And Tischler's Breakthrough And The '175 Patent .................................................................11

    D.    Praise And Commercial Success.......................................14

    E.    Proceedings Before The Board ..........................................15

        1.    The prior art .............................................................18

            a.    Stevenson.................................................18

            b.    Pinnow ...................................................19

            c.    Nakamura................................................21

      2.     The Board's final decision .......................................................21

SUMMARY OF THE ARGUMENT ....................................................25

STANDARD OF REVIEW ...................................................................27

ARGUMENT ...........................................................................................27

I.    THE BOARD BASED ITS OBVIOUSNESS DETERMINATION ON THE MISTAKEN PREMISE THAT DOWN-CONVERSION FROM A MONOCHROMATIC LED TO PRODUCE WHITE LIGHT WAS KNOWN. ..........................................................................................27

    A.    The Board's Belief That Down-Conversion Of LEDs To Make White Light Was Known Is Not Supported By Substantial Evidence. ..........................................................27

        1.    Stevenson did not make white light. ........................29

        2.    Pinnow did not use LEDs. ........................................30

        3.    Nakamura did not use down-conversion or make white light. .........................................................31

    B.    The Board Misinterpreted The Testimony Of Cree's Experts. ...........................................................................32

    C.    The Board Wrongly Relied On What The Field Learned *After* The Invention. ..............................................34

II.    THE BOARD ERRED IN DETERMINING THAT A SKILLED ARTISAN WOULD HAVE BEEN MOTIVATED TO COMBINED PINNOW WITH STEVENSON AND NAKAMURA. ..........................................35

    A.    The Board Articulated No Motivation To Combine Pinnow With Stevenson And Nakamura. ..............................36

    B.    The Board Impermissibly Shifted The Burden To Cree To Show No Motivation To Combine. ................................39

    C.    The Record Shows That A Skilled Artisan Would Not Have Combined Pinnow With Stevenson And Nakamura. ................40

III.   THE BOARD'S OBVIOUSNESS DETERMINATION RESTS ON
       IMPERMISSIBLE HINDSIGHT.................................................................45

       A.    The State Of The Art At The Time Of The Invention Was
             Triplets.............................................................................................45

       B.    The Board's Proffered Combination Of Stevenson,
             Nakamura, And Pinnow Was Based On Hindsight. ..........................48

IV.    THE BOARD ERRED BY DISREGARDING CREE'S COMPELLING
       EVIDENCE OF OBJECTIVE INDICIA OF NONOBVIOUSNESS...............................51

       A.    The Single-LED White Light Was Praised Throughout
             The LED Industry.............................................................................53

       B.    Cree's Significant Licensing Of The '175 Patent Reflects
             "Respect For The Invention."...........................................................57

       C.    Single-LED White Lights Embodying The Claimed
             Invention Have Achieved Blockbuster Commercial
             Success. ...........................................................................................59

CONCLUSION .......................................................................................................62

ADDENDUM

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

## CASES

Page(s)

*Brown & Williamson Tobacco Corp. v. Philip Morris Inc.*,
  229 F.3d 1120 (Fed. Cir. 2000) ............................................................60

*Cheese Systems, Inc. v. Tetra Pak Cheese & Powder Systems, Inc.*,
  725 F.3d 1341 (Fed. Cir. 2013) ................................................. 48-49

*Crocs, Inc. v. International Trade Commission*,
  598 F.3d 1294 (Fed. Cir. 2010) ........................................................3, 60

*DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*,
  567 F.3d 1314 (Fed. Cir. 2009) ........................................................42

*Eli Lilly & Co. v. Teva Pharmaceuticals USA, Inc.*,
  619 F.3d 1329 (Fed. Cir. 2010) ........................................................51

*Hybritech Inc. v. Monoclonal Antibodies, Inc.*,
  802 F.2d 1367 (Fed. Cir. 1986) ........................................................56

*In re Chapman*,
  595 F.3d 1330 (Fed. Cir. 2010) ........................................................33

*In re Gartside*,
  203 F.3d 1305 (Fed. Cir. 2000) ........................................................27

*In re Glatt Air Techniques, Inc.*,
  630 F.3d 1026 (Fed. Cir. 2011) ........................................................30

*In re Huai-Hung Kao*,
  639 F.3d 1057 (Fed. Cir. 2011) ........................................................39

*In re Kahn*,
  441 F.3d 977 (Fed. Cir. 2006) ........................................................38

*In re Sullivan*,
  498 F.3d 1345 (Fed. Cir. 2007) ........................................................44

*In re Wallen*,
  565 F. App'x 867 (Fed. Cir. 2014) ................................................39

*In re Winslow*,
    365 F.2d 1017 (C.C.P.A. 1966) ......................................................................38

*In re Zurko*,
    258 F.3d 1379 (Fed. Cir. 2001) ..........................................................31, 32, 38

*Institut Pasteur & Universite Pierre et Marie Curie v. Focarino*,
    738 F.3d 1337 (Fed. Cir. 2013) ...............................................................passim

*InTouch Technologies, Inc. v. VGo Communications, Inc.*,
    751 F.3d 1327 (Fed. Cir. 2014) .................................................................27, 49

*Iron Grip Barbell Co. v. USA Sports, Inc.*,
    392 F.3d 1317 (Fed. Cir. 2004) ......................................................................57

*J.T. Eaton & Co. v. Atlantic Paste & Glue Co.*,
    106 F.3d 1563 (Fed. Cir. 1997) ......................................................................60

*KSR International Co. v. Teleflex Inc.*,
    550 U.S. 398 (2007)........................................................................................48

*Leo Pharmaceutical Products, Ltd. v. Rea*,
    726 F.3d 1346 (Fed. Cir. 2013) ................................................................passim

*Merck & Co., Inc. v. Teva Pharmaceuticals USA, Inc.*,
    395 F.3d 1364 (Fed. Cir. 2005) ......................................................................59

*Power Integrations, Inc. v. Fairchild Semiconductor International, Inc.*, 711 F.3d 1348 (Fed. Cir. 2013) .................................................................57

*Power–One, Inc. v. Artesyn Technologies, Inc.*,
    599 F.3d 1343 (Fed. Cir. 2010) ......................................................................55

*Rambus Inc. v. Rea*,
    731 F.3d 1248 (Fed. Cir. 2013) ................................................................passim

*Sensonics, Inc. v. Aerosonic Corp.*,
    81 F.3d 1566 (Fed. Cir. 1996) ........................................................................34

*St. Jude Medical, Inc. v. Access Closure, Inc.*,
    729 F.3d 1369 (Fed. Cir. 2013) ......................................................................48

*Standard Oil Co. v. American Cyanamid Co.*,
   774 F.2d 448 (Fed. Cir. 1985) ............................................................51

*Vulcan Engineering Co. v. Fata Aluminum, Inc.*,
   278 F.3d 1366 (Fed. Cir. 2002) .........................................................53

## STATUTES

28 U.S.C.
   § 1295(a)(4)(A) ................................................................................3

35 U.S.C.
   § 103(a) .............................................................................................17

## STATEMENT OF RELATED CASES

No appeal in this case was previously before this Court or any other court. Counsel for Appellant Cree, Inc. ("Cree") is not aware of any case pending in this Court that would directly affect or be directly affected by the Court's decision in this appeal.

Two cases pending before the United States District Court for the Western District of Wisconsin may be affected by the Court's decision in this appeal. Cree asserts U.S. Patent No. 6,600,175 ("the '175 patent"), in addition to seven other patents, in *Cree, Inc. v. Harvatek Corp., et al.*, No. 14-CV-620 (W.D. Wis.), and *Cree, Inc. v. Kingbright Electronic Co., et al.*, No. 14-CV-621 (W.D. Wis.).

## INTRODUCTION

Drs. Bruce Baretz and Michael Tischler, the inventors of the '175 patent, created a new way to make white light. Like sunlight, white light is unique. It is not limited to one color of light (*i.e.*, one wavelength), but includes a broad spectrum of colors. At a time when everyone else focused on making white light by arranging red, green, and blue lights in "triplets," the inventors were the first to make white light from a single light-emitting diode ("LED"). No one had done that before, and a significant new industry was born.

Nevertheless, the Patent Trial and Appeal Board ("Board") erroneously concluded that the claimed invention was obvious because it was already "known."

The Board did not identify any reference that disclosed the three key elements of the invention: [1] making white light [2] by down-conversion [3] from a single LED. Instead, relying only on a book published years *after* the invention, the Board simply asserted that this combination of elements—that is, the invention itself—was already a "known" approach to those of skill in the art.

The Board carried this faulty premise—that it was "known" approach to make white light from down-conversion of an LED–through its entire analysis. Because it assumed the invention was known, the Board identified no rationale for combining prior art references to produce the patented invention (filed in 1996). Instead, the Board erroneously concluded that a skilled artisan would combine a 1974 violet LED and a 1972 laser beam system with a 1993 blue LED, regardless of differences in time and technology. To bridge those differences, the Board relied on its incorrect assumption that the invention itself was a "known approach[]." A32.

The Board further compounded its error by disregarding objective evidence of nonobviousness on legally erroneous grounds. Though undisputed evidence shows that the industry recognized the invention as a breakthrough, the Board disregarded that evidence because some in the industry incorrectly attributed that breakthrough invention to later developers, rather than to Drs. Baretz and Tischler. This Court has never suggested that industry praise for *the invention* may be

disregarded because it mistakenly does not attribute the discovery to the ***inventors***. Similarly, although the '175 patent has undisputedly been a key asset in patent licenses, the Board disregarded that "probative and cogent evidence," which this Court has held must be considered. *Institut Pasteur & Universite Pierre et Marie Curie v. Focarino*, 738 F.3d 1337, 1345 (Fed. Cir. 2013). And while undisputed evidence shows blockbuster annual sales of the patented LEDs, the Board erroneously disregarded that evidence as lacking a nexus to the patent—contrary to the principle that "[a] prima facie case of nexus is made when the patentee shows … that the product that is commercially successful is the invention disclosed and claimed in the patent." *Crocs, Inc. v. Int'l Trade Comm'n*, 598 F.3d 1294, 1310-1311 (Fed. Cir. 2010).

Because the '175 patent was a breakthrough, and the Board's obviousness determination depends on error, the Board's decision should be reversed or vacated and remanded for further proceedings.

## JURISDICTIONAL STATEMENT

The Board entered its decision in this reexamination proceeding on November 21, 2014. A1. Cree noticed its timely appeal on January 16, 2015. A1331-1332. This Court has jurisdiction under 28 U.S.C. § 1295(a)(4)(A).

## STATEMENT OF ISSUE ON APPEAL

Whether the Board erred in determining that claims 118, 134-136, 138, and 140 of the '175 patent are obvious.

## STATEMENT OF CASE AND FACTS

### A.    Cree, Inc.

Cree has been widely recognized as a pioneer in lighting technology, and particularly in the revolutionary use of LEDs. A562-563; *see* A554. Based on its innovations, Cree sells lighting solutions that provide better illumination, backlighting, signs, signals, and wireless communications. A562-563. Cree is the owner and assignee of the '175 patent. A174.

### B.    Technology Background

#### 1.    LED technology

LEDs are semiconductor chips that turn electricity into light. *See* A795(Redwing)(¶12); A956(Wetzel)(¶13). As the '175 patent's inventors recognized, LEDs are advantageous over conventional incandescent or fluorescent light due to their "low fabrication costs, long operational lifetimes and low maintenance costs." A61(1:15-23). LEDs are also small, weighing only a few grams (A823(Redwing)(¶77), A981(Wetzel)(¶78)), and consume much less power than traditional lights (A61(2:17-20); *see* A554 (describing LEDs as "a critical

path toward significantly reducing energy costs for lighting throughout the

world")).

As early as the 1960s, researchers began attempting to develop single-color

(monochromatic) LEDs to make red, green, and blue light—the three primary

colors. A757(Stringfellow)(¶14). In addition to developing single-color LEDs for

commercial applications, the hope was that the three primary color LEDs, once

developed, could be used to create light of all colors of interest needed in

commerce. A757-758(Stringfellow)(¶¶15-16). In the 1960s, the primary focus

was on developing red LEDs, which proved the least difficult to develop. A757-

758(Stringfellow)(¶¶14-15). Red LEDs, once developed, were used in personal

calculators and digital watches. A757(Stringfellow)(¶15). From the 1970s

through the mid-1980s, researchers shifted focus to the development of a green

LED. A757-758(Stringfellow)(¶¶14-15). Finally, from the late 1980s through the

early 1990s, researchers focused on the last piece of the primary color puzzle—the

blue LED. *Id.*

## 2. The blue LED and use of triplets to create white light

In the early 1990s, the electronics industry expected that, once developed, a

commercially-viable blue LED could be combined with existing red and green

LEDs to create white light. *See* A758(Stringfellow)(¶15). White light is not a

single color on the visible light spectrum; instead, white is the combination of

different colors mixing together, as shown when a prism separates white light into
its constituent colors.  A795(Redwing)(¶12); A956-957(Wetzel)(¶13).



A1317.  The creation of white light "requires 'color mixing' of light with **specific**
**wavelengths** and **optical powers** which depend on the response of the human eye to
different wavelengths of light."  A795(Redwing)(¶12) (emphases added); *see also*
A798(Redwing)(¶16); A961-962(Wetzel)(¶25).  Importantly, "[n]ot all
combinations of different wavelengths of light result in white light—only
particular combinations of colors" make white.  A957(Wetzel)(¶13); A795-
796(Redwing)(¶12).

At particular wavelengths, the three primary colors of light (red, green, and
blue) can be mixed to create white light.  A795(Redwing)(¶12).  The industry

anticipated that a blue LED would allow for color mixing of light emitted separately from red, green, and blue LEDs—an approach known as a "triplet"—to create white light. *See* A759-760(Stringfellow)(¶17); *see also* A61(1:32-41). For example, a 1991 technical specification from Ledtronics provided that red, green, and blue anodes were needed "to produce a white light." A440; *see also* A759-760(Stringfellow)(¶17) (describing commercial LED products that employed a triplet approach); A452-456 (Sharp publication announcing introduction of triplet).

The blue LED proved to be the most difficult of the primary colors to create; but in 1993, Dr. Shuji Nakamura of Nichia Chemical Industries[1] developed a commercially-viable blue LED. A757(Stringfellow)(¶14). Although Dr. Nakamura's blue LED emitted a low level of optical power compared to other light sources (approximately one-thousandth of a watt, or 1 mW), it was significantly stronger than other blue LEDs available at the time. A823(Redwing)(¶77); A981-982(Wetzel)(¶79). While Dr. Nakamura's blue LED has been characterized as a "bright" blue LED, this characterization stemmed from its relative comparison to predecessor blue LEDs, rather than to other sources of light.

Following the introduction of Dr. Nakamura's blue LED, the industry began using triplets to make white light, combining this new blue LED with red and green LEDs. A764(Stringfellow)(¶26) ("[T]he clear direction of the field … was

---

[1] Dr. Nakamura now works as a part-time employee of Cree.

to utilize red LED/green LED/blue LED arrays."); A799(Redwing)(¶18) ("[I]n the 1994-1996 timeframe, the generally accepted means of obtaining white light from colored LEDs was to combine red, green, and blue LEDs (i.e., a RGB triplet)."); A958(Wetzel)(¶17) (same); *see also* A784 ("Single white light-emitting diodes (LED) were not feasible to date …. The mixture of colors making up white light was up to now only possible by combining three different diodes."); A750 ("By combining red, green, and blue emitting diodes, the generation of white light by LEDs became possible. However, the emission of white light by a single chip LED was still impossible."); A61(2:47-50) ("All currently available examples of such lamps contain a minimum of three LED dies (or chips)—one red, one green and one blue ….").

As Drs. Joan Redwing and Christian Wetzel—both renowned experts in the LED field—explained, using triplets to perform the color mixing necessary to create white light was "relatively straightforward" and controlled, as it merely required use of an "appropriate input power" (or intensity) for each individual LED, but no altering of the colors themselves (*i.e.*, changing the wavelength of the emitted light). A798(Redwing)(¶16); *see* A799(Redwing)(¶18); A958(Wetzel)(¶17). For example, a user could "tune" the white light created using the triplet by making it "warmer" (*i.e.*, increasing the red input's power) or "colder" (*i.e.*, increasing the blue input's power). A799 (Redwing)(¶18);

A958(Wetzel)(¶17); *see* A764(Stringfellow)(¶24) ("[W]ith direct emission LED triplet arrangements, each of the red, green, and blue LEDs could be individually electrically biased ....").

### 3.    Down-conversion of light

Down-conversion is a process in which a luminophoric (*i.e.*, light-emitting) material—such as a phosphor—reacts to emitted (primary) light by creating and emitting other (secondary) light with a longer wavelength (lower frequency) than, and thus a different color from, the original primary light.  A795(Redwing)(¶12); A956(Wetzel)(¶13); *see also* A62(3:48-50).  The character of the converted light depends on both the characteristics of the primary light source as well as the type and placement of the phosphor.  A958(Wetzel)(¶17).  Thus, in down-conversion, "[t]he range of wavelengths and the optical power of the light emitted by a … phosphor is dependent on both the wavelength or range of wavelengths and optical power of the primary light source as well as the absorption and emission characteristics of the phosphor."  A796-797(Redwing)(¶13).

Although down-conversion can change the color of light, it also depletes some of the energy of the original light.  A956-957(Wetzel)(¶13); *see also* A763(Stringfellow)(¶24) ("In down-conversion, higher energy primary radiation is absorbed to produce lower energy secondary radiation as an output.").  Thus, while

down-conversion can be used to alter the color of light, it significantly decreases brightness.  A798(Redwing)(¶16); *see also* A957-958(Wetzel)(¶15).

Given the "the substantial dissipation of energy that would occur in any down-conversion process," down-conversion of LEDs had not been common prior to the '175 patent's invention.  A763-764(Stringfellow)(¶24).  Down-conversion of LED light had generally been used only to create ***primary colors*** (*i.e.*, changing the wavelength of light to make the red, green, or blue necessary for a triplet)—an effort that was no longer necessary after the development of commercially-viable LEDs that directly emitted each of the primary colors.  *See* A799(Redwing)(¶20) ("At that time [1994-1996], phosphors would have been used to achieve a primary color LED, not white."); *see also* A102(4:3-5) (noting that different phosphors may possibly be used to develop "all the primary colors"); A157(¶0008) (discussing use of a fluorescent dye to convert violet light to blue); A808(Redwing)(¶38).

Moreover, "[t]he LEDs in existence in the 1994-1996 timeframe, including [Dr. Nakamura's] recently introduced blue LEDs, were not powerful; they emitted relatively little light."  A957(Wetzel)(¶15); A798(Redwing)(¶16) (explaining that the blue LEDs had "very low optical power").  Thus, even for generating primary colors, down-conversion of LED light—an inherently low-power light source— was "discredited due to the loss of energy and light brightness during the down-conversion process."  A957(Wetzel)(¶15).  "Because the down-conversion process

would have resulted in [an] even lesser amount of emitted light than the already small amount being emitted by the LEDs at the time, a person of skill in the art would not have been encouraged to use such a process to alter the color of emitted light, and in fact, would have been dissuaded from considering this approach." A957-958(Wetzel)(¶15). Instead, after the development of the blue LED (the last primary color in the triplet), "the industry was focused on LEDs that directly emitted the color of interest and there was no focus on the use of down-conversion because (a) it would waste energy; (b) it was no longer needed to create primary colors; and (c) it entailed increased cost and complexity." A764(Stringfellow)(¶26). Thus, while down-conversion to create primary colors was suggested in the early years of LED development, by the early 1990s, down-conversion was no longer considered necessary since LEDs that directly emitted all three primary colors could be used in triplets to produce white light.

## C.    Drs. Baretz's And Tischler's Breakthrough And The '175 Patent

While the rest of the industry was focusing on the triplet approach to make white light, Drs. Bruce Baretz and Michael Tischler invented a different approach. Drs. Baretz and Tischler acknowledged in the patent that, while "the recent availability of the blue LED makes … a white light display realizable," the conventional wisdom was that white light generation required the use of "multiple LEDs" that were "then incorporated into complicated and expensive LED

modules." A61(2:28-33). These LED modules—or triplets—were "powered via at least 4 electrical leads," and thus were "an expensive and complicated method of offering white light illumination." A61(2:47-53). Drs. Baretz and Tischler bucked the conventional wisdom and instead sought "to develop a simple solid state LED lamp, with a minimum of power leads, (i.e., 2) exactly as practiced in single color LED lamps, such that three domains of red, green and blue light are generated and yet the white light emission is apparent to an observer." A62(3:29-33).

The '175 patent, entitled "Solid State White Light Emitter And Display Using Same," was filed on March 26, 1996 and issued on July 29, 2003. A56.[2] The patented solution was to "provide [white] light solid state luminescent devices using a single die … without the need for multiple power leads or for more than one discrete LED lamp." A63-64(6:66-7:6). In other words, Drs. Baretz and Tischler developed a single-LED white light as an alternative to the common triplet approach. Their invention, which is claimed in the '175 patent and depicted in its Figure 1 (reproduced below), was to create a single-LED white light by down-converting a monochromatic blue gallium nitride (GaN) LED (13) using a suitable luminophoric medium (20) to create "a broader emission that provides white light" from primary and/or secondary emissions. A64-65(8:26-36, 9:10-13).

---

[2] The Examiner acknowledged that the '175 patent's invention was invented at least as early as January 1995. A399.

# FIGURE 1



A58; *see* A64-65(8:58-9:9).

Drs. Baretz's and Tischler's "use of phosphors to down-convert LEDs to white light was a new way of obtaining white light" and not an obvious one. A958(Wetzel)(¶17). Unlike triplets, where the character of the emitted white light can be controlled by tuning the intensity of the red, green, and blue LEDs, in down-conversion, the character of the emitted white light depends on both the characteristics of the primary light source and the type and placement of the luminophoric medium. A798(Redwing)(¶16); A958(Wetzel)(¶17); *see* A764(Stringfellow)(¶24) ("[D]own-conversion requires phosphors or other

luminophoric material that is outside the control of the electronics manufacturer."). Thus, "the production of white light via color mixing is a non-trivial process and will differ significantly depending on the type of light source that is used … , the peak wavelength and peak width of the primary light sources as well as their respective optical powers." A796(Redwing)(¶13); *see* A795(Redwing)(¶12) ("[T]he required optical powers of each of the components used in color mixing will also depend on the specific wavelengths of the red, green and blue primary colors."). Accordingly, the process of ensuring that the secondary emissions created by the phosphor are at the right wavelengths and intensities to generate white light was complex and difficult.

### D.    Praise And Commercial Success

The single-LED white light, initially invented by Drs. Baretz and Tischler, has been praised throughout the industry as a breakthrough in LED technology. A 1997 article published by the Fraunhofer-Gesellschaft ("Fraunhofer Institute") explained that while commercial availability of a blue LED rendered "the generation of white light by LEDs … possible" by "combining red, green, and blue emitting diodes," the "emission of white light by a single chip LED was still impossible." A749-750. The Fraunhofer Institute further claimed that this "impossibility" was remedied by the "innovative idea" of combining "a blue emitting GaN LED with an organic dye or an inorganic phosphor … to synthesise

white light by additive colour mixing," an idea that would "enable mass production of white emitting LEDs."  A750; *see also* A749 (describing the single-LED white light as a "breakthrough" that was "setting out to conquer the market for illumination").  Similarly, a July 1997 article published by Nikkei Electronics Asia ("Nikkei") described the single-LED white light as an "innovation," explaining that "the mixture of colors making up white light" was previously "only possible by combining three different diodes."  A784.

Following its issuance in 2003, the '175 patent was "a key intellectual property asset in major commercial technology transactions" for Cree, including licenses with major manufacturers of LED products such as Nichia Corporation; Toyoda Gosei; Osram GmbH; Phillips Electronics; Stanley Electric Company; and others.  A546-548(Brandes II)(¶4); A586-587(Brandes IV)(¶¶5-6).  The global market for single-LED white lights also has soared, approaching $10 billion in sales by 2010.  A588(Brandes IV); *see* A575(Brandes III)(¶21).

### E.    Proceedings Before The Board

On July 16, 2010—over seven years the '175 patent's issuance—the Patent Office began this *ex parte* reexamination.  A1346; A1348.  On November 20, 2013, the Examiner issued a final rejection of independent claims 118 and 134 and dependent claims 135, 136, 138, and 140.  A1382; A1555.  Representative independent claims 118 and 134 recite:

118.   A light-emission device, comprising a single-die, two-lead gallium nitride based semiconductor blue light-emitting diode emitting radiation; and a recipient down-converting luminophoric medium for down-converting the radiation emitted by the light-emitting diode, to a polychromatic white light, wherein the luminophoric medium is dispersed in a polymer that is on or about the single-die, two-lead gallium nitride based semiconductor blue light-emitting diode.

134.   A light-emitting device, comprising: at least one single-die gallium nitride based semiconductor blue light-emitting diode (LED) coupleable with a power supply to emit a primary radiation which is the same for each single-die LED present in the device, said primary radiation being a relatively shorter wavelength radiation; and a down-converting luminophoric medium arranged in receiving relationship to said primary radiation, and which in exposure to said primary radiation, is excited to responsively emit a secondary, relatively longer wavelength, polychromatic radiation, with separate wavelengths of said polychromatic radiation mixing to produce a white light output, wherein each of the at least one single-die gallium nitride based semiconductor blue light-emitting diode in interaction with luminophoric medium receiving its primary radiation produces white light output, and wherein the luminophoric medium is dispersed in a polymer that is on or about the single-die gallium nitride based semiconductor blue light-emitting diode.

A69.

Cree appealed the Examiner's rejections to the Board.  In addition to other documentary and testimonial evidence, Cree relied on the declarations of three leading experts in the LED field—Drs. Gerald B. Stringfellow, Joan Redwing, and Christian Wetzel—whom the Board recognized as "renowned" and "well qualified" to address the issues.  A8; A22 n.12; A23 n.13; A24 n.14.  Dr. Stringfellow, a professor of Materials Science and Engineering at the University of

Utah with over 46 years of experience in LED research, was intimately familiar with the Examiner's identified primary prior art reference (Stevenson), having studied under Dr. Stevenson personally. A752-753; A756; A761(Stringfellow)(¶¶3, 11, 18).[3] Dr. Joan Redwing, the associate head of the Department of Materials Science and Engineering at Penn State University, is the author of over 110 technical papers relating to Gallium(III)-N materials and devices. A793-794(Redwing)(¶¶5, 7). Dr. Christian Wetzel, a professor of Physics at Rensselaer Polytechnic Institute, has extensive research experience in group-III nitride LEDs, including relating to enhancement and performance of green LEDs. A954-955(Wetzel)(¶¶3-5).

The Board affirmed the Examiner's rejection of the claims "under 35 U.S.C. § 103(a) as being unpatentable over Stevenson, Pinnow, and Nakamura." A14.

---

[3] Dr. Stringfellow is well-respected in the LED field. He is a co-inventor on three issued U.S. patents and two pending U.S. patent applications, has received numerous awards for technological achievement, including a lifetime achievement award for outstanding contributions to the field of crystal growth, and is an author of several books relating to LED technology. A753-755(Stringfellow)(¶¶6, 8-9); *see also* A22 n.12 (acknowledging that Dr. Stringfellow is a "worldwide-recognized expert in the field of LEDs with over 46 years of experience and over 350 peer-reviewed articles" and was thus "well qualified to testify regarding the technology").

## 1.    The prior art

### a.    *Stevenson*

U.S. Patent No. 3,819,974 ("Stevenson"), entitled "Gallium Nitride Metal-Semiconductor Junction Light Emitting Diode," issued on June 25, 1974, more than 20 years before the '175 patent's invention.  A98.  Stevenson discloses an LED "capable of emitting light in the violet region of the spectrum."  A102(3:24-26); *see also* A101(1:10-12, 26-27).  The Stevenson violet LED was weak, with "an optical power output in the range from 0.000286 mW to 0.000298 mW." A801(Redwing)( ¶23); *see* A960(Wetzel)(¶22); A762(Stringfellow)(¶21) ("[T]he violet light [the Stevenson LED] produced was extremely dim in character.").

Although Stevenson focused on the violet LED itself, Stevenson also briefly notes that a violet LED could theoretically be "converted to lower frequencies (lower energy) … using organic and inorganic phosphors … to develop different colors." A102(3:28-4:1).  And, consistent with the industry's focus on developing primary colors in the 1960s and 1970s (*see supra* pp. 5-9), Stevenson also speculates that different phosphors could be used to develop the three primary colors from a violet LED.  A102(4:3-5).  However, "Stevenson does not identify any specific phosphors, nor does it suggest combining or mixing multiple phosphors together, each of which would need to be known to create white light.

Likewise, there is no mention of color mixing that is needed to create white light."

A803(Redwing)(¶27).

### b.    Pinnow

U.S. Patent No. 3,691,482 ("Pinnow"), entitled "Display System," issued on

September 12, 1972.  A75.  Pinnow discloses the projection of a high-powered

laser beam onto a phosphor display screen.  A75(Abstract).  The Pinnow lasers are

"argon-ion emitting at 4,880 A. and cadmium-ion emitting at 4,416 A."  A78(1:53-

55).[4]  The Pinnow system "was about six feet long, water-cooled, included a

complex optical system to scan the laser beam, and weighed about 120 pounds."

A963(Wetzel)(¶28); *see* A823(Redwing)(¶77); A1098-1101.  Unlike LEDs, which

have low power output, the Pinnow lasers were "relatively powerful, e.g., about

5400 W electrical input and about 100 mW optical output," features useful for

display screens.  A963(Wetzel)(¶28); *see* A804-805(Redwing)(¶29).  Moreover,

these lasers had "a very precise central frequency and tight emission spectrum,"

meaning the range of wavelengths emitted from a laser are very narrow.

A963(Wetzel)(¶28); A804-805(Redwing)(¶29).

Pinnow explains that its high-powered, gas laser emits light through a

modulator, which alters or modulates the amplitude of the laser beam.  A79(4:2-7).

The modulated laser beam then enters a deflector, which deflects the beam

---

[4] The units in Pinnow are angstroms.  An angstrom (Å) is equal to $10^{-10}$ m (one ten-billionth of a meter) or 0.1 nm, such that 4,880 Å is equivalent to 488 nm.

horizontally and vertically such that it can fill a display screen, as shown below.
A79(4:20-23).



A76(Fig.3). The display screen is coated with a phosphor that contains at least one organic dye or pigment. A79(3:24-28, 4:40-42). While Pinnow discloses that "[a] combination of more than two primaries can … be used to produce white" on the screen (A79(3:35-36)), the phosphors disclosed in Pinnow are specific to the input being projected—a high-powered laser emitted at the particular wavelengths disclosed (*e.g.*, 4,880 Å) (A79(3:28-34)). *See* A963-964(Wetzel)(¶30) ("Pinnow only provides particularized combinations of lasers and phosphors for two lasers …."); A805(Redwing)(¶31) (same); *see also supra* pp. 5-6 (explaining that the creation of white light depends on several factors, including the type of input light and its optical power and wavelength).

### c.    Nakamura

U.S. Patent No. 5,578,839 ("Nakamura"), entitled "Light-Emitting Gallium Nitride-Based Compound Semiconductor Device" (A128), discloses the blue LED invented by Dr. Nakamura in 1993 (*see, e.g.*, A141(13:40-45)). *See supra* p. 7. Although Dr. Nakamura's blue LED was dim compared to other light sources (approximately 1 mW, or 100 times weaker than the Pinnow laser), it was stronger than the blue LEDs available before 1993. A823(Redwing)(¶77); A981-982(Wetzel)(¶79); A963(Wetzel)(¶28). Nakamura was filed on November 17, 1993 and issued on November 26, 1996. A128. There is no discussion of down-conversion of LEDs in Nakamura, nor is there any discussion of the production of white light output. *See* A807(Redwing)(¶36); A965(Wetzel)(¶35).

### 2.    The Board's final decision

The Board affirmed the Examiner's rejection of claims 118, 134-136, 138, and 140 over Stevenson in combination with Pinnow and Nakamura. A3. The Board focused on an issue it described as "simple and straightforward:  was it obvious at the time of the invention to use an LED, in particular a <u>blue</u> LED, to create white light via down-conversion as recited in the claims?" A28.[5]

---

[5] Providing no separate rationale or reasoning, the Board stated that claims 118 and 134 were unpatentable over Stevenson, admitted prior art ("APA"), Wanmaker, Nakamura, Tabuchi, and Martic "for the same reasons discussed in connection with the combination of Stevenson, Pinnow, and Nakamura." A52. The

The Board began its analysis with a faulty premise with no support in the record, namely that "in early 1996, there were **two known approaches** to produce white light **from LEDs**": "a direct emission 'triplet' approach" and "a 'down-conversion' approach in which a phosphor material is used to convert monochromatic light from a blue or ultraviolet (UV) LED to create white light." A29-30 (emphasis added).  Although the Board acknowledged that a chapter of Dr. Nakamura's book, *The Blue Laser Diode: The Complete Story*, published in 2000 was **not prior art** given the '175 patent's 1996 filing date, the Board nonetheless relied on that book to retroactively establish that use of down-conversion to create white light from an LED "would have been expected from those skilled in the art as a predictable use of a blue LED chip."  A33-34.  The Board thus concluded that a skilled artisan would be presumed to have "sufficient skill to experiment with known approaches to create white light and decide on the best approach."  A32.

The Board acknowledged that Cree submitted declarations from three "researchers and renowned experts" in the LED field (A8) and that those declarations were "compelling" (A31).  Each of these experts had testified that down-conversion had **not** been used to make white light from an LED prior to the '175 patent's invention.  Nonetheless, the Board discounted the declarations of

---

arguments in this brief with respect to Stevenson, Pinnow, and Nakamura apply equally to the Board's obviousness finding based on this further combination.

Drs. Stringfellow, Redwing, and Wetzel as not "probative as to the dispositive question of whether an artisan of ordinary skill would have considered 'down-conversion' of a <u>blue</u> LED to create white light, <u>not</u> before <u>but</u> after the emergence of [Dr. Nakamura's] high brightness and efficient blue LEDs … in late 1993." A28.  The Board then determined that "[o]nce the high-power, high-brightness blue LEDs developed by Dr. Nakamura became available in late 1993 …, the disadvantages of the 'down-conversion' process using phosphors dissipated and such a process became available as a preferred solution to high-power, high-brightness blue LEDs to create white light."  A32.

Acknowledging that "Stevenson does not implicitly disclose the use of <u>blue</u> LEDs and 'down-conversion' to produce white light" (A18), the Board relied on Nakamura for the disclosure of a blue LED and Pinnow for the disclosure of the use of down-conversion to create white light (A26).  The Board found that the Examiner had shown an adequate motivation to combine these three references— "the advantage [of] using Nakamura's GaN-based blue LED in place of Stevenson's GaN-based LED on a single die in combination of 'down-conversion' phosphors to create white light" (A36).  The Board further held that Cree failed to show "why that reason is erroneous or why a person of ordinary skill in the art *would not* have reached the conclusions reached by the Examiner" or that "the Examiner's proffered combination of references would have been uniquely

challenging or difficult for one of ordinary skill in the art." A36; A37 (internal quotation marks omitted).

The Board also rejected Cree's evidence of objective indicia of nonobviousness. A39. The Board dismissed Cree's submission of the 1997 Fraunhofer Institute article as evidence of industry acknowledgment on the ground that the article misattributed the innovation to the wrong parties. A43-44 (reasoning that the "praises and acknowledgements [in the article] are directed to the invention of others, *i.e.*, Nichia and Siemens AG, and <u>not</u> [Cree's] invention"). The Board similarly disregarded Cree's evidence of licensing, because Cree had not disclosed "the specific terms of [the] licenses." A46. Finally, the Board concluded that Cree's evidence of commercial success of single-LED white lights was not "indicative of the commercial success of the subject matter disclosed in the '175 patent," because the evidence of commercial success was "not commensurate in scope with the claims." A47-48.[6]

Cree timely appealed.[7] A1331-1332.

---

[6] The Board also rejected Cree's evidence of long-felt but unsolved need and unexpected results. A39-43.

[7] On March 24, 2015, Cree submitted an Information Disclosure Statement to the Commissioner of Patents disclosing a section of a 1972 book published by the staff of Thorn Lighting Ltd., entitled *Lamps and Lighting*, which has not yet been considered by the Examiner or the Board. A1334.

## SUMMARY OF THE ARGUMENT

The Board's determination that claims 118, 134-136, 138, and 140 of the '175 patent are obvious should be reversed.

1.      The Board's error in this case began with the extraordinary finding that the technology claimed in the '175 patent was already "known."  Without any evidentiary support, the Board adopted the faulty premise that a "'down-conversion' approach in which a phosphor material is used to convert monochromatic light from a blue or violet (UV) LED to create white light" was already "known" before Drs. Baretz and Tischler invented it.  A29-30.  The Board thus built its obviousness analysis on this mistaken premise that the patented combination of elements was already "known" and "identified" by others, and that any artisan could make the whole invention by merely "choosing the down-conversion approach."  A30-31.  This fundamental error pervaded the Board's analysis and its conclusion that the patent invention was obvious.

2.      The Board further erred by failing to articulate *any* rational basis for combining the teachings of Pinnow, which discloses a system in which a high-powered laser beam is projected onto a phosphor screen to display a white image, with Stevenson and Nakamura, which disclose violet and blue LEDs, respectively. The Board compounded this error by improperly shifting the burden to Cree to demonstrate why a skilled artisan would *not* have been motivated to combine the

teachings of Stevenson, Nakamura, and Pinnow to achieve the patented innovation. The Board then found—without considering the abundant evidence before it—that Cree failed to meet that burden.  That conclusion was not supported by any evidence, let alone substantial evidence.

3.     The Board's obviousness determination was a classic application of hindsight.  Rather than considering the testimonial and documentary evidence before it, the Board instead selectively pieced together elements disparately existing in three prior art references—two of which were over two decades old—to arrive at the claimed invention.  In doing so, the Board ignored the undisputed evidence that the LED industry's clear direction at the time of the invention was the use of triplets to create white light—an approach that presented no recognized problem.

4.     The Board also erred by disregarding Cree's compelling objective evidence of nonobviousness.  Cree presented evidence that the industry recognized the claimed invention as a breakthrough innovation that would transform the LED industry; the '175 patent has been a key asset in licenses with numerous LED manufacturers; and the sale of LEDs embodying the claimed invention formed a multi-billion-dollar industry.  This evidence confirmed that the challenged claims of the '175 patent are nonobvious.  Committing a series of legal and factual errors,

the Board erroneously disregarded this evidence in direct contravention of this Court's precedent.

## STANDARD OF REVIEW

"Obviousness is a question of law based on underlying factual findings: (1) the scope and content of the prior art; (2) the differences between the claims and the prior art; (3) the level of ordinary skill in the art; and (4) objective indicia of nonobviousness." *InTouch Techs., Inc. v. VGo Commc'ns, Inc.*, 751 F.3d 1327, 1347 (Fed. Cir. 2014). This Court reviews the Board's legal conclusions de novo and its factual findings for substantial evidence. *Rambus Inc. v. Rea*, 731 F.3d 1248, 1251 (Fed. Cir. 2013). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *In re Gartside*, 203 F.3d 1305, 1312 (Fed. Cir. 2000).

## ARGUMENT

I. **THE BOARD BASED ITS OBVIOUSNESS DETERMINATION ON THE MISTAKEN PREMISE THAT DOWN-CONVERSION FROM A MONOCHROMATIC LED TO PRODUCE WHITE LIGHT WAS KNOWN.**

A. **The Board's Belief That Down-Conversion Of LEDs To Make White Light Was Known Is Not Supported By Substantial Evidence.**

The Board based its analysis on a regrettable but evident mistake. The Board erroneously concluded that "at the time of Appellant's invention in early

1996, there were ***two known approaches to produce white light from LEDs***." A29

(emphasis added).[8]

> One was a direct-emission "triplet" approach in which individual
> LEDs that emit three primary colors—red, green, and blue (RGB)—
> are packaged together and then all the primary (RGB) colors are
> mixed together to form white light. ***The other was a "down-
> conversion" approach in which a phosphor material is used to
> convert monochromatic light from a blue or violet (UV) LED to
> create white light***, much in the same way a fluorescent light bulb
> works.

A29-30 (emphasis added).  This premise had no support in the record and is plainly

incorrect.  The down-conversion of light from a monochromatic LED to make

white light was ***not*** known at the time of the invention; rather, it ***is*** the invention.

The Board's "two known approaches" error is not a mistake about a

subsidiary issue.  It is central to and infects the Board's entire analysis.  The Board

ruled that it was obvious to use down-conversion to create white light from LEDs

because it was (according to the Board) not merely obvious, but actually already

***known***.  The Board assumed that a skilled artisan in 1996 knew the "two known

approaches to create white light based on LED."  A32.  The Board also assumed

that a "down-conversion approach" was already an "identified … solution … to

convert light from LEDs into white light."  A29.  And the Board further assumed

that all that was required to make the invention was "choosing the down-

---

[8] The Board incorrectly stated that the claims of the '175 patent were invented in
1996.  Cree established a priority date at least as early as 1995.  *See supra* p. 12
n.2.

conversion approach." *Id.*; *see also* A31 ("the two primary approaches to produce white light from LEDs available at the time of the invention"). Because the '175 patent claims the use of down-conversion to create white light from LEDs, the Board's assumption that such technology was already "known" and "identified" doomed it.

The Board never identified any specific prior art reference to support its conclusion that down-conversion from LEDs to make white light was known. That is not surprising, because no prior art reference considered by the Examiner or the Board disclosed such an approach. Once the Board's error is corrected, the rejections cannot be sustained.[9]

### 1. Stevenson did not make white light.

The 1974 Stevenson reference made colored light, not white light. *See* A102(3:24-4:6) (noting "[t]his device may be used as a source of violet light"; "the primary colors may be developed"; "such devices may be used for color display systems"). Although the Examiner erroneously found that Stevenson disclosed white light, the Board did not endorse this finding. Instead, the Board stated that white light was "implicitly suggested by Stevenson, and expressly disclosed by

---

[9] The Board also rejected dependent claims 135-136 and 140 over the combination of Stevenson, Pinnow, Nakamura, and Tadatsu and dependent claims 138 and 140 over the combination of Stevenson, Pinnow, Nakamura, and Tabuchi. A48-51. Like Stevenson, Pinnow, and Nakamura, neither Tadatsu nor Tabuchi discloses down-conversion of an LED to create white light. *See* A825-827(Redwing)(¶¶85-88); A984-988(Wetzel)(¶¶86-98).

Pinnow." A19.[10]  No substantial evidence supports a conclusion that Stevenson

disclosed white light, either implicitly or expressly.  *See Institut Pasteur*, 738 F.3d

at 1345 (reversing under substantial evidence standard where reference did not

disclose element); *In re Glatt Air Techniques, Inc.*, 630 F.3d 1026, 1027 (Fed. Cir.

2011) (same).

### 2.    Pinnow did not use LEDs.

The 1972 Pinnow reference did not use LEDs, but instead used a large, high-

powered, gas laser.  Indeed, Pinnow stated that the laser was necessary in order to

achieve white light.  *See* A79(3:45-55) ("a necessary condition for achieving a true

white is that the illuminating laser beam have a wavelength of approximately 4,950

A. or shorter").  Any assertion that Pinnow disclosed using LEDs to make white

light likewise fails under substantial evidence review.

---

[10] The Board conspicuously did not endorse the Examiner's erroneous statement
that Stevenson discloses "visible light," which includes white light.  *See* A18 n.10.
As discussed above, Stevenson discloses only ***colored*** light along the visible
spectrum, not white light.  *See, e.g.*, A102(4:4) (noting that "the primary colors
may be developed").  Undisputed expert testimony established that a skilled artisan
would not understand Stevenson to disclose white light because, among other
things, white would have been such a significant accomplishment that Stevenson
would have identified it explicitly, and Stevenson contains no reference to the
color mixing that is fundamental to the creation of white light.  A802-
804(Redwing)(¶¶26-27).

### 3.     Nakamura did not use down-conversion or make white light.

The 1993 Nakamura patent discloses a blue LED.  *E.g.*, A141(13:40-45).  It never discloses down-conversion or the production of white light.  *See* A807(Redwing)(¶36); A965(Wetzel)(¶35).

\*     \*     \*

Because the cited references do not support the Board's assertion about what was "known" at the time of the invention, the Board's conclusion fails substantial evidence review.  *See In re Zurko*, 258 F.3d 1379, 1385 (Fed. Cir. 2001) (holding the Board's obviousness finding unsupported by substantial evidence and noting that "the deficiencies of the cited references cannot be remedied by the Board's general conclusions about what is 'basic knowledge' or 'common sense' to one of ordinary skill in the art").  As in *Zurko*, the Board cannot fill a gap in the prior art—the very gap that the inventors filled with their ingenuity—by asserting, without evidence, that down-converting LEDs to make white light was "known":

> With respect to core factual findings in a determination of patentability, … the Board cannot simply reach conclusions based on its own understanding or experience—or on its assessment of what would be basic knowledge ….  Rather, the Board must point to some ***concrete evidence*** in the record in support of these findings.  To hold otherwise would render the process of appellate review for substantial evidence on the record a meaningless exercise.

*Id.* at 1386 (emphasis added).[11]

## B.    The Board Misinterpreted The Testimony Of Cree's Experts.

The Board also based its faulty premise on the testimony of Cree's experts, wrongly asserting that Cree's experts "acknowledge[d]" that down-conversion of LEDs to make white light was "known" at the time of the invention.  *See* A29-30 (citing A763-765(Stringfellow)(¶¶24-26); A795-799(Redwing)(¶¶12, 16-18); A958-959(Wetzel)(¶¶17-20).  The very paragraphs cited by the Board show that this assertion was mistaken.

Dr. Stringfellow did not "acknowledge" that down-converting an LED to make white light was known.  To the contrary, he stated that the inventors of the '175 patent were the first to invent it.  *See* A764(Stringfellow)(¶25) ("In my 46 years of experience in the field of LED technology, I am unaware of any real-

---

[11] The Board might have had in mind the Examiner's incorrect argument that another reference (a patent by Abe) "discloses down-converting **LED light** … to make white light."  A1171.  That assertion is contradicted even by the portion of the reference that the Examiner quoted, which specifies that Abe discusses the use of semiconductor *lasers*, not LEDs.  A1172; A1175.  Abe expressly distinguishes LEDs from lasers as too weak for use in such devices.  A110(1:65-67) (in contrast to a laser, an "LED generates weak radiant power output and is difficult to be adapted for illumination").  Or the Board might have misread the Examiner's assertion that a Japanese patent by Menda discloses the use of "solid state devices" to make white light.  A1254.  That too would be an error, because the Examiner's phrasing obscures the undisputed fact that the "solid state device" in Menda is not an LED.  *See* A160 (Menda discloses "an organic electroluminescent element," not an LED); A603(¶28) (Menda device is made of different components from an LED); A601(¶25) (Menda device is different shape and size from an LED); A603-604(¶30) (Menda device has different electrical properties from an LED).

world LED devices or proposal utilizing phosphors to produce white light prior to the Baretz/Tischler invention disclosed in the '175 patent ….").

Dr. Redwing did not "acknowledge" that down-converting an LED to make white light was known either. To the contrary, she stated that she was "unaware of any literature" describing "the phosphor down-conversion of blue LED light to white light that predates the filing date of the '175 patent." A798(Redwing)(¶17). She explained in detail that prior down-conversion of LEDs was limited to the generation of *colored* light, and did not produce white light. *See* A797-798(Redwing)(¶15) ("By [1996], down conversion of LED light was known and had been used in very select and rare occasions. … These instances were to produce *primary color emission, not white light*." (emphasis added)). Dr. Wetzel's testimony was similar. He stated that, at the time of the invention, "the generally accepted means of obtaining white light from colored LEDs was to combine red, green, and blue LEDs." A958(Wetzel)(¶17).

The Board's finding that Cree's experts acknowledged that down-conversion of LEDs to produce white light was known is simply inexplicable. The experts said the exact opposite. The Board's finding is, accordingly, unsupported by any evidence, let alone substantial evidence. *See In re Chapman*, 595 F.3d 1330, 1339 (Fed. Cir. 2010) (vacating obviousness finding where "the Board based its decision on a misunderstanding of [the prior art]").

### C.    The Board Wrongly Relied On What The Field Learned *After* The Invention.

To support its erroneous assumption that down-conversion of LEDs to make white light was known in March 1996, the Board also relied on Dr. Nakamura's book describing the creation of white light ***after the invention***.  A33-34 & n.17 (citing A863 (*The Blue Laser Diode: The Complete Story* 230 (2000))).  The Board stated that, even though the book was published years after the invention, it supported a finding of obviousness in light of "the knowledge … of those skilled in the art"—which the Board had already erroneously assumed included "two known approaches to create white light."  A34 n.17; A32.  That is wrong as a matter of law.  As this Court has confirmed, "[t]he invention must be viewed not after the blueprint has been drawn by the inventor, but as it would have been perceived in the state of the art that existed ***at the time the invention was made***."  *Sensonics, Inc. v. Aerosonic Corp.*, 81 F.3d 1566, 1570 (Fed. Cir. 1996) (emphasis added). "To draw on hindsight knowledge of the patented invention, when the prior art does not contain or suggest that knowledge, is to use the invention as a template for its own reconstruction—an illogical and inappropriate process by which to determine patentability."  *Id.*  Using a reference to establish retroactively a state of the art condition is as legally impermissible as using hindsight to combine references.

If the Board had instead considered what was known at the legally relevant time—the time the invention was made as early as 1995—it could not have found the invention obvious.  At the time of the invention, none of Stevenson, Pinnow, or Nakamura had mentioned down-converting LEDs to make white light.  Instead, the industry believed that the path to white light was through triplets. A764(Stringfellow)(¶26); A799(Redwing)(¶18); A958(Wetzel)(¶17); *see also* A784 ("The mixture of colors making up white light was up to now only possible by combining three different diodes."); A61(2:47-50) ("All currently available examples of such lamps contain a minimum of three LED dies (or chips)—one red, one green and one blue, encapsulated in a single epoxy package.").  Accordingly, at the legally relevant time, the invention was neither "known" nor obvious.

## II. THE BOARD ERRED IN DETERMINING THAT A SKILLED ARTISAN WOULD HAVE BEEN MOTIVATED TO COMBINED PINNOW WITH STEVENSON AND NAKAMURA.

Each of the claims rejected by the Board recites three key elements: (1) a "blue light-emitting diode"; (2) a "down-converting luminophoric medium" that is "dispersed in a polymer" and arranged to receive light emitted from the blue LED; *and* (3) down-conversion of emitted blue LED light such that primary and/or secondary emissions mix to produce "white light."  A1192.  The Board found that a skilled artisan would have been motivated to "achieve the claimed subject matter" based on "the advantage [of] using Nakamura's GaN-based blue LED in

place of Stevenson's GaN-based LED on a single die in combination of 'down-conversion' phosphors to create white light."  A36.  But in reaching this conclusion, the Board failed to articulate *any* motivation to combine Stevenson (a weak violet LED that could theoretically be converted to "*primary colors*") and Nakamura (a blue LED) with *Pinnow* (projection of a large, high–powered, gas laser onto a phosphor screen to display a white image).  Instead, the Board improperly shifted the burden to Cree to demonstrate "why a person of ordinary skill in the art *would not*" have been motivated to combine the teachings of Stevenson, Nakamura, and Pinnow to produce the patented innovation of Drs. Baretz and Tischler.  *Id.*  This is also reversible error.

## A.     The Board Articulated No Motivation To Combine Pinnow With Stevenson And Nakamura.

As the Board acknowledged, neither Stevenson nor Nakamura discloses the down-conversion of LED emissions to make *white light*.  *See supra* pp. 29-31; *see also* A18 ("Stevenson does not implicitly disclose the use of <u>blue</u> LEDs and 'down-conversion' to produce white light."); A26 ("Nor is Stevenson relied upon for an express disclosure of the creation of white light. … Pinnow, not Nakamura, is relied upon for utilizing a 'down-conversion' approach to create white light.").

Recognizing that Stevenson and Nakamura each fail to disclose a key aspect of the '175 patent's invention (*i.e.*, down-conversion to produce white light), the Board relied on Pinnow "for explicitly disclosing the 'down-conversion' of the

primary radiation using a mixture of phosphors to produce white light."  A18; *see also* A26.  But neither the Examiner nor the Board articulated ***any rational motivation*** for why a skilled artisan would have combined the teachings of Pinnow—which discloses the projection of a large, high-powered, gas laser beam through a modulator and a deflector and onto a phosphor screen to display a white image—with the teachings of Stevenson and Nakamura, which disclose violet and blue LEDs, respectively.  Rather, both the Board's and the Examiner's articulated basis for combining the prior art references focused solely on the advantage of substituting Nakamura's "more powerful" blue LED for "Stevenson's older, less-efficient LED."[12]  A20; A27-28 (finding that the Examiner demonstrated a motivation to combine "because Nakamura's blue LED is more powerful than Stevenson's older, less efficient LED in terms of power and brightness"); *see also* A36 ("[T]he Examiner has provided a reason showing motivation by a person of ordinary skill in the art to achieve the claimed subject matter, i.e., the advantage using Nakamura's GaN-based blue LED in place of Stevenson's GaN-based LED …."); A1233 ("[A skilled artisan] would immediately appreciate that Nakamura's better brighter LED is more efficient than Stevenson's leading to brighter light emission.").  But substituting Nakamura's LED for Stevenson's does not create a

---

[12] Indeed, the Board conceded that there was no ***explicit*** teaching or suggestion to combine the references.  A35-36.

motivation to use either of them in connection with techniques taught by a laser display system like Pinnow.[13]

The Board's conclusory statement that there was "motivation by a person of ordinary skill in the art to achieve the claimed subject matter" (A36) —without support or articulated reasoning—is insufficient to establish a prima facie case of obviousness. "[R]ejections on obviousness grounds cannot be sustained by mere conclusory statements; instead, there must be some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness." *In re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006); *see also Zurko*, 258 F.3d at 1386 ("[T]he Board cannot simply reach conclusions based on its own understanding or experience—or on its assessment of what would be basic knowledge or common sense. Rather, the Board must point to some concrete evidence in the record in

---

[13] The Examiner contended that whether a skilled artisan would "'turn to' Pinnow is *irrelevant*" because a skilled artisan would be "presumed to be aware of Pinnow" since "the phosphors cannot tell from what light source a wavelength of light comes." A1248 (emphasis added). The Board did not rely on or articulate this rationale—which was supported by no record evidence—as a motivation for combining Pinnow with Stevenson and Nakamura. Indeed, finding a motivation to combine merely from "presumed … aware[ness]" of a prior art reference would eliminate the motivation to combine inquiry, since the skilled artisan is presumed to be aware of *all* prior art references. *See In re Winslow*, 365 F.2d 1017, 1020 (C.C.P.A. 1966) ("We think the proper way to apply the 103 obviousness test to a case like this is to first picture the inventor as working in his shop with the prior art references— which he is *presumed to know*— hanging on the walls around him." (emphasis added)). Moreover, all of the evidence showed that a skilled artisan would *not* be motivated to combine Pinnow's laser display teachings with LED references like Nakamura or Stevenson. *See infra* pp. 40-44.

support of these findings."). The Board's failure to supply that reasoning here is reversible error.

## B. The Board Impermissibly Shifted The Burden To Cree To Show No Motivation To Combine.

The Board's failure to provide any explanation or reasoning as to why a skilled artisan would have been motivated to combine the teachings of Pinnow with those of Stevenson and Nakamura is a sufficient basis for reversal in itself. *See In re Huai-Hung Kao*, 639 F.3d 1057, 1061 (Fed. Cir. 2011); *see also In re Wallen*, 565 F. App'x 867, 867 (Fed. Cir. 2014). The Board's error went further, however, because it improperly shifted the burden of proof to Cree, requiring Cree to demonstrate "why a person of ordinary skill in the art *would not* have reached the conclusions reached by the Examiner" (A36) and that the "proffered combination of references would have been 'uniquely challenging or difficult for one of ordinary skill in the art'" (A37). But the Examiner—not Cree—bore the burden to show that the '175 patent was obvious. *See Rambus*, 731 F.3d at 1255. The Board nonetheless "erroneously placed the burden on [Cree] to prove that its claims were not obvious" by requiring Cree to demonstrate why a skilled artisan ***would not*** have been motivated to combine Pinnow with Stevenson and Nakamura. *Id.* "That was legal error," and provides an additional basis for reversal of the Board's decision. *Id.* (finding error in the Board's conclusion that the patentee

"ha[d] not demonstrated that skilled artisans ... ***would not*** have been able to arrive at the broadly claimed invention" (emphasis added)).

### C. The Record Shows That A Skilled Artisan Would Not Have Combined Pinnow With Stevenson And Nakamura.

The Board further erred by not considering the detailed evidence Cree provided on the issue of motivation to combine. Regardless of where the burden lies, the record contains ample evidence—which the Board ignored—showing that a skilled artisan would not have combined Pinnow with Stevenson or Nakamura. Pinnow discloses a completely different light source and system and would have provided no guidance to a skilled artisan seeking to down-convert an LED to generate white light. The Board's conclusion to the contrary is not supported by any evidence, let alone substantial evidence.

Pinnow discloses the projection of a large, high-powered, gas laser beam through a modulator and a deflector and onto a phosphor screen to display a white image. *See supra* pp. 19-20. The system disclosed in Pinnow "was about six feet long, water-cooled, included a complex optical system to scan the laser beam, and weighed about 120 pounds." A963(Wetzel)(¶28); *see also* A823(Redwing)(¶77); A1098-1101. And unlike small LEDs, which emit a broader range of wavelengths at low optical power, lasers such as Pinnow's emit a narrow range of wavelengths at high optical power. *See* A814(Redwing)(¶58). The Pinnow lasers, for example, would have emitted wavelengths of approximately 488 nm ± 0.000159 nm (A804-

805(Redwing)(¶29)) and had an optical power of approximately 100 mW (A963(Wetzel)(¶28)).  Each Pinnow laser thus emitted a powerful, focused beam of light at a single wavelength.  *See* A973-974(Wetzel)(¶61).

By contrast, LEDs emit a broader spectrum of light (*i.e.*, a range of wavelengths), not a single wavelength of light like a laser.  A815(Redwing)(¶60); A817(Redwing)(¶63); A973-974(Wetzel)(¶61).  And LEDs are a feeble light source compared to lasers.  A957-958(Wetzel)(¶15); A798(Redwing)(¶16). Indeed, even Dr. Nakamura's blue LED emitted less than 1 mW of optical power—more than 100 times less output than the focused Pinnow laser beams. A823(Redwing)(¶77); A981-982(Wetzel)(¶79); *see also, e.g.*, A141(13:40-41) (explaining that "[t]he blue light-emitting diode [of Example 1] exhibited an output power of 300 μW at 20 mA").  Thus, the characteristics of light emitted from LEDs at the time of the invention—both in terms of the range of wavelengths and the optical power—were vastly different from the Pinnow lasers.

The expert evidence confirmed that the differences in the characteristics of light emitted from a blue laser (Pinnow) and from a blue LED (Nakamura) matter when attempting down-conversion to generate white light.  *See* A796-797(Redwing)(¶13) (light generated through down-conversion is dependent on "both the wavelength or *range of wavelengths* and the *optical power* of the primary light source as well as the absorption and emission *characteristics of the*

*phosphor*" (emphases added)).  ***First***, the down-conversion process significantly decreases the brightness or intensity of the converted light.  *See supra* pp. 9-11.  A high-power primary light source, such as a laser, thus yields a stronger secondary output for color mixing after down-conversion.  A798(Redwing)(¶16) ("[T]he physics of the [down-conversion] process cause energy loss and therefore loss of luminous intensity."); *see also* A957-958(Wetzel)(¶15).  This is particularly important for white light generation which is intended for illumination.  *See* A798(Redwing)(¶16); A957(Wetzel)(¶15); *see also* A61(1:36-41) (noting that Dr. Nakamura's blue LED allowed for use of triplets to achieve "white light illumination").[14]

***Second***, performing the color mixing necessary for white light is much more predictable where the primary (*i.e.*, original) light source has a narrow emission spectrum, because the secondary emissions needed for color mixing can be "precisely identified."  A823(Redwing)(¶78).  While lasers have such narrow

---

[14] The Examiner asserted that the output power (*i.e.*, illumination) for LEDs was "***entirely irrelevant*** to the issue of patentability because no output intensity is claimed."  A1178 (emphasis added).  But, as discussed above, the characteristics of emitted LED light is relevant to the obviousness determination, as is the practical consideration of whether "the combination [of references] would have worked for its intended purpose."  *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 567 F.3d 1314, 1326 (Fed. Cir. 2009).  Here, down-conversion of a low power LED to white light would have been neither predictable nor obvious, as explicitly noted in the references before the Examiner.  *See* A110(1:65-67) ("[T]he visible radiation LED generates weak radiant power output and is difficult to be adapted for illumination.").

emission spectrums, LEDs emit a broader range of wavelengths making identification of the appropriate secondary emissions difficult.

*Third*, down-conversion requires selection of the appropriate phosphor or phosphors that can work with the emitted wavelength or range of wavelengths of the primary light source.  This task is made much more difficult where the primary light source emits a broad spectrum of light, as LEDs do.  A817(Redwing)(¶63).

For all these reasons, "the production of white light via color mixing is a non-trivial process and will differ significantly depending on the *type of light source* that is used … , the peak wavelength and peak width of the primary light sources as well as their respective optical powers."  A796-797(Redwing)(¶13) (emphasis added).  Specifically, "[w]hen using a high power laser, there is little concern for the energy loss in down conversion because the laser can provide a substantial amount of power.  The same is not true for LEDs, which provide relatively little power."  A981(Wetzel)(¶78).  And "[c]olor mixing by necessity is far more predictable when a laser is employed as opposed to an LED because the primary laser emission which is being mixed with the secondary emission can be precisely identified," and an appropriate phosphor combination more easily selected.  A823(Redwing)(¶78).  Pinnow, therefore, would have provided no guidance to a skilled artisan seeking to produce white light from an LED through down-conversion.  *See* A814(Redwing)(¶59); *see also* A814(Redwing)(¶58)

("Pinnow does not disclose a phosphor or a specific combination of phosphors that would absorb some of this broad LED emission spectrum to produce white light.").

Accordingly, even if Cree bore the burden of proof on this issue (and it did not), the Board erred in ignoring the significant evidence before it showing that a skilled artisan would not have been motivated to combine Pinnow with the teachings of Stevenson and Nakamura in 1995.  Drs. Redwing and Wetzel each provided unrebutted evidence confirming that a skilled artisan considering down-conversion of an LED would not have looked to Pinnow.  The Board erred in failing to consider this evidence.  *See In re Sullivan*, 498 F.3d 1345, 1353 (Fed. Cir. 2007) ("[W]hen an applicant puts forth relevant rebuttal evidence, as it did here, the Board ***must consider*** such evidence. …  By failing to consider the submitted evidence, the Board thus committed error." (emphasis added)).[15]

---

[15] The Board also sustained the Examiner's rejection of claims 118 and 134 based on the combination of Stevenson, APA, Wanmaker, Nakamura, Tabuchi, and Martic, reasoning that APA was relied on "as an alternative to the teachings of Pinnow, i.e. the same down conversion via phosphors."  A52.  But Wanmaker, Tabuchi, and Martic do not disclose down-conversion of any light to white.  *See* A966-968(Wetzel)(¶¶39-46).  And the APA disclosed in the patent's Background of the Invention section discloses light sources such as ultraviolet fluorescent lamps, which—like the Pinnow lasers—are significantly more powerful than LEDs.  *See* A62(3:40-52); *see also* A811(Redwing)(¶48); A968(Wetzel)(¶47).  As Drs. Redwing and Wetzel explained, a skilled artisan would not have turned to the fluorescent lamp technology disclosed in the APA to achieve the claimed invention.  *See* A830(Redwing)(¶92); A832(Redwing)(¶98); A990(Wetzel)(¶102); A992-993(Wetzel)(¶107); A994(Wetzel)(¶111).  The Board provided no rationale to the contrary.  The Board's obviousness rejection based on this ground should

### III.    THE BOARD'S OBVIOUSNESS DETERMINATION RESTS ON IMPERMISSIBLE HINDSIGHT.

Despite its failure to articulate any motivation to combine Stevenson and Nakamura with Pinnow, the Board nonetheless determined that "the proffered combination is merely a predictable use of prior art elements according to their established functions." A37. But there was nothing "predictable" about combining elements from disparate prior art references, most of which were more than two decades old, in a manner that was directly contrary to the direction of the industry at the time of the invention. In fact, all of the evidence before the Board demonstrated the exact opposite—at the time of the invention, no one in the industry was attempting or even contemplating the use of down-conversion to create white light from LEDs. Instead, the entire industry was focused on triplets. The Board's decision is a classic application of hindsight bias.

### A.    The State Of The Art At The Time Of The Invention Was Triplets.

From the 1960s through the early 1990s, researchers in the LED field worked toward developing the three monochromatic primary color LEDs (red, green, and blue). It was anticipated that, once developed, light emitted from each of those LEDs could be mixed using a triplet approach to create white light for commercial applications. A757-759(Stringfellow)(¶¶14-16); *see supra* pp. 5-9.

---

therefore be reversed or vacated for the same reasons discussed with respect to the combination of Stevenson, Pinnow, and Nakamura.

Consistent with that goal, in 1974—over twenty years before Drs. Baretz and Tischler developed their invention—Stevenson disclosed a violet LED that could theoretically be "converted to lower frequencies … to develop different colors," including "the primary colors." A102(3:23-4:5). The industry, like Stevenson, was focused on developing primary colors to be used in triplet combinations. More specifically, despite Stevenson's intimation that primary colors could potentially be created by down-converting a violet LED, from the 1970s through the early 1990s, "the industry was focused on LEDs that ***directly emitted*** the color of interest," rather than use of down-conversion to generate different colors of light. A764-765(Stringfellow)(¶26). The direct emission approach to creating primary colors offered "the advantages of higher efficiency, greater light-emitting output power, longer operating lifetimes, and superior luminosity, in relation to down-converting techniques." A763-764(Stringfellow)(¶24). Thus, even after Stevenson, LED researchers worked over the next two decades to develop LEDs that directly emitted each of the three primary colors, which could be used in a triplet to create white light. *See supra* pp. 5-9.[16]

In 1993, Dr. Nakamura invented a blue LED bright enough for commercial use. *See* A141(13:40-45); A757(Stringfellow)(¶14); A807(Redwing)(¶35).

---

[16] No commercial device ever resulted from the violet LED disclosed in Stevenson, and no device employing the Stevenson violet LED and a phosphor was ever built. A762(Stringfellow)(¶¶21-22); *see also* A801-802(Redwing)(¶24).

Following Dr. Nakamura's invention, the industry acted on the conventional view that white light could be achieved through triplets. *See* A764-765(Stringfellow)(¶26) ("[T]he clear direction of the field, and especially at the time of Baretz/Tischler work, was to utilize red LED/green LED/blue LED arrays."); A799(Redwing)(¶18) ("[I]n the 1994-1996 timeframe, the generally accepted means of obtaining white light from colored LEDs was to combine red, green, and blue LEDs (i.e., a RGB triplet)."); A958(Wetzel)(¶17) (same); *see also* A784 ("The mixture of colors making up white light was up to [1997] only possible by combining three different diodes."); A61(2:47-50) ("All currently available examples of such lamps contain a minimum of three LED dies (or chips)—one red, one green and one blue, encapsulated in a single epoxy package."). Prior to 1995 (including after the introduction of Dr. Nakamura's blue LED in 1993), no one in the industry created or even attempted to create white light from LEDs using down-conversion. *See* A765(Stringfellow)(¶27); *see also* A798(Redwing)(¶17); A958(Wetzel)(¶16).

Indeed, after 1993, there was no longer any motivation to down-convert LEDs at all, as the only previously suggested purpose for down-converting LEDs (from over two decades prior) was to produce ***primary colors***—a task no longer necessary once LEDs directly emitting all three primary colors were available. *See* A764-765(Stringfellow)(¶26). This was particularly true given that, after Dr.

Nakamura's blue LED emerged in 1993, there was no perception in the industry of any problems with triplets that would have prompted a skilled artisan to pursue a different approach. *See* A765(Stringfellow)(¶27); *see also* A798(Redwing)(¶17); A958(Wetzel)(¶16).

### B.    The Board's Proffered Combination Of Stevenson, Nakamura, And Pinnow Was Based On Hindsight.

Consistent with the state of the art, in 1995, the references cited by the Board mentioned down-conversion only to produce primary colors (Stevenson, more than two decades old) or only for a laser light source, which is fundamentally different from LEDs (Pinnow, also over two decades old); the direction of the industry was to use triplets to create white light; and there was no recognized problem with the triplet approach. Although finding the testimonies of Drs. Stringfellow, Redwing, and Wetzel "persuasive relative to … the general state of the art in LEDs" (A31), the Board, applying a purported "balancing test," nonetheless found that it would have been obvious to a skilled artisan to perform the "proffered combination" of Stevenson, Pinnow, and Nakamura to down-convert a single LED to produce white light (A37). But, even under this Court's "'expansive and flexible' obviousness analysis, [the Board] ***must*** guard against 'hindsight bias' and 'ex post reasoning.'" *St. Jude Med., Inc. v. Access Closure, Inc.*, 729 F.3d 1369, 1381 (Fed. Cir. 2013) (emphasis added) (quoting *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 421 (2007)); *see Cheese Sys., Inc. v. Tetra Pak*

- 48 -

*Cheese & Powder Sys., Inc.*, 725 F.3d 1341, 1352 (Fed. Cir. 2013) ("Among the difficult challenges of applying the doctrine of obviousness is avoidance of even a hint of hindsight."). The Board's attempt to piece together "elements of the claims [that] disparately existed in the prior art" was "nothing more than impermissible hindsight." *InTouch*, 751 F.3d at 1348-1349.[17]

This Court's decision in *Leo Pharmaceutical Products, Ltd. v. Rea*, 726 F.3d 1346 (Fed. Cir. 2013), is instructive. The patent at issue there ("the '013 patent") was filed in 2000 and claimed a pharmaceutical composition comprising three components: (1) a vitamin D analog; (2) a corticosteroid; and (3) a solvent. *Id.* at 1349, 1359. The Board rejected the '013 patent claims as obvious over three prior art references: Turi (dated 1977), Dikstein (dated 1984), and Serup (dated 1993), which disclosed pharmaceutical compositions comprising "a steroid contained within a solvent" (Turi), "a vitamin D analog and a corticosteroid" (Dikstein), and "a vitamin D analog and a steroid" (Serup). *Id.* at 1350. This Court reversed, explaining that the record "discloses several reasons that a person of ordinary skill in the art would not have been motivated to try, let alone make, the claimed

---

[17] And even were the Board's "balancing test" proper, at a minimum, that balancing should have included consideration of the objective indicia of non-obviousness. *See InTouch*, 751 F.3d at 1352 (reversing obviousness finding where the invalidity expert made "no effort … to guard against … hindsight bias by appropriately considering all objective evidence of nonobviousness"). As discussed below, it did not. *See infra* pp. 51-62.

invention." *Id.* at 1354-1355.  The Court reasoned that "combining Turi and

vitamin D to address the side effects of a steroid treatment is only straightforward

in hindsight," as "Turi was publicly available in the prior art for ***twenty-two years***,"

but there was "no evidence that anyone sought to improve Turi with vitamin D."

*Id.* at 1355 (emphasis added).  The Court further explained:

> Here, the "background of useful knowledge"—including the prior art
> relied on by the Board—was published ***decades*** before the '013 patent
> …. The ***elapsed time*** between the prior art and the '013 patent's filing
> date evinces that the '013 patent's claimed invention was ***not obvious
> to try***.  Indeed this considerable time lapse suggests instead that the
> Board only traverses the obstacles to this inventive enterprise with a
> resort to ***hindsight***. … [U]ntil the advancement made by the inventors
> of the '013 patent, no one had proposed a new formulation that would
> be storage stable.  The problem was not known, the possible
> approaches to solving the problem were not known or finite, and the
> solution was not predictable.  Therefore, the claimed invention would
> not have been obvious to try to one of ordinary skill in the art.  Indeed
> ordinary artisans would not have thought to try at all because they
> would not have recognized the problem.

*Id.* at 1356-1357 (emphases added).

As in *Leo Pharmaceutical*, the primary reference here—Stevenson—was

over ***two decades*** old at the time of the invention.  And, despite the fact that

Pinnow (on which the Board relied for disclosure of down-conversion to create

white light) had been available for even longer (since at least 1972), no one in the

industry was working to develop down-conversion techniques to generate white

light from LEDs prior to the '175 patent's invention.  Indeed, Nakamura does not

even ***mention*** the possibility.  *See* A965(Wetzel)(¶35).  Instead, the entire industry

(including Dr. Nakamura himself) was using triplets to produce white light—an approach that presented no recognized problem. Thus, all of the evidence before the Board confirmed that a skilled artisan would ***not*** have combined Stevenson, Pinnow, and Nakamura in 1995 to develop the claimed invention. *See Standard Oil Co. v. American Cyanamid Co.*, 774 F.2d 448, 454 (Fed. Cir. 1985) (a skilled artisan is "presumed to be one who thinks along the line of ***conventional*** wisdom in the art and is not one who undertakes to innovate, whether by patient, and often expensive, systematic research or by extraordinary insights" (emphasis added)); *see also Eli Lilly & Co. v. Teva Pharm. USA, Inc.*, 619 F.3d 1329, 1340 (Fed. Cir. 2010) (noting that the actions of the inventors should not be "conflate[d] … with those of ordinary skill in the art"). As in *Leo Pharmaceutical*, "the Board erred by collapsing the obviousness analysis into a hindsight-guided combination of elements." 726 F.3d at 1354. The claimed invention would not have been obvious to a skilled artisan in 1995 from a reading of Stevenson, Pinnow, and Nakamura. The Board's decision to the contrary is a classic example of hindsight.

## IV.   THE BOARD ERRED BY DISREGARDING CREE'S COMPELLING EVIDENCE OF OBJECTIVE INDICIA OF NONOBVIOUSNESS.

The nonobviousness of the '175 patent is confirmed by compelling objective indicia. The industry recognized the invention of Drs. Baretz and Tischler as a breakthrough achievement; the patent has been a key asset in numerous licenses; and the invention created a multi-billion-dollar market. The Board erroneously

disregarded this evidence, finding that "the evidence of secondary considerations in support of nonobviousness does not outweigh the strong evidence of obviousness." A48. The Board's conclusion cannot be reconciled with this Court's precedent.

"[C]onsideration of the objective indicia [of nonobviousness] is *part of* the whole obviousness analysis, not just an afterthought." *Leo Pharm.*, 726 F.3d at 1357. "Such objective evidence can establish that 'an invention appearing to have been obvious in light of the prior art was not.'" *Rambus*, 731 F.3d at 1256. Indeed, "[i]n some cases, that evidence is 'the most probative and cogent evidence in the record,'" as "[i]t helps 'turn back the clock and place the claims in the context that led to their invention.'" *Id.* The objective indicia of nonobviousness "are crucial in avoiding the trap of hindsight when reviewing, what otherwise seems like, a combination of known elements." *Leo Pharm.*, 726 F.3d at 1358. "Thus, the Board should give the objective indicia its proper weight and place in the obviousness analysis, and not treat objective indicia of nonobviousness as an afterthought." *Id.*

Here, Cree established that the creation of a single-LED white light using down-conversion was praised as an "innovative idea" and a "breakthrough" in the LED industry (A749-750), that "the '175 patent is a key intellectual property asset in major commercial technology transactions" (A546-548(Brandes II)(¶4)), and

that single-LED white lights embodying the invention have been extremely successful, with annual sales approaching $10 billion in 2010 (A575(Brandes III)(¶21); A588-589(Brandes IV)(¶¶9-10). The Board should have considered this evidence, which confirmed that the challenged claims are patentable. The Board reached a contrary conclusion only by committing a series of legal and factual errors, which provide an additional basis for reversal.

### A. The Single-LED White Light Was Praised Throughout The LED Industry.

"Appreciation by contemporaries skilled in the field of the invention is a useful indicator of whether the invention would have been obvious to such persons at the time it was made." *Vulcan Eng'g Co. v. Fata Aluminium, Inc.*, 278 F.3d 1366, 1373 (Fed. Cir. 2002). Cree presented cogent evidence that "emission of white light by a single chip LED" was a "breakthrough" in LED technology. A749-750. The Board's refusal to consider this evidence was error. *See* A44.

Cree presented evidence that multiple sources praised the single-LED white light as a significant achievement in LED technology. For example, a 1997 press release by the Fraunhofer Institute explained that, after the commercial availability of blue LEDs three years prior, "the generation of white light became possible" by "combining red, green, and blue emitting diodes," but "the emission of white light by a single chip LED was still impossible." A750. The press release further explains that this "impossibility" was remedied by the "innovative idea" of

"generat[ing] white light by luminescence conversion," an invention it

misattributed to a research team at the Fraunhofer Institute and Nichia Chemical

Industries.  A749.  As the press release recognized, this advancement was expected

to "enable mass production of white emitting LEDs."  A750.  The research team

credited with this development was awarded the 1997 Fraunhofer prize—an

"annual prize[] for outstanding scientific achievements" (A538-542)—for its work.

A750.

 Another 1997 press release from the Fraunhofer Institute similarly described

the development of a single-LED white light as a "breakthrough" that would

"conquer the market for illumination."  A749.  And a 1997 press release from

Nikkei described the single-LED white light (also mistakenly attributed to the

Fraunhofer Institute) as an "innovation."  A784.

 This evidence of "industry praise … provides probative and cogent evidence

that one of ordinary skill in the art would not have" understood the '175 patent

invention to be obvious.  *Institut Pasteur*, 738 F.3d at 1347.  The industry

expressly recognized the development of a single-LED white light by down-

converting an LED to be a major advancement in LED technology.

 The Board refused to consider this compelling evidence on the ground that

"the[] praises and acknowledgements are directed to the ***invention of others*** … and

<u>not</u> Appellant's invention."  A44 (first emphasis added).  That was error.  It is

undisputed that the 1997 press releases attributing the development of a single-LED white light to others address the same invention as claimed in the '175 patent and were dated well ***after that invention***.  Indeed, as the Examiner acknowledged, Drs. Baretz and Tischler invented the subject matter claimed in the '175 patent at least as early as January 1995—over two years before the achievements described in the 1997 press releases.  A399.  The press releases therefore reflect a ***mistaken*** attribution of the '175 patent's invention to others—not "the invention of others," as the Board erroneously concluded.

That the press releases incorrectly attributed the invention to others does not negate their probative value.  While an applicant must tie industry praise to ***the patented invention***, the praise need not be directed to ***the particular inventors***.  Indeed, this Court has recognized an accused infringer's statements that "its ***own infringing product*** was an advancement in the industry" as evidence of industry praise to support a finding of non-obviousness where the statements "related to features of the patented invention, linking that industry praise with the patented invention."  *Power-One, Inc. v. Artesyn Techs., Inc.*, 599 F.3d 1343, 1352 (Fed. Cir. 2010) (emphasis added).  Here, the industry praise was indisputably linked to the patented invention.  The Fraunhofer Institute press releases described the "innovative idea" as "combin[ing] a blue emitting GaN LED with an organic dye or an inorganic phosphor, emitting at longer wavelengths, to synthesise white light

by additive colour mixing."  A750; *see* A749 ("Blue emitting diodes based on gallium nitride were combined with luminescent dyes giving bright light emission or changed wavelengths.  The resulting mixture of colours is visible as white light.").  And the Nikkei press release similarly described the "innovation" as follows: "Blue LEDs based on gallium nitride were combined with luminescent dyes giving bright light emission at changed wavelengths.  The resulting mixture of colors is visible as white light."  A784.  These descriptions are precisely the invention claimed in the '175 patent.  *See* A69 (claiming a "blue light-emitting diode" that is down-converted using a "luminophoric medium" to produce "white light").  The fact that the praise was directed to others well after Drs. Baretz's and Tischler's invention is irrelevant.  The Board's refusal to consider this evidence warrants reversal.[18]

---

[18] The Board also wrote that "[the] press releases and praises [are] strong evidence of obviousness, rather than non-obviousness—in view of blue LEDs available from Dr. Nakamura—the entire industry was adopting the known 'down-conversion' process via phosphors to create white light."  A44.  While it is unclear why the Board made this statement, it too is erroneous.  As an initial matter, the Examiner never relied on Cree's evidence of industry praise as demonstrating obviousness.  *See* A1299-1301.  "The Board may not 'rel[y] on new facts and rationales not previously raised to the applicant by the examiner.'"  *Rambus*, 731 F.3d at 1255.  And in any event, "obviousness must be determined as of the time the invention was made."  *Hybritech Inc. v. Monoclonal Antibodies, Inc.*, 802 F.2d 1367, 1380 n.4 (Fed. Cir. 1986).  As in *Hybritech,* the 1997 press releases "are of little probative value [as to contemporaneous development] in this case because they are dated … at the earliest, ***more than a year*** after the … filing date here and ***roughly two years*** after conception occurred."  *Id.* (emphases added).

**B.    Cree's Significant Licensing Of The '175 Patent Reflects "Respect For The Invention."**

Cree also submitted evidence of "licenses showing industry respect for the invention" claimed in the '175 patent. *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 711 F.3d 1348, 1368 (Fed. Cir. 2013). In particular, Cree demonstrated that the '175 patent is "a key intellectual property asset in major commercial technology transactions," including licenses with various manufacturers of LED products such as Nichia Corporation (the same company mistakenly credited with the '175 patent invention); Toyoda Gosei; Osram GmbH; Phillips Electronics; Stanley Electric Company; Rohm Co.; Kingbright Electronic Co.; Seoul Semiconductor, Inc.; and Cotco Holdings, Ltd. ("Cotco"), among others. A546-548(Brandes II)(¶4); A586-587(Brandes IV)(¶¶5-6). The Board, however, "***disregarded***" this compelling evidence of industry respect on the ground that Cree failed to provide "the specific terms of these licenses or the circumstances under which they were granted." A45-46 (emphasis added).

The Board erred when it "too finely parsed" and disregarded Cree's licensing activities. *Institut Pasteur*, 738 F.3d at 1347. While a patentee must present "affirmative evidence of nexus where the evidence of commercial success presented is a license,'" *Iron Grip Barbell Co. v. USA Sports, Inc.*, 392 F.3d 1317, 1324 (Fed. Cir. 2004), contrary to the Board's conclusion, it need not provide the "specific terms" of the licenses to satisfy the nexus requirement (A46). The terms

of technical licenses, including Cree's, are often confidential. *See* A587(Brandes IV)(¶7). Requiring a patent owner to disclose specific terms would impose a hurdle that many companies cannot legally meet. Nor does the law require this. Instead, evidence of "[o]bjective indicia 'need only be reasonably commensurate with the scope of the claims.'" *Institut Pasteur*, 738 F.3d at 1347. Cree's evidence here met—and exceeded—that requirement.

Cree's Director of Intellectual Property Strategy and Business Development, Dr. George Brandes, submitted declarations detailing Cree's licensing programs for the '175 patent, explaining that several LED manufacturers entered into cross-licenses with Cree "in which the '175 patent was an important patent in the transaction." A546-548(Brandes II)(¶4). For example, Cree obtained a license from Cotco that "requires the licensee to mark a product produced pursuant to the license with the designation 'Powered by Cree®, U.S. Patent No. 6,600,175.'" A587(Brandes IV)(¶7). And while confidentiality obligations prohibited disclosure of the specific terms of other licenses to the '175 patent, Dr. Brandes explained that "[o]ther licenses have similar requirements" to the Cotco license. *Id.* Indeed, press releases announcing Cree's licenses with LED manufacturers Toyoda Gosei, Osram, and Phillips specifically mentioned that the agreements included a license to white LEDs. *See* A557 (Toyoda Gosei license includes "White LED technology"); A559 (Osram license includes a license to "white LEDs

and phosphors"); A562-563 (Phillips license includes a license to "white LEDs and phosphors"). Thus, Cree's "licensing activities provide 'probative and cogent evidence' of non-obviousness of the claims at issue." *Institut Pasteur*, 738 F.3d at 1347 (crediting as probative evidence of licensing press releases describing licenses to the patented invention).

Despite this compelling evidence of extensive licensing of the '175 patent, the Board discounted Cree's evidence, speculating that the licenses merely allowed the licensors access to Cree's patented LED technology "without fear of future litigation." A46. "But that theoretical possibility does not undermine the strong probative value of the licensing of the ['175 patent]." *Institut Pasteur*, 738 F.3d at 1347. Thus here, as in *Rambus*, "there is no evidence in the record to support the PTO's assertion that the commercial value of the licenses stemmed from other licensed [Cree] patents. Indeed, the only evidence before the Board points to a contrary conclusion." 731 F.3d at 1257. The Board thus erred in disregarding Cree's evidence of licensing.

## C.    Single-LED White Lights Embodying The Claimed Invention Have Achieved Blockbuster Commercial Success.

"Commercial success is relevant [to the obviousness analysis] because the law presumes an idea would successfully have been brought to market sooner, in response to market forces, had the idea been obvious to persons skilled in the art." *Merck & Co. v. Teva Pharms. USA, Inc.*, 395 F.3d 1364, 1376 (Fed. Cir. 2005).

- 59 -

"When a patentee can demonstrate commercial success, usually shown by significant sales in a relevant market, and that the successful product is the invention disclosed and claimed in the patent, it is presumed that the commercial success is due to the patented invention." *J.T. Eaton & Co. v. Atlantic Paste & Glue Co.*, 106 F.3d 1563, 1571 (Fed. Cir. 1997); *see also Brown & Williamson Tobacco Corp. v. Philip Morris Inc.*, 229 F.3d 1120, 1130 (Fed. Cir. 2000) ("[I]f the marketed product embodies the claimed features, and is coextensive with them, then a nexus is presumed and the burden shifts to the party asserting obviousness to present evidence to rebut the presumed nexus.").

Cree established that "the global market for LED/ white light products" *embodying* the invention claimed in the '175 patent have achieved significant commercial success, with global sales approaching $10 billion in 2010. A575(Brandes III)(¶21); A588-589(Brandes IV)(¶¶9-10) ("[T]he annual market size … is the total annual revenue from devices with a blue LED that consists of a phosphor that produces white light."). Cree therefore established a "prima facie case of nexus" by showing "both that there is commercial success, and that the product that is commercially successful *is the invention* disclosed and claimed in the patent." *Crocs*, 598 F.3d at 1310-1311 (emphasis added).

Although the record contained "little or no evidence to rebut [Cree's] prima facie case of nexus," *id.* at 1311, the Board nonetheless found that Cree had failed

to "establish a nexus between the claimed invention and commercial success," such that "the record [was] completely silent on whether the commercial success was caused by the subject matter of the '175 patent." A47-48.[19]  But here the commercial success of single-LED white lights embodying the claimed invention "is a testament to the improved properties of the ['175] patent's claimed invention." *Leo Pharm.*, 726 F.3d at 1358; *see* A576-578(Brandes III)(¶25) (describing the advantages of the single-LED white light, such as the "compact design," low cost of manufacture, and ability to select individual LEDs); A590-591(Brandes IV)(¶¶15-17) (same); A861-870 (describing reduced cost as a benefit of single-LED white lights over triplets); *see also supra* pp. 11-12.  Thus, the nexus requirement was satisfied.  The Board therefore erred in dismissing the evidence of the blockbuster commercial success of single-LED white lights embodying the claimed invention.

*        *        *

As in *Leo Phamaceutical*, "the objective indicia—taken in sum—are the most 'probative evidence of nonobviousness ... enabl[ing] the court to avert the

---

[19] The Board also discounted Cree's evidence of commercial success on the ground that "market research data of LED/white light products is not actual sale data; rather, potential sale data."  A47.  But as Dr. Brandes explained, the sales data from 2002-2010 was based on "the total annual revenue from devices with a blue LED that consists of a phosphor that produces white light."  A575(Brandes III)(¶20); A588-589(Brandes IV)(¶10).  Only the 2011 data was "estimated" sales data.  A575(Brandes III)(¶20).

trap of hindsight.'" 726 F.3d at 1359. Thus, when "[v]iewed through the lens of the objective indicia, as opposed to the hindsight lens used by the Board, the ['175] patent would not have been not obvious over [Stevenson] in combination with [Pinnow and Nakamura]." *Id.* Accordingly, this Court should reverse, or, at the very least, vacate and remand, the Board's obviousness determination.

## CONCLUSION

The Board's decision that claims 118, 134-136, 138, and 140 of the '175 patent are obvious should be reversed or vacated and remanded for further proceedings.

Respectfully submitted,

/s/ William F. Lee

HEATHER PETRUZZI
BRITTANY BLUEITT AMADI
WILMER CUTLER PICKERING
  HALE AND DORR LLP
1875 Pennsylvania Avenue, NW
Washington, DC  20006
(202) 663-6000

WILLIAM F. LEE
CYNTHIA D. VREELAND
PETER M. DICHIARA
MARK C. FLEMING
SYDENHAM B. ALEXANDER, III
WILMER CUTLER PICKERING
  HALE AND DORR LLP
60 State Street
Boston, MA  02109
(617) 526-6000

*Attorneys for Appellant Cree, Inc.*

May 22, 2015

# ADDENDUM

# TABLE OF CONTENTS

**Page(s)**

Decision on Appeal of the Patent Trial and Appeal Board
    (Nov. 21, 2014)..........................................................................A1-55 (TAB 1)

U.S. Patent No. 6,600,175 (July 29, 2003) ......................................A56-68 (TAB 2)

List of Rejected Claims from Patent Owner's Appeal
    Brief (Mar. 20, 2014).............................................................A69-70 (TAB 3)

# TAB 1

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 90/010,940 | 05/06/2010 | 6600175 | 1300-000044/US/RXA | 4549 |

23483       7590       11/21/2014
WILMERHALE/BOSTON
60 STATE STREET
BOSTON, MA 02109

| EXAMINER |
|---|
| KIELIN, ERIK J |

| ART UNIT | PAPER NUMBER |
|---|---|
| 2814 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 11/21/2014 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

A1

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

*Ex parte* CREE, INC.
Patent Owner and Appellant

_____

Appeal 2014-007890
Reexamination Control No. 90/010,940
Patent 6,600,175 B1[1]
Technology Center 3900

_____

Before JASON V. MORGAN, HUNG H. BUI, and
MICHELLE N. WORMMEESTER, *Administrative Patent Judges*.

BUI, *Administrative Patent Judge*.


DECISION ON APPEAL

This reexamination proceeding arose from a third-party request for *ex parte* reexamination filed on April 2, 2010 (Control Number 90/010,940). Cree, Inc. (Appellant), the owner of the patent under reexamination,[2] appeals under 35 U.S.C. §§ 134(b) and 306 from an Examiner's final rejection of claims 118, 134–136, 138, and 140.[3]

_____

[1] The patent involved in this reexamination appeal proceeding (the '175 Patent) issued to Bruce Baretz, and Michael A. Tischler (hereinafter "Baretz et al.") on July 29, 2003.

[2] *See* Patent Assignment Abstract of Title, Reel 015286 /Frame 0635 recorded on May 5, 2004, and entered into the record of Control No. 90/010,940 as "Title Report" on May 18, 2010.

[3] Original claims 1–5, 11–13, 21–24, and 26 are subject to reexamination as per Third Party Request dated April 2, 2010.  Claims 6–10, 14–20, and 25

Appeal 2014-007890
Reexamination Control No. 90/010,940
Patent No. 6,600,175 B1

We have jurisdiction under 35 U.S.C. §§ 134(b) and 306. An oral hearing was conducted on November 5, 2014. A transcript of the hearing will be made of record.

We AFFIRM.[4]

## STATEMENT OF THE CASE

### Related Proceedings

Appellant has informed the Office that there are no related appeal or interference proceedings.

### The '175 Patent

The '175 patent describes a light emitting assembly, shown in Fig. 6, comprising a solid state light emitting diode (LED) which emits a first, relatively shorter wavelength radiation in the form of blue or ultraviolet (UV) light, and a down-converting luminophoric medium which, when impinged by the first, relatively shorter wavelength radiation, is excited to

---

are not subject to reexamination. As such, claims 6–10, 14–20, and 25 will remain intact regardless of the outcome of the reexamination. During the reexamination, claims 27–61 were newly added on May 3, 2011, and claims 62–188 were newly added on March 26, 2012. Subsequently, claims 1–5, 11–13, 21–24, 26–117, 119–133, 137, 139, and 141–188 were canceled on August 24, 2012 to reduce the number of issues for consideration on appeal, leaving only six (6) claims pending on this appeal, i.e., claims 118, 134–136, 138, and 140.

[4] Our decision refers to Appellant's Appeal Brief filed on March 20, 2014 ("App. Br."); Reply Brief filed July 9, 2014 ("Reply Br."); Examiner's Answer mailed May 9, 2014 ("Ans."); Final Office Action mailed November 20, 2013 ("Final Rej."); and '175 Patent Specification issued on July 29, 2003 ("Spec.").

2

Appeal 2014-007890
Reexamination Control No. 90/010,940
Patent No. 6,600,175 B1

emit a second, longer wavelength radiation in the form of white light. '175
patent, 7:8–27 and Abstract.

Fig. 6 of the '175 patent is reproduced with additional marking for
illustration.



Fig. 6 of the '175 patent is a schematic representation of a light emitting
assembly 80 comprising a solid state LED 82 to emit a blue or UV light and
a down-converting luminophoric medium 90 to emit white light.

In a specific embodiment, the blue or UV light output from the LED is
down-converted to white light by packaging the solid state LED, shown in
Fig. 1, with *fluorescent organic and/or inorganic fluorescers or phosphors
in a polymeric matrix*. '175 patent, Fig. 1 and Abstract (emphasis added).
According to Appellant, the term "luminophoric medium" refers "to a
material which in response to radiation emitted by the solid state device
emits light in the white visible light spectrum by *fluorescence and/or
phosphorescence*." '175 patent, 7:55–58 (emphasis added).

Appeal 2014-007890
Reexamination Control No. 90/010,940
Patent No. 6,600,175 B1

Fig. 1 of the '175 patent is reproduced with additional marking for illustration.



Fig. 1 of the '175 patent is a schematic representation of a white LED assembly 10 comprising a LED die 13 and a down-converting material 20.

As shown in Fig. 1 of the '175 patent, the white LED assembly 10 includes an LED die 13 packaged within a light-transmissive enclosure 11 filled with suitable down-converting material 20, e.g., a down-converting luminophoric medium including fluorescers and/or phosphors to down convert the blue or UV light output from the LED die 13 to white light.  '175 patent at 8:58–9:8.

*Claims on Appeal*

Claims 118 and 134 are the only independent claims on appeal and are limited to a single-die gallium nitride (GaN) blue LED to emit blue light (as opposed to blue or UV light as disclosed by the '175 patent).  In particular, claims 118 and 134 are directed to light emission devices that include a single-die GaN blue LED in combination with a down-converting

Appeal 2014-007890
Reexamination Control No. 90/010,940
Patent No. 6,600,175 B1

luminophoric medium to produce a white light.  App. Br. 7.  Representative
claims 118 and 134 are reproduced below:

118.  A light-emission device, comprising *a single-die,
two-lead gallium nitride based semiconductor <u>blue</u> light-
emitting diode* emitting radiation; and a recipient *down-
converting luminophoric medium for down-converting the
radiation emitted by the light-emitting diode, to a
polychromatic white light*, wherein the luminophoric medium is
dispersed in a polymer that is on or about the single-die, two-
lead gallium nitride based semiconductor blue light-emitting
diode.

134.  A light-emitting device, comprising:

at least *one single-die gallium nitride based
semiconductor <u>blue</u> light-emitting diode (LED)* coupleable with
a power supply to emit a primary radiation which is the same
for each single-die LED present in the device, said primary
radiation being a relatively shorter wavelength radiation; and

a *down-converting luminophoric medium* arranged in
receiving relationship to said primary radiation, and which in
exposure to said primary radiation, is excited to responsively
emit a secondary, relatively longer wavelength, polychromatic
radiation, with separate wavelengths of said polychromatic
radiation mixing to produce *a white light output*,

wherein each of the at least one single-die gallium nitride
based semiconductor blue light-emitting diode in interaction
with luminophoric medium receiving its primary radiation
produces *white light output*, and

Appeal 2014-007890
Reexamination Control No. 90/010,940
Patent No. 6,600,175 B1

> wherein *the luminophoric medium is dispersed in a*
> *polymer that is on or about the single-die gallium nitride based*
> *semiconductor blue light-emitting diode.*

App. Br. 69 (Claims Appendix) (disputed limitations in italics, some
paragraphing added).

### *Prior Art References & Publications Considered*

| | | | |
|---|---|---|---|
| (1) | Pinnow et al. (Pinnow) | US 3,691,482 | Sept. 12, 1972 |
| (2) | Martic et al. (Martic) | US 3,743,833 | July 3, 1973 |
| (3) | Wanmaker et al. (Wanmaker) | US 3,793,046 | Feb. 19, 1974 |
| (4) | Stevenson et al. (Stevenson) | US 3,819,974 | June 25, 1974 |
| (5) | Abe | US 5,535,230 | July 9, 1996 |
| (6) | Silsby | US 5,563,621 | Oct. 8, 1996 |
| (7) | Nakamura et al. (Nakamura) | US 5,578,839 | Nov. 26, 1996 |
| (8) | Tabuchi et al. (Tabuchi) | JP 50-79379 | Nov. 24, 1973 |
| (9) | Tadasu et al. (Tadasu) | JP 5-152609 | June 18, 1993 |
| (10) | Menda | JP 6-267301 | Sept. 22, 1994 |

(11)   Admitted Prior Art in the '175 patent (APA)

(12)   CRC HANDBOOK OF CHEMISTRY AND PHYSICS E-201 (63d ed. 1983);

(13)   BASF Data Sheet for Lumogen® F Violet 570;

(14)   BASF Data Sheet for Lumogen® F Yellow 083;

(15)   BASF Data Sheet for Lumogen® F Red 300;

(16)   LIST OF LASER TYPES, Wikipedia *available at*
http://en.wikipedia.org/wiki/List_of_laser_types (last visited Sept. 20,
2013), Apr. 27, 2013, version *available at* http://en.wikipedia.org/
w/index.php?title=List_of_laser_types&oldid=552479686.

(17)   Definition of "Resin" from The Free Dictionary *available at*
http://www.thefreedictionary.com/resin (last visited Oct. 9, 2013).

(18)   Definition of "About" from The Free Dictionary *available at*
http://www.thefreedictionary.com/about (last visited Oct. 10, 2013).

Appeal 2014-007890
Reexamination Control No. 90/010,940
Patent No. 6,600,175 B1

### Expert Declarations & Other Exhibits

Appellant has provided several Declarations under 37 C.F.R. § 1.132 from several researchers and renowned experts in the field of light emitting diodes (LEDs) including Dr. Gerald B. Stringfellow (Exhibits 5–6), Dr. Joan Redwing (Exhibit 11), and Dr. Christian Wetzel (Exhibit 12). These Declarations provide expert testimony regarding: (i) the state of the art regarding LEDs and white light at the time of the invention, including Stevenson's original patent for a bright violet/blue LED, (ii) how the industry was utilizing what is known as a direct-emission "triplet" approach in which individual LEDs that emit three primary colors—red, green, and blue (RGB)—are packaged together and then all the primary (RGB) colors are mixed together to form white light, (iii) how those of ordinary skill in the art including the Declarants would have pursued the RGB "triplet" approach and avoided a "down-conversion" approach in which a phosphor material is used to convert monochromatic light from a blue or ultraviolet (UV) LED to create white light, as disclosed by Appellant's invention, and (iv) how single white LEDs were not possible until after Appellant's invention, i.e., blue LED in combination of "down-conversion" to produce white light as allegedly corroborated with documentary evidence.

In addition, Appellant has provided three (3) Declarations under 37 C.F.R. § 1.132 from Dr. George Brandes (Exhibits 2–4), Director of IP Strategy and Business Development at Cree, Inc., the patentee, to provide testimony of second considerations of non-obviousness, including: (i) evidence of long felt but unsolved need, (ii) unexpected results, (iii) scientific recognition and industry acknowledgement, (iv) licensing, and

Appeal 2014-007890
Reexamination Control No. 90/010,940
Patent No. 6,600,175 B1

(v) commercial success of Appellant's invention. The '175 patent allegedly provides documentary evidence that corroborates the Declarations and support Appellant's arguments. *See, e.g.*, App. Br. 6–7 (citing Spec. col. 2, ll. 29–31, 38–51, col. 8, ll. 26–32), 54–55 (citing, e.g., Spec. col. 1, l. 11– col. 5, l. 59); Reply Br. 8–9 (citing Spec. col. 9, ll. 9–18), 11 (citing Spec. col. 8, ll. 26–32), and 19 (citing Spec. col. 1, ll. 32–41).

A complete listing of these Exhibits and alleged corroborating evidence is provided below:

Exhibit 1:    *Research News*, FRAUNHOFER GESELLSCHAFT, 1997.
- Submitted as Exhibit A to Response dated Aug. 24, 2012. Entered into record on Nov. 20, 2013.

Exhibit 2:    Declaration of Dr. George R. Brandes dated January 6, 2012 (Brandes II[5]).
- Submitted with Response dated Jan. 7, 2012. Entered into the record on Jan. 26, 2012.
- *Cree Licenses Remote Phosphor IP, Launches New LEDs and Services*, LEDs MAGAZINE, INDUSTRY NEWS, Dec. 2011: submitted as Exhibit A.
- *Cree and Nichia Announces White LED Cross-Licensing*, LEDs MAGAZINE, INDUSTRY NEWS, Feb. 2005: submitted as Exhibit B.
- *Toyoda Gosei Announces Patent Agreement with Cree*, Toyoda email announcement, May 2008: submitted as Exhibit C.

---

[5] For consistency with the Briefs, we retain the Declaration labels used by Appellant and the Examiner. For example, we refer to "Brandes II" even though—because Appellants did not rely on, or submit as an exhibit, the November 19, 2010, Declaration of Dr. Brandes—we do not refer to "Brandes I" in our Decision.

- *Cree and Osram Sign LED Patent Cross-License Agreement*, SEMICONDUCTOR TODAY, INDUSTRY NEWS, April 2011: submitted as Exhibit D.
- *Cree and Phillips Sign Comprehensive LED Patent Cross-License Agreement*, Cree email announcement, July 2010: submitted as Exhibit E.

Exhibit 3:     Declaration of Dr. George R. Brandes dated March 26, 2012 (Brandes III).
- Submitted with Response dated March 26, 2012. Entered into the record on May 24, 2012.

Exhibit 4:     Declaration of Dr. George R. Brandes dated August 23, 2012 (Brandes IV).
- Previously submitted with Response dated August 24, 2012. Entered into the record on Nov. 20, 2013.

Exhibit 5:     Declaration of Dr. Gerald B. Stringfellow dated March 26, 2012 (Stringfellow II).
- Submitted with Response dated March 26, 2012. Entered into the record on May 24, 2012.
- *Research News*, FRAUNHOFER GESELLSCHAFT, 1997: submitted as Exhibit N.

Exhibit 6:     Declaration of Dr. Gerald B. Stringfellow dated August 23, 2012 (Stringfellow III).
- Previously submitted with Response dated August 24, 2012. Entered into the record on Nov. 20, 2013.

Exhibit 7:     http://www.nichia.co.jp/en/about_nichia/history.html.
- Submitted as Exhibit B with Response dated August 24, 2012. Entered into the record on Nov. 20, 2013.

Appeal 2014-007890
Reexamination Control No. 90/010,940
Patent No. 6,600,175 B1

Exhibit 8:    H.P. Maruska & D.A. Stevenson, *Mechanism of Light Production in Metal-Insulator-Semiconductor Diodes; GaN:Mg Violet Light-Emitting Diodes*, 17 SOLID STATE ELECTRONICS 1179 (1974).
- Submitted as Exhibit C with Response dated August 24, 2012. Entered into the record on Nov. 20, 2013.

Exhibit 9:    Alfred Vollmer, *White LED Developed Using Luminescence Conversion*, Nikkei Electronic Asia, July 1997.
- Submitted as Exhibit D with Response dated August 24, 2012. Entered into the record on Nov. 20, 2013.

Exhibit 10:   Applied Physics Letters 92, 143309 (2008).
- Submitted with Response dated August 24, 2012. Entered into the record on Nov. 20, 2013.

Exhibit 11:   Declaration of Dr. Joan M. Redwing dated August 24, 2012.
- Previously submitted with Response dated August 24, 2012. Entered into the record on Nov. 20, 2013.
- Shuji Nakamura et al., THE BLUE LASER DIODE: THE COMPLETE STORY (2000): submitted as Attachment D.
- He Tian et al., *Bichromophoric Rhodamine Dyes and their Fluorescence Properties*, 26 DYES AND PIGMENTS 159 (1994): submitted as Attachment E.
- C.J. Nuese & J.I. Pankove, *Light-Emitting Diodes — LEDs* (unidentified date of publication): submitted as Attachment F.
- Isamu Akasaki & Hiroshi Amano, *Widegap Column — III Nitride Semiconductors for UV/Blue Light Emitting Devices*, 141 J. Electrochemical

Appeal 2014-007890
Reexamination Control No. 90/010,940
Patent No. 6,600,175 B1

Soc'y 2266–2271 (1994): submitted as Attachment G.

- H.P. Maruska & D.A. Stevenson, *Mechanism of Light Production in Metal-Insulator-Semiconductor Diodes; GaN:Mg Violet Light-Emitting Diodes*, 17 SOLID STATE ELECTRONICS 1171-1179 (1974): submitted as Attachment H.

Exhibit 12:   Declaration of Dr. Christian M. Wetzel dated August 24, 2012.

- Previously submitted with Response dated August 24, 2012.  Entered into the record on Nov. 20, 2013.

Appeal 2014-007890
Reexamination Control No. 90/010,940
Patent No. 6,600,175 B1

*Examiner's Rejections*

A. <u>Stevenson as a primary reference</u>

(1)    Claims 118, 134, and 140 stand rejected under 35 U.S.C.
§ 103(a) as being unpatentable over Stevenson, Pinnow, and Nakamura.
Ans. 6–18.

(2)    Claims 135, 136, and 140 stand rejected under 35 U.S.C.
§ 103(a) as being unpatentable over Stevenson, Pinnow, Nakamura, and
Tadatsu.  Ans. 18–20.

(3)    Claims 138 and 140 stand rejected under 35 U.S.C. § 103(a) as
being unpatentable over Stevenson, Pinnow, Nakamura, and Tabuchi.  Ans.
20–22.

(4)    Claims 118 and 134 stand rejected under 35 U.S.C. § 103(a) as
being unpatentable over Stevenson, APA, Wanmaker, Nakamura, Tabuchi,
and Martic.  Ans. 22–27.

B. <u>Tabuchi as a primary reference</u>

(5)    Claims 118, 134, 138, and 140 stand rejected under 35 U.S.C.
§ 103(a) as being unpatentable over Tabuchi, APA, Wanmaker, Nakamura,
and Martic.  Ans. 27–35.

(6)    Claims 118, 134, 138, and 140 stand rejected under 35 U.S.C.
§ 103(a) as being unpatentable over Tabuchi, Pinnow, and Nakamura.  Ans.
35–40.

(7)    Claims 135 and 136 stand rejected under 35 U.S.C. § 103(a) as
being unpatentable over Tabuchi, Pinnow, Nakamura, and Tadatsu.  Ans.
40–42.

Appeal 2014-007890
Reexamination Control No. 90/010,940
Patent No. 6,600,175 B1

*Issues on Appeal*

Based on Appellant's arguments, the dispositive issue on appeal is whether the Examiner erred in rejecting claims 118, 134, and 140 under 35 U.S.C. § 103(a) as being unpatentable over Stevenson, Pinnow, and Nakamura.  In particular, the appeal turns on:

(1)    Whether the combination of Stevenson, Pinnow, and Nakamura teaches or suggests all limitations of Appellant's claims 118, 134, and 140, including: (i) the use of a blue LED in combination with a down-converting luminophoric medium to produce white light, and (ii) the down-converting luminophoric medium is dispersed in a polymer that is on or about the single-die blue GaN-based LED.  App. Br. 15–35; Reply Br. 2–9.

(2)    Whether there is an objective reason supported by a rational underpinning to combine the teachings of Stevenson, Pinnow, and Nakamura in order to use a blue LED to create white light via down conversion.  App. Br. 4–14; Reply Br. 2–3.

(3)    Whether the Examiner has engaged in impermissible hindsight to combine the teachings of Stevenson, Pinnow, and Nakamura in order to use a blue LED to create white light via down conversion.  App. Br. 13–14; Reply Br. 1.

(4)    Whether the Examiner has accorded proper weight to Appellant's expert testimony in support of the conclusion of obviousness.  Reply Br. 8–20.

(5)    Whether secondary considerations of non-obviousness such as: (i) evidence of long felt but unsolved need, (ii) unexpected results, (iii) scientific recognition and industry acknowledgement, (iv) licensing, and (v) commercial success are sufficient to overcome strong indications of obviousness.  App. Br. 54–67; Reply Br. 17–18.

Appeal 2014-007890
Reexamination Control No. 90/010,940
Patent No. 6,600,175 B1

ANALYSIS

*§ 103(a) Rejection of Claims 118, 134, and 140 based on*
*Stevenson, Pinnow, and Nakamura*

Independent claim 118 defines broadly a light-emission device that uses a blue LED in combination with a down-converting luminophoric medium to produce white light. In particular, claim 118 recites a light-emission device comprising:

> a single-die, two-lead gallium nitride based semiconductor *blue* light-emitting diode emitting radiation; and

> a recipient down-converting luminophoric medium for down-converting the radiation emitted by the light-emitting diode, to a polychromatic *white light*, wherein the *luminophoric medium is dispersed in a polymer* that is on or about the single-die, two-lead gallium nitride based semiconductor *blue* light-emitting diode.

App. Br. 69 (Claims Appendix) (disputed limitations in italics).

Independent claim 134 is substantially identical to independent claim 118, and further defines: (1) the relationship between the primary radiation (light output from blue LED) and the secondary radiation having a longer wavelength (light output from down-converting luminophoric medium) and (2) at least one single-die GaN-based blue LED (as opposed to merely a single-die GaN-based blue LED as recited in claim 118).

Dependent claim 140 further requires the single-die LED arranged to *directly impinge* radiation to the polymer (emphasis added).

Appeal 2014-007890
Reexamination Control No. 90/010,940
Patent No. 6,600,175 B1

*Obviousness*

In evaluating whether claims are obvious,

[1] the scope and content of the prior art are to be determined;
[2] differences between the prior art and the claims at issue are
to be ascertained; and [3] the level of ordinary skill in the
pertinent art resolved.  Against this background, the
obviousness or nonobviousness of the subject matter is
determined.  Such secondary considerations as commercial
success, long felt but unsolved needs, failure of others, etc.,
might be utilized to give light to the circumstances surrounding
the origin of the subject matter sought to be patented.

*Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966).  However, an

obviousness analysis "need not seek out precise teachings directed to the

specific subject matter of the challenged claim, for a court can take account

of the inferences and creative steps that a person of ordinary skill in the art

would employ."  *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (2007).  A

prima facie case of obviousness is established when the prior art itself would

appear to have suggested the claimed subject matter to a person of ordinary

skill in the art.  *In re Rinehart*, 531 F.2d 1048, 1051 (CCPA 1976).  The

level of ordinary skill in the art is reflected by the prior art of record.  *See*

*Okajima v. Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001); *In re GPAC*

*Inc.*, 57 F.3d 1573, 1579 (Fed. Cir. 1995); *In re Oelrich*, 579 F.2d 86, 91

(CCPA 1978).

The Examiner finds the combination of Stevenson, Pinnow, and

Nakamura discloses all limitations of Appellant's claims 118, 134, and 140.

Appeal 2014-007890
Reexamination Control No. 90/010,940
Patent No. 6,600,175 B1

Ans. 6–18.  For example, the Examiner finds Stevenson[6] discloses a light-emitting device comprising: (1) a single-die, two lead[7] gallium nitride (GaN)-based semiconductor LED to emit primary radiation in the violet region of the spectrum,[8] and (2) a down-converting luminophoric medium including organic and inorganic phosphors to convert the primary radiation[9]

----

[6] Professor David Stevenson along with his doctoral students at Stanford University, Herbert Maruska and Walden Rhines, developed the first violet/blue LED using magnesium-doped gallium nitride in 1972.  Patent No. 3,819,974 was issued on June 25, 1974; however, devices built in early 1970s did not have sufficient light output (brightness level) to be of practical use at least until 1993 when high-power, high-brightness blue LEDs were developed by Dr. Shuji Nakamura of Nichi Corporation making high-power white light sources practical.

[7] By definition, a light emitting diode (LED) is a "two-lead" semiconductor light source.  This is because a LED is simply a basic p-n junction diode, which emits light when activated, i.e., when a voltage is applied to the leads forcing electrons and holes to recombine for light emission.  See "LED" THE AMERICAN HERITAGE SCIENCE DICTIONARY (Houghton Mifflin Company, 2005).  As such, the term "two-lead" is inherent in every LED and, does not add patentable weight.

[8] According to the Examiner, Stevenson's peak emission is violet, but both blue and ultraviolet (UV) emissions are included.  Ans. 8–9 (citing Stevenson's Fig. 4 in which light emitted from Stevenson's LED ranges from blue to ultraviolet (UV) and centered in violet around 400nm; see also col. 1, ll. 10–12, 16–17; col., 3, ll. 24–28).  Appellant's experts, Dr. Joan Redwing and Dr. Christian Wetzel, acknowledge Stevenson's emission spectrum contains blue and UV emission.  However, the actual emission of blue or UV light is relatively small compared to the violet emission; thus, Stevenson's LED is known as a violet LED and not a blue LED.  See Redwing Decl. ¶ 25 and Wetzel Decl. ¶ 24.

[9] According to the Examiner, impingement of radiation emitted from LED to the luminophoric medium dispersed in a polymer, albeit directly, indirectly or otherwise, is a matter of design choice.  Ans. 17.

Appeal 2014-007890
Reexamination Control No. 90/010,940
Patent No. 6,600,175 B1

from the GaN-based LED die to visible light having a longer wavelength.[10]
Ans. 6–12 (citing Stevenson, col. 1, ll. 58–64; col. 2, ll. 29–31; col. 3, l. 24–
col. 4, l. 7; Fig. 3 and Fig. 4).

Fig. 3 of Stevenson is reproduced below with additional markings for
illustration.



Fig. 3 of Stevenson discloses a single-die, two-lead GaN-based LED
to emit primary radiation in the violet region of the spectrum.

The Examiner acknowledges Stevenson does not implicitly disclose
the use of <u>blue</u> LEDs and "down-conversion" to produce white light.  To the
extent necessary, the Examiner relies on (1) Nakamura for disclosing high-
power, high-brightness blue LEDs, and (2) Pinnow for explicitly disclosing
the "down-conversion" of the primary radiation using a mixture of
phosphors to produce white light and the mixture of phosphors is dispersed

---

[10] According to the Examiner, visible light (light in a spectral range of
greater sensitivity for the human eye) also includes white light.  Ans. 11
(citing Stevenson, col. 3, l. 24–col. 4, l. 7).

17

**A18**

Appeal 2014-007890
Reexamination Control No. 90/010,940
Patent No. 6,600,175 B1

in a polymer that is "about" the primary radiation. *Id*. at 13–17 (citing
Nakamura, col. 2, ll. 7–14, 30–33; col. 4, ll. 9–11, ll. 52–59; col. 11, l. 61–
col. 12, l. 6; and cols. 13–20 "Examples 1-28 of blue LEDs"; and Pinnow,
col. 1, l. 65–col. 2, l. 7, 15–20; col. 3, ll. 24–55; col. 6, ll. 28–30; Fig. 3 and
Abstract).

      Based on these factual findings and the principles outlined in *KSR*,
550 U.S. at 406, the Examiner concludes the following:  First, "[i]t would
have been obvious . . . to substitute Stevenson's GaN-based LED with either
the known UV light emitting or blue light emitting GaN-based LED
disclosed in Nakamura" because such a substitution would be seen as
"simple substitution of one known element (Stevenson's GaN-based LED)
for another known element (Nakamura's GaN-based LED) to obtain
predictable results (as evidenced by Pinnow)."  Ans. 14 (emphasis omitted).
Second, once the substitution is made [and a blue LED (instead of a violet
LED) is placed in a single die as disclosed by Stevenson], a person having
ordinary skill in the art[11] would have utilized the same "down-conversion"
using a mixture of phosphors to convert the blue or UV light output from the
blue LED die to produce white light, as implicitly suggested by Stevenson
and expressly disclosed by Pinnow.  *Id*. at 17; *see also* Stevenson, col. 3, l.
24–col. 4, l. 7; Pinnow, Abstract.

      According to the Examiner, the reason for combining the references is
based on the recognition that some *advantage or expected beneficial result*
would have been produced by their combination.  *In re Sernaker*, 702 F.2d

---

[11] An artisan of ordinary skill is a hypothetical person who is presumed to
know the relevant prior art at the time of Appellant's invention. *In re
GPAC*, 57 F.3d at 1579.

Appeal 2014-007890
Reexamination Control No. 90/010,940
Patent No. 6,600,175 B1

989, 994–95 (Fed. Cir. 1983). For example, Nakamura's GaN-based LED is more powerful than Stevenson's GaN-based LED (i.e., Nakamura's GaN-based LED would provide more photons to be down-converted by the phosphors and thereby provide brighter overall light emission from the device) and, as such, there is an "advantage or expected beneficial result" in using the higher-power, high brightness Nakamura LED, specifically brighter emission by the phosphors. Ans. 110. Therefore, an artisan of ordinary skill would have appreciated this benefit and recognized that Nakamura's better and brighter LED would have been an "update" using a "modern electronic component" of Stevenson's older, less-efficient LED. *Id*. (emphasis omitted).

Nevertheless, Appellant contends: (1) the combination of Stevenson, Pinnow, and Nakamura does not teach or suggest the subject matter of Appellant's claims 118, 134, and 140, i.e., the use of a blue LED in combination with a down-converting luminophoric medium to create white light; (2) there is no reason to combine the teachings of Stevenson, Pinnow, and Nakamura and, in the absence of such a reason, and (3) the Examiner has engaged in an impermissible hindsight to combine the teachings of Stevenson, Pinnow, and Nakamura in order to use a blue LED to create white light via down conversion as recited in Appellant's independent claim 118, 134, and 140. App. Br. 4–35; Reply Br. 1–9. In particular, Appellant argues:

> (1)    None of the art suggests, let alone teaches, the use of a blue LED and "down-conversion" to create white light because (i) Stevenson only discloses a violet LED, not blue, (ii) Pinnow relies on a blue argon gas laser as a light source, a very different thing from a blue LED, and (iii) Nakamura

Appeal 2014-007890
Reexamination Control No. 90/010,940
Patent No. 6,600,175 B1

teaches a blue LED but provides no teaching or suggestion of "down-conversion" (App. Br. 21–29);

(2)    No one skilled in the art would turn to Stevenson if they were considering the creation of white light from an LED because Stevenson's LED is a very low power, MIS type device that was unsuitable for the creation of white light (*id.* at 29–30);

(3)    No one skilled in the art would turn to Pinnow if they were considering the creation of white light from an LED because Pinnow relies on an extremely high power laser that is very different from an LED (*id.* at 30–33);

(4)    Nakamura fails to suggest using a blue LED and down-conversion to create white light (*id.* at 33–34);

(5)    Stevenson and Pinnow, if combined, do not yield white light (*id.* at 35); and

(6)    The combination of Stevenson, Pinnow, and Nakamura still fails to teach or suggest "luminophoric medium . . . dispersed in a polymer" (*id.* at 35–36).

In support of these arguments, Appellant relies on expert testimony from Dr. Gerald B. Stringfellow (Exhibits 5–6), Dr. Joan Redwing (Exhibit 11), and Dr. Christian Wetzel (Exhibit 12) to describe: (i) the state of the art regarding LEDs and white light at the time of the invention, including Stevenson's original patent for a violet/blue LED, (ii) how the industry at the time was utilizing what is known as a direct-emission "triplet" approach in which individual LEDs that emit three primary colors—red, green, and blue (RGB)—are packaged together and then all the primary (RGB) colors are mixed together to form white light, (iii) how those of ordinary skill in the art including the Declarants would have pursued the RGB "triplet" approach

Appeal 2014-007890
Reexamination Control No. 90/010,940
Patent No. 6,600,175 B1

and avoided a "down-conversion" approach in which a phosphor material is used to convert monochromatic light from a blue or ultraviolet (UV) LED to create white light, as disclosed by Appellant's invention, and (iv) how single white LEDs were not possible until after Appellant's invention, i.e., blue LED in combination of "down-conversion" to produce white light as corroborated with documentary evidence. Stringfellow II Decl. ¶¶ 38–41 (Exhibit 5); Stringfellow III Decl. ¶¶ 14–28 (Exhibit 6); Redwing Decl. ¶¶ 15–103 (Exhibit 11); and Wetzel Decl. ¶¶ 17–125 (Exhibit 12).

For example, Dr. Stringfellow[12] testifies: (1) during the history of LEDs from 1960s to mid-1990s, researchers directed their efforts to the development of better monochromatic primary color LED devices, via direct-emission "triplet" approach "because researchers believed that if they achieved successful red, green, and blue [(RGB)] monochromatic light sources, then they could create any other color of interest by mixing these monochromatic light sources" (Stringfellow III Decl. ¶ 14); (2) Stevenson discloses the original, seminal work on a bright violet/blue LED in early 1974, known as a "MIS" device, but no work was ever done or proposed to use Stevenson's MIS device to produce white light (id. ¶¶ 20–22) and no one of ordinary skill in the art would look to Stevenson for anything to do with production of white light (id. ¶ 24); (3) no LED devices would utilize phosphors to produce white light prior to Appellant's invention disclosed in

---

[12]  Dr. Stringfellow is a member of the National Academy of Engineering, a Fellow of the IEEE and a worldwide-recognized expert in the field of LEDs with over 46 years of experience and over 350 peer-reviewed articles. *See* Stringfellow III Decl. ¶¶ 4–5, 10–11. Dr. Stringfellow is well qualified to testify regarding the technology in this re-examination proceeding.

Appeal 2014-007890
Reexamination Control No. 90/010,940
Patent No. 6,600,175 B1

the '175 patent because the industry was focused on using a direct-emission "triplet" approach (*id.* ¶¶ 24–26); and (4) at the time of the invention, there was no focus on the use of "down-conversion" because (a) it would waste energy, (b) it was no longer needed to create primary color, and (c) it entailed increased cost and complexity (*id.* ¶ 26).

Likewise, Dr. Joan Redwing[13] acknowledges light emitted from LEDs can undergo a process known as "down-conversion" where the light is subsequently passed through a layer of phosphors or other luminophoric (i.e., light emitting) material and converted to light having a longer wavelength (Redwing Decl. ¶ 12), but nevertheless testifies that no person of ordinary skill in the art would have used a "down-conversion" process to create white light (*id.* ¶ 15) because: (1) such "down-conversion" process causes energy loss and therefore loss of luminous intensity whereas the production of white light requires a significant amount of power and brightness (*id.* ¶ 16), (2) the blue or violet LEDs in existence *prior* to the 1994–1996 timeframe had very low optical power, and given these disadvantages, and (3) an artisan of ordinary skill would have been dissuaded from considering "down-conversion" and would instead utilize the direct emission RGB "triplet" approach to produce white light (*id.* ¶¶ 16–18).

---

[13]  Dr. Redwing is the Professor of Materials Science and Engineering, Chemical Engineering & Electrical Engineering, as well as the chair of the Intercollege Graduate Degree Program in Materials Science and Engineering at Pennsylvania State University, an expert in the field of LEDs and GaN-based semiconductor devices with over 240 peer-reviewed articles. *See* Redwing Decl. ¶¶ 4–5, 7.  Dr. Redwing is also well qualified to testify regarding the technology in this re-examination proceeding.

Appeal 2014-007890
Reexamination Control No. 90/010,940
Patent No. 6,600,175 B1

Similarly, Dr. Christian Wetzel[14] also testifies: (1) the generally accepted means of obtaining white light was to combine red, green, and blue LEDs (i.e., RGB "triplet" approach) (Wetzel Decl. ¶ 17), and (2) an artisan of ordinary skill would have pursued the use of RGB "triplet" approach to generate white light, and would have been dissuaded from pursuing phosphors "down-conversion" of LED light to white because phosphors were more expensive than other semiconductor materials (*id.* ¶¶ 18–20).

Based on the testimony of three renowned experts in the field of LEDs, each of whom was a person having ordinary skill in the art at the time of the invention and each of whom testified that Appellant's invention, i.e., the use of a blue LED and "down-conversion" to create white light was not obvious and an artisan of ordinary skill would have pursued a direct-emission RGB "triplet" approach using red, green, and blue LEDs, instead of pursuing "down-conversion" with a luminophoric medium, Appellant argues there is no reason to use a <u>blue</u> LED to create white light via down conversion. App. Br. 12–14; Reply Br. 1–5. According to Appellant, the expert testimony is corroborated with contemporaneous documents, including:

      (1)    Dr. Nakamura[15]—a highly renowned figure in the LED field and a person of extraordinary skill in the art at the

---

[14] Dr. Wetzel is the Wellfleet Career Development Constellation Professor, Future Chips at Rensselaer Polytechnic Institute, an expert in the field of LEDs and GaN-based LEDs with over 150 peer-reviewed articles. *See* Wetzel Decl. ¶¶ 5, 7. Dr. Wetzel is also well qualified to testify regarding the technology in this re-examination proceeding.

[15] Dr. Shuji Nakamura "is famous for his work with bright blue LEDs and is a named inventor on two of the references relied on in the Final Office Action: U.S. Patent No. 5,578,839 to Nakamura *et al.* ('Nakamura') and

Appeal 2014-007890
Reexamination Control No. 90/010,940
Patent No. 6,600,175 B1

time of the invention—characterized the "down-conversion"
approach as "impossible" in his book, THE BLUE LASER
DIODE: THE COMPLETE STORY 230 (2000) (Exhibit 11 –
Attachment D);

(2)   Nichia's Executive Vice President, Mr. Tazaki,
praised the Appellant's invention as "pioneering." *See* LEDs
Magazine, Industry News, Feb. 2005 (Exhibit 2); and

(3)   Alfred Vollmer, writing for Nikkei Electronics
Asia in 1997, summarized the situation as: "*Single white light-
emitting diodes (LEDs) were not feasible* to date as LEDs emit
monochromatic light only. *The mixture of colors making up
white light was up to now only possible by combining three
different diodes*" (Exhibit 9) (emphasis added).

App. Br. 4–10; Reply Br. 3–4.

We do not find Appellant's arguments and proffered evidence

persuasive to show reversible error on the part of the Examiner. *In re Jung*,

637 F.3d 1356, 1365 (Fed. Cir. 2011) (explaining that even if the examiner

had failed to make a prima facie case, the Board would not have erred in

framing the issue as one of reversible error because it has long been the

Board's practice to require an appellant to identify the alleged error in the

examiner's rejections). Rather, we find the Examiner has provided a

comprehensive response, supported by a preponderance of evidence, to each

of the contentions raised by Appellant and, as such, adopt as our own the

---

Japan Patent Application Publication H05-152609 to Tadatsu *et al.*
('Tadatsu')." App. Br. 4 n.3. Dr. Nakamura is one of the three recipients of
the 2014 Nobel Prize for Physics "for the invention of efficient blue light
emitting diodes, which has enabled bright and energy-saving white light
sources." Nobel Prize winners at http://www.nobelprize.org/nobel_prizes/
physics/laureates/2014/nakamura-facts.html (last visited Nov. 19, 2014).

Appeal 2014-007890
Reexamination Control No. 90/010,940
Patent No. 6,600,175 B1

Examiner's findings and reasons well-stated in the Examiner Answer at pages 43–134.

Nevertheless, we note Appellant's arguments are predicated upon: (1) multiple attacks of Stevenson, Pinnow, and Nakamura individually, (2) mischaracterization of the Examiner's reliance on these references, and (3) improper bodily incorporation of Pinnow into Stevenson. App. Br. 1–41. For example, Stevenson is not relied upon for disclosing a <u>blue</u> LED (Nakamura is). Ans. 6–13, 67. Nor is Stevenson relied upon for an express disclosure of the creation of white light. *Id*. at 15, 82–85. Likewise, Pinnow, not Stevenson, is relied upon for teaching phosphors dispersed in a polymer. *Id*. at 87–89. Instead, Stevenson is merely relied upon for the general teaching of a two-lead, GaN-based LED on a single die. *Id*. at 6–13. Similarly, Pinnow is not relied upon for disclosing the use of a blue argon gas laser as a light source; rather, a "down-conversion" approach to create white light. *Id*. at 17–19, 24–25, 31–33. And, Pinnow, not Nakamura, is relied upon for utilizing a "down-conversion" approach to create white light. *Id*. at 26–28, 33–34. As such, Appellant's arguments regarding: (1) why Stevenson's LED—a very low power, MIS type device—was unsuitable for the creation of white light, (2) why Pinnow's high power laser was incompatible with LEDs, and (3) Stevenson and Pinnow, if combined, do not yield white light, are misplaced and unpersuasive. App. Br. 29–35.

One cannot show nonobviousness by attacking references individually when the rejection is based on a combination of references. *In re Keller*, 642 F.2d 413, 425 (CCPA 1981). Each reference cited by the Examiner must be read, not in isolation, but for what it fairly teaches in combination

Appeal 2014-007890
Reexamination Control No. 90/010,940
Patent No. 6,600,175 B1

with the prior art as a whole. *See In re Merck & Co.*, 800 F.2d 1091, 1097 (Fed. Cir. 1986). Nor can nonobviousness be demonstrated by physically combining the references. *In re Sneed*, 710 F.2d 1544, 1550 (Fed. Cir. 1983); *see also In re Nievelt*, 482 F.2d 965, 968 (CCPA 1973) ("Combining the *teachings* of references does not involve an ability to combine their specific structures."). All the features of the secondary reference need not be bodily incorporated into the primary reference, *see Keller*, 642 F.2d at 425, and one having ordinary skill in the art is not compelled to blindly follow the teaching of one prior art reference over the other without the exercise of independent judgment, *see Lear Siegler, Inc. v. Aeroquip Corp.*, 733 F.2d 881, 889 (Fed. Cir. 1984). *See also KSR*, 550 U.S. at 421 ("A person of ordinary skill is also a person of ordinary creativity, not an automaton."). "The test for obviousness is not whether the features of a secondary reference may be bodily incorporated into the structure of the primary reference . . . . Rather, the test is what the combined teachings of the references would have suggested to those of ordinary skill in the art." *Keller*, 642 F.2d at 425.

Contrary to Appellant's arguments, we agree with the Examiner: (1) Stevenson and Nakamura teach a two-lead, GaN-based blue LED on a single die, (2) Stevenson and Pinnow teach a "down-conversion" via phosphors from LED light, including phosphors dispersed in a polymer located "about" the LED (Ans. 117–121) and, given the presumed knowledge by an artisan of ordinary skill regarding the relevant prior art at the time of Appellant's invention, (3) the combined teachings of Stevenson, Pinnow, and Nakamura would have suggested to an artisan of ordinary skill to use a <u>blue</u> LED on a

Appeal 2014-007890
Reexamination Control No. 90/010,940
Patent No. 6,600,175 B1

single die to create white light via "down-conversion" because Nakamura's blue LED is more powerful than Stevenson's older, less-efficient LED in terms of power and brightness and, as such, is more suitable with a "down-conversion" process to produce white light.  Ans. 16–17, 110.

We also do not find Appellant's expert testimony from Dr. Stringfellow (Exhibits 5–6), Dr. Redwing (Exhibit 11), and Dr. Wetzel (Exhibit 12) probative as to the dispositive question of whether an artisan of ordinary skill would have considered "down-conversion" of a <u>blue</u> LED to create white light, <u>not</u> before <u>but</u> after the emergence of high brightness and efficient blue LEDs developed by Dr. Shuji Nakamura in late 1993.  Rather, we find the Examiner has provided a comprehensive response, supported by a preponderance of evidence, to each of the contentions raised by Appellant and, as such, adopt as our own the Examiner's findings, considerations of Appellant's expert testimonies and reasons well-stated in the Examiner Answer at pages 43–134.

At the outset, we agree with Appellant that the dispositive issue presented in this appeal is simple and straightforward: was it obvious at the time of the invention to use an LED, in particular a <u>blue</u> LED, to create white light via down-conversion as recited in the claims?  Reply Br. 21.

The answer to that question need not require (1) hundreds of pages of briefing, expert testimony from Dr. Stringfellow, Dr. Redwing, and Dr. Wetzel, and corroborating evidence, and (2) in response, a 192-page, single-space Examiner's Answer.  Rather, the answer to that question is a simple resounding "yes" particularly, in light of high-power, high-brightness blue LEDs developed by Dr. Shuji Nakamura in late 1993, a major breakthrough

27

**A28**

Appeal 2014-007890
Reexamination Control No. 90/010,940
Patent No. 6,600,175 B1

in light technology for which he was awarded the 2014 Nobel Prize for Physics."[16]

In our view, Appellant's invention is nothing more than a new application of a high-power, high-brightness blue LED developed by Dr. Nakamura in late 1993 on a single die, and that application is predictable according to the blue LED's inherent functions, particularly, in view of: (1) the state of the art in LEDs, (2) the market demand for white light and design trends to create white light, (3) a finite number of identified, predictable solutions available to convert light from LEDs into white light (i.e., direct-emission "triplet" approach vs. "down-conversion" approach), (4) advantages and/or disadvantages of utilizing (i) the direct-emission "triplet" approach and (ii) the "down-conversion" approach to create white light, and (5) the sensibility of picking and choosing the "down-conversion" approach over the direct-emission "triplet" approach because light emitted from a single-die blue LED could now be down-converted directly into white light without the need of multiple "RGB" LEDs positioned on the same single die, via direct emission "triplet" approach.

Appellant's experts, Drs. Stringfellow, Redwing, and Wetzel, acknowledge: (1) Stevenson's seminal work on a violet/blue LED in early 1974, and (2) at the time of Appellant's invention in early 1996, there were two known approaches to produce white light from LEDs. One was a direct-emission "triplet" approach in which individual LEDs that emit three primary colors—red, green, and blue (RGB)—are packaged together and

---

[16] *See* Nobel Prize winners at http://www.nobelprize.org/nobel_prizes/physics/laureates/2014/nakamura-facts.html (last visited Nov. 19, 2014).

Appeal 2014-007890
Reexamination Control No. 90/010,940
Patent No. 6,600,175 B1

then all the primary (RGB) colors are mixed together to form white light.
The other was a "down-conversion" approach in which a phosphor material
is used to convert monochromatic light from a blue or ultraviolet (UV) LED
to create white light, much in the same way a fluorescent light bulb works.
*See* Stringfellow Decl. ¶¶ 24–26; Redwing Decl. ¶¶ 12, 16–18; Wetzel Decl.
¶¶ 17–20.  We find ample evidence of record supports the Examiner's
showing that "it is well within the level of skill of the [artisan of ordinary
skill at the time of Appellant's invention] to select a mixture of phosphors
(i.e., luminescent materials) to produce white light" upon excitation primary
radiation sources emitting blue or UV light, including, for example: (1)
Pinnow, col. 1, ll. 51–56; col. 6, ll. 28–30; (2) Appellant's Admitted Prior
Art (APA), col. 3, l. 40 – col. 4, l. 42; (3) Tabuchi, pages 3–5; (4) Menda ¶¶
21–23, and Fig. 4; (5) Abe, col. 2, ll. 20–36; and (6) Appellant's own
admitted prior art (APA), '175 patent, col. 10, ll. 41–65.  Ans. 44–50, 97–
108.

Dr. Redwing and Dr. Wetzel further testify the main reason the
"down-conversion" process was not used in connection with the then
existing LEDs ***prior*** to the 1994–1996 timeframe was because: (1) such a
"down-conversion" process requires a significant amount of power and
brightness to create white light, and LEDs available during that timeframe
did not have enough power and brightness level, and (2) phosphors were
more expensive than other semiconductor materials.  *See* Redwing Decl.
¶¶ 16–18 and Wetzel Decl. ¶¶ 18–20 (emphasis added).  According to Dr.
Redwing and Dr. Wetzel, because of these disadvantages, an artisan of
ordinary skill would have been dissuaded from considering "down-

Appeal 2014-007890
Reexamination Control No. 90/010,940
Patent No. 6,600,175 B1

conversion" and would instead utilize the direct emission RGB "triplet" approach to produce white light.  Redwing Decl. ¶¶ 16–18.

*Probative Value of Expert Testimony & Corroborating Evidence*

All Appellant's expert testimonies from Drs. Stringfellow, Redwing, and Wetzel are compelling and are considered persuasive relative to: (1) the general state of the art in LEDs, (2) the two primary approaches to produce white light from LEDs available at the time of the invention in early 1996, and (3) the question of whether an artisan of ordinary skill would have been dissuaded from considering "down-conversion" and would instead utilize the direct emission RGB "triplet" approach to produce white light. However, Appellant's expert testimonies do not account for: (1) the design need or market pressure for white light LEDs with sufficient power and brightness, (2) the finite number of solutions to create white light based on LEDs, (3) the level of skill by an artisan of ordinary skill, and (4) the emergence of high-power, high brightness blue LEDs by Dr. Shuji Nakamura in late 1993 and the impact of those bright blue LEDs in creating white light sources.

> When there is a design need or market pressure to solve a problem and there are a finite number of identified, predictable solutions, a person of ordinary skill in the art has good reason to pursue the known options within his or her technical grasp.  If this leads to the anticipated success, it is likely the product not of innovation but of ordinary skill and common sense.

*KSR*, 550 U.S. at 402–03.

An artisan of ordinary skill (i.e., a person having ordinary skill in the art) is a hypothetical person who is presumed to know all the relevant prior

Appeal 2014-007890
Reexamination Control No. 90/010,940
Patent No. 6,600,175 B1

art at the time of Appellant's invention (in 1996), including, for example: (1) Stevenson's seminal work on a violet/blue LED, (2) two known approaches to create white light based on LED, and (3) Nakamura's high-power, high-brightness blue LEDs in 1993 using gallium nitride revolutionized LED lighting, making high-power light sources practical. *In re GPAC*, 57 F.3d at 1579. Those persons "must be [also] presumed to know something" about the art "apart from what the references disclose." *In re Jacoby*, 309 F.2d 513, 516 (CCPA 1962). Thus, that person is presumed to have the technical competence and experience of skilled artisans working in the area of the subject invention and of the manner in which problems were solved, including sufficient skill to experiment with known approaches to create white light and decide on the best approach in view of the then newly developed high-power, high-brightness blue LEDs by Dr. Nakamura at the time of Appellant's invention, i.e., '175 patent. Ans. 122–129. Once the high-power, high-brightness blue LEDs developed by Dr. Nakamura became available in late 1993 (two years before Appellant's invention), the disadvantages of the "down-conversion" process using phosphors dissipated and such a process became available as a preferred solution to high-power, high-brightness blue LEDs to create white light.

We have reviewed all Appellant's expert testimonies from Drs. Stringfellow, Redwing, and Wetzel. However, we do not consider these testimonies to be probative as to the question of whether an artisan of ordinary skill would have considered "down-conversion" of a blue LED to create white light, especially after the high brightness and high efficient blue LEDs developed by Dr. Nakamura became available in late 1993. Likewise,

Appeal 2014-007890
Reexamination Control No. 90/010,940
Patent No. 6,600,175 B1

we are not persuaded by corroborating evidence, including: (1) Dr. Shuji Nakamura's Chapter 10.4 of his book, THE BLUE LASER DIODE: THE COMPLETE STORY (2000) in which Appellant has characterized as an acknowledgement the "down-conversion" approach was "impossible" until recently (Exhibit 11 – Attachment D); (2) Nichia's Executive Vice President, Mr. Tazaki, praised Appellant's invention as "pioneering" (*see* LEDs MAGAZINE, INDUSTRY NEWS, Feb. 2005 (Exhibit 2)); and (3) Alfred Vollmer, writing for Nikkei Electronics Asia in 1997, summarized the situation as: "*Single white light-emitting diodes (LEDs) were not feasible* to date as LEDs emit monochromatic light only. *The mixture of colors making up white light was up to now only possible by combining three different diodes*" (Exhibit 9) (emphasis added).

Contrary to Appellant's characterizations, Chapter 10.4 of Dr. Nakamura's book describes the opposite: "it has been impossible to obtain white LEDs until recently due to the lack of highly efficient blue and green LEDs." THE BLUE LASER DIODE: THE COMPLETE STORY 230 (2000). The same chapter also discusses the two approaches to create white light: (1) direct-emission "triplet" approach in which individual LEDs that emit three primary colors—red, green, and blue (RGB)—are packaged together and then all the primary (RGB) colors are mixed together to form white light; and (2) "down-conversion" approach in which a phosphor material is used to convert light from a blue LED to create white light. In fact, Dr. Nakamura concludes the "triplet" approach as more expensive because "RGB" LEDs are required instead of single-color LEDs. As a result, Nakamura suggests fabricating white LEDs using blue LEDs in combination

Appeal 2014-007890
Reexamination Control No. 90/010,940
Patent No. 6,600,175 B1

with "down-conversion" phosphors, *so that only one blue LED chip is required.* (Exhibit 9).

If anything, Dr. Nakamura actually suggests that fabricating white LEDs using blue LEDs in combination with "down-conversion" phosphors, shown, for example, in Fig 10.14 of Dr. Nakamura's book, would have been expected from those skilled in the art as a predictable use of a blue LED chip.[17]  Fig. 10.14 of Dr. Nakamura's book is reproduced below:



Fig. 10.14 of Nakamura's book shows an example structure of a white LED including a blue LED chip and a down-converting luminophoric medium, i.e., a phosphor layer on top of the blue LED chip to create white light.

---

[17]  Dr. Nakamura's book, THE BLUE LASER DIODE: THE COMPLETE STORY, does <u>not</u> appear to be prior art against Appellant's invention because its 2nd edition is published after the filing date of March 26, 1996 of the '175 patent. The 1st edition was not published until at least 1997 and, likewise, does not appear to be prior art against Appellant's invention either. http://link.springer.com/book/10.1007%2F978-3-662-03462-0 (last visited Nov. 19, 2014). As such, Chapter 10.4 of Dr. Nakamura's book cannot be used as § 102 prior art against Appellant's independent claims 118 and 134. Nevertheless, because Chapter 10.4 is cited and relied upon by Appellant to show nonobviousness (App. Br. 26–27, 33–34; Reply Br. 14–16), the same information can also be relied upon to show how such white light creation is a predictable use of Nakamura's blue LED chip if down-converted via phosphors consistent with the knowledge and level of those skilled in the art.

Appeal 2014-007890
Reexamination Control No. 90/010,940
Patent No. 6,600,175 B1

Likewise, the Alfred Vollmer article reinforces the teachings of
Chapter 10.4 of Dr. Nakamura's book that scientists at the Fraunhofer
Institute for Applied Solid State Physics of Freiburg, Germany, developed
white LEDs based on Dr. Nakamura's blue LEDs.  (Exhibit 9).

Similarly, the praise from Nichia's Executive Vice President,
Mr. Tazaki, describing Appellant's invention as "pioneering" is misleading.
That article refers to a patent cross-license agreement between Cree and
Nichia designed to prevent future litigation and to allow Cree access to
Nichia's patents relating to LED technology for solid-state white lighting
(Exhibit 2).  The word "pioneering" was not specifically used to describe
Appellant's invention, but was used in reference to a larger patent portfolio.

### Reason to Combine

We recognize that the Examiner must articulate some "reasoning with
some rational underpinning to support the legal conclusion of obviousness."
*In re Kahn*, 441 F.3d 977, 988 (Fed. Cir 2006).  The reasoning is important
"because inventions in most, if not all, instances rely upon building blocks
long since uncovered, and claimed discoveries almost of necessity will be
combinations of what, in some sense, is already known." *KSR*, 550 U.S. at
418–19.  However, the Examiner's reasoning need not appear in, or be
suggested by, one or more of the references on which the Examiner relies
upon.  Instead, a reason to combine teachings from the prior art "may be
found in explicit or implicit teachings within the references themselves, from
the ordinary knowledge of those skilled in the art, or from the nature of the

Appeal 2014-007890
Reexamination Control No. 90/010,940
Patent No. 6,600,175 B1

problem to be solved." *WMS Gaming Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1355 (Fed. Cir. 1999) (citing *In re Rouffet*, 149 F.3d 1350, 1357 (Fed. Cir. 1998)). "Under the correct [obviousness] analysis, any need or problem known in the field of endeavor at the time of invention and addressed by the patent can provide a reason for combining the elements in the manner claimed." *KSR*, 550 U.S. at 420.

Here, the Examiner has provided a reason showing motivation by a person of ordinary skill in the art to achieve the claimed subject matter, i.e., the advantage using Nakamura's GaN-based blue LED in place of Stevenson's GaN-based LED on a single die in combination of "down-conversion" phosphors to create white light. *See* Ans. 43–50, 110. Appellant has not demonstrated why that reason is erroneous or why a person of ordinary skill in the art *would not* have reached the conclusions reached by the Examiner. *See DyStar Textilfarben GmbH & Co. Deutschland KG v. C.H. Patrick Co.*, 464 F.3d 1356, 1368 (Fed. Cir. 2006) ("[T]he proper question is whether the ordinary artisan possesses knowledge and skills rendering him *capable* of combining the prior art references."). Consequently, we are not persuaded by Appellant's arguments that the Examiner failed to articulate a rationale for combining Stevenson, Pinnow, and Nakamura.

*Impermissible Hindsight*

We are also not persuaded by Appellant's arguments that the Examiner has engaged in an impermissible hindsight to combine the teachings of Stevenson, Pinnow, and Nakamura to use a blue LED to create

35

**A36**

Appeal 2014-007890
Reexamination Control No. 90/010,940
Patent No. 6,600,175 B1

white light via down conversion. App. Br. 12–14; Reply Br. 1–5. We are
cognizant that our reviewing courts have not established a bright-line test for
hindsight. The U.S. Supreme Court guides that "[a] factfinder should be
aware, of course, of the distortion caused by hindsight bias and must be
cautious of arguments reliant upon *ex post* reasoning." *KSR*, 550 U.S. at 421
(citing *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 36 (1966)).
Nevertheless, the Court has also qualified the issue of hindsight by stating
"[r]igid preventative rules that deny factfinders recourse to common sense,
however, are neither necessary under our case law nor consistent with it."
*KSR*, 550 U.S. at 421.

In this appeal, we see the hindsight question before us as a *balancing
test*, i.e., whether: (1) the Examiner's proffered combination of references is
merely "the predictable use of prior art elements according to their
established functions" (*KSR*, 550 U.S. at 417), consistent with common
sense; or, (2) an artisan would not have reasonably combined the cited
references in the manner proffered by the Examiner *but for* having the
benefit of the claim to use as a guide (i.e., impermissible hindsight).

After reviewing the respective teachings and suggestions of the cited
references, we find weight of the evidence shows the proffered combination
is merely a predictable use of prior art elements according to their
established functions. Therefore, on this record, we are not persuaded the
Examiner engaged in impermissible hindsight, as Appellant contends. App.
Br. 12–14; Reply Br. 1–5. Moreover, Appellant has not demonstrated the
Examiner's proffered combination of references would have been "uniquely
challenging or difficult for one of ordinary skill in the art." *See Leapfrog*

36

**A37**

Appeal 2014-007890
Reexamination Control No. 90/010,940
Patent No. 6,600,175 B1

*Enters., Inc. v. Fisher-Price, Inc.*, 485 F.3d 1157, 1162 (Fed. Cir. 2007)

(citing *KSR*, 550 U.S. at 418).

*Evidence of Nonobviousness Based on Secondary Considerations*

Factual inquiries for an obviousness determination include secondary considerations based on evaluation and crediting of objective evidence of nonobviousness. *Graham*, 383 U.S. at 17. Notwithstanding what the teachings of the prior art would have suggested to one with ordinary skill in the art at the time of Appellant's invention, the totality of the evidence submitted, including objective evidence of nonobviousness, may lead to a conclusion that the challenged claims would not have been obvious to one with ordinary skill in the art. *In re Piasecki*, 745 F.2d 1468, 1471–72 (Fed. Cir. 1984). Secondary considerations may include any of the following: long-felt but unsolved needs, failure of others, unexpected results, commercial success, copying, licensing, and praise. *See Graham*, 383 U.S. at 17; *Leapfrog Enters.*, 485 F.3d at 1162.

Evidence of nonobviousness must be commensurate in scope with the claimed invention. *In re Kao*, 639 F.3d 1057, 1068 (Fed. Cir. 2011) (citing *In re Tiffin*, 448 F.2d 791, 792 (CCPA 1971)); *In re Hiniker Co.*, 150 F.3d 1362, 1369 (Fed. Cir. 1998). In that regard, in order to be accorded substantial weight, there must be a nexus between the merits of the claimed invention and the evidence of secondary considerations. *In re GPAC Inc.*, 57 F.3d at 1580. "Nexus" is a legally and factually sufficient connection between the objective evidence and the claimed invention, such that the objective evidence should be considered in determining nonobviousness.

Appeal 2014-007890
Reexamination Control No. 90/010,940
Patent No. 6,600,175 B1

*Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*, 851 F.2d 1387, 1392
(Fed. Cir. 1988). The burden of showing that there is a nexus lies with
Appellant. *Id.*; *see also In re Paulsen*, 30 F.3d 1475, 1482 (Fed. Cir. 1994).

Appellant argues that there is substantial evidence of nonobviousness
based on secondary considerations. In support of these arguments,
Appellant relies on three Declarations under 37 C.F.R. § 1.132 from Dr.
George Brandes (Exhibits 2–4), a Director of IP Strategy and Business
Development at Cree, Inc., to provide testimony of non-obviousness,
including: (1) evidence of long felt but unsolved need, (2) unexpected
results, (3) scientific recognition and industry acknowledgement,
(4) licensing, and (5) commercial success of Appellant's invention also
allegedly corroborated with documentary evidence. Again, we are not
persuaded, and adopt as our own the Examiner's findings and reasons well-
stated in the Examiner Answer at pages 173–191. Nevertheless, for
purposes of completeness, the evidence pertaining to each secondary
consideration is discussed separately below.

### *(1) Long-Felt but Unsolved Need*

Establishing long-felt need requires objective evidence that an art
recognized problem existed in the art for a long period of time without
solution. In particular, the evidence must show that the need was a
persistent one that was recognized by those of ordinary skill in the art. *In re
Gershon*, 372 F.2d 535, 539 (CCPA 1967).

Appellant argues the Specification of the '175 patent describes the
need for a white light single-die LED that would be useful for application,

Appeal 2014-007890
Reexamination Control No. 90/010,940
Patent No. 6,600,175 B1

and that the white light single-die LED problem eluded solution for a number of years.  App. Br. 54 (citing '175 patent at col. 1, l. 11–col. 5, l. 59).  In addition, Appellant argues: (1) Stevenson, which issued June 25, 1974, attests to the long-standing character of this long felt but unsolved need, and (2) the 1997 information release of Fraunhofer Institute, Freiberg, Germany, which states that "three years ago [i.e., in 1994] . . . the emission of white light by a single chip LED was still impossible" (Exhibit 5, 16 (citing Attachment N)) and such "information release evidences a time span of 20 years over which 'the emission of white light by a single chip LED was still impossible,['] []until solved by the present inventors in making the invention disclosed."  App. Br. 54–55.  Appellant also argues a single die LED white light device remained an elusive goal for many years since the only LED approach was considered viable for white light production was the combination of three LEDs, each of a different primary color (red, blue, green, respectively)—so-called LED "triplets."  *Id.* (citing '175 patent, col. 3, ll. 17–28).

   We find Appellant's arguments misleading, however.  First, nowhere in the '175 patent or Stevenson is there a description of this long felt but unsolved need as Appellant argues.  As correctly recognized by the Examiner,

> Stevenson . . . successfully solved the problem in exactly the same manner as claimed: <u>using a luminophor (phosphor) to convert blue-to-UV light from a GaN-based LED to visible light, including white light</u>.  That is all that is claimed, and it was successfully done by others (Stevenson . . .) 20 years before the time of the '175 patent.  Thus, there is no unsolved need. Instead, that which Appellant and its declarants make clear is that there was a long felt need for a white LED device

39

Appeal 2014-007890
Reexamination Control No. 90/010,940
Patent No. 6,600,175 B1

> that was **bright** enough to be **commercially viable.**  The key to
> the brightness issue was the invention of a LED emitting
> sufficiently bright light in the UV-to-blue, or to green, range of
> the spectrum, and that was done by others, e.g. Nakamura, <u>not</u>
> by the inventors of the '175 patent. . . .
>
> To the extent that the '175 patent may disclose
> information directed to making the white LEDs bright enough
> to be of practical value in commercial applications such as
> backlights for LEDs (Brief, p. 54), <u>none of this is claimed in the
> claims at issue in this reexamination,</u> so the point is moot.

Ans. 173 (emphasis added).

Second, the Fraunhofer press release is an advertisement that does not
identify any problem existing in the art for a long period of time without
solution.  *Id.* at 174.  Third, and contrary to Appellant's arguments, the
direct emission "triplet" approach was not the only approach considered
viable for white light production.  As testified by Drs. Stringfellow,
Redwing, and Wetzel, the "down-conversion" approach was also available
for white light production but was not used because LEDs available before
the 1994–1996 timeframe did not have enough power and/or brightness level
to be practical.  *See* Stringfellow Decl. ¶¶ 24–26; Redwing Decl. ¶¶ 12, 16–
18; Wetzel Decl. ¶¶ 17–20.  Thus, we do not find Appellant's arguments and
proffered evidence to be persuasive.

### *(2) Unexpected Results*

"[U]nexpected results [relied upon to rebut a prima facie case of
obviousness] . . . must be shown to be unexpected compared with the closest
prior art."  *In re Baxter Travenol Labs*, 952 F.2d 388, 392 (Fed. Cir. 1991)

Appeal 2014-007890
Reexamination Control No. 90/010,940
Patent No. 6,600,175 B1

(citation omitted).  Such evidence must be commensurate in scope with the degree of patent protection desired.  *In re Grasselli*, 713 F.2d 731, 743 (Fed. Cir. 1983).  In addition, the difference in results relied upon to establish nonobviousness must be shown to be truly unexpected by one of ordinary skill in the art.  *Pfizer Inc. v. Apotex Inc.*, 480 F.3d 1348, 1371 (Fed. Cir. 2007).  Thus, it is not enough to merely show that there is a difference— even a significant difference.  Rather, the difference in results must be shown to be unexpected by one of ordinary skill in the art.  *In re Harris*, 409 F.3d 1339, 1344 (Fed. Cir. 2005).

In this case, Appellant has not performed any comparison relative to the closest prior art.  Nor has Appellant directed us to any evidence indicating that an artisan of ordinary skill would have considered the difference in results to be truly unexpected.  Instead, Appellant simply advances two arguments: (1) the invention of a single die white light LED embodied an unexpected result, and (2) the invention was surprisingly found to provide white light LED devices that are in fact capable of producing white light of sufficient uniformity and intensity for general applications. App. Br. 55–56.

While attorney arguments are helpful when directing us to evidence in the record, the arguments themselves do not constitute evidence.  Here, Appellant's arguments are speculative and unsupported by objective evidence.  Ans. 176.  Argument of counsel cannot take the place of evidence lacking in the record.  *Meitzner v. Mindick*, 549 F.2d 775, 782 (CCPA 1977); *see also In re Pearson*, 494 F.2d 1399, 1405 (CCPA 1974).  As such, these arguments are entitled to little probative value.  *In re Geisler*, 116 F.3d

Appeal 2014-007890
Reexamination Control No. 90/010,940
Patent No. 6,600,175 B1

1465, 1470 (Fed. Cir. 1997); *In re De Blauwe*, 736 F.2d 699, 705 (Fed. Cir. 1984).  Thus, we find Appellant's arguments and proffered evidence unpersuasive.

### (3) Scientific Recognition and Industry Acknowledgement

Appellant argues because failure of the art to achieve white light emission from a single LED, and failure of the art to achieve commercially viable organic light emitting devices, Appellant's invention is a remarkable breakthrough in the form of a single LED device for the production of white light.  App. Br. 56.  In addition, Appellant cites press releases from Nichia in Japan and Fraunhofer Institute in Germany, as evidence of commercial success and/or industry acknowledgement.  Appellant further relies on the Declaration of Dr. Brandes (Exhibit 2) to support a claim that the '175 patent has been recognized in the optoelectronics and illumination products industry as a patent claiming a fundamental advance in the field of LED device and display technology.

We do not find Appellant's arguments and proffered evidence persuasive and, as such, adopt the Examiner's response outlined in Examiner's Answer.  Ans. 176–178.  In particular, Fraunhofer's 1997 release states, *inter alia*:

> This problem was solved by a research team at the Fraunhofer- Institut für Angewandte Festkörperphysik IAF in Freiburg (Germany) and, at the same time, by their colleagues at Nichia Chemical Industries in Japan.  <u>Their innovative idea was to generate white light by luminescence conversion.  They combined a blue emitting GaN LED with an organic dye or an inorganic phosphor, emitting at longer wavelengths, to synthesise white light by additive colour mixing.</u>  Peter

Appeal 2014-007890
Reexamination Control No. 90/010,940
Patent No. 6,600,175 B1

> Schlotter, a member of the IAF research team, points out a
> further advantage of the new luminescence conversion LEDs
> (LUCOLEDs): "LUCOLEDs allow to extend the range of
> colours emitted by LEDs to whatever colour is required,
> depending on which conversion dyes or phosphors are used.
> Even purple light, which is impossible to be generated by
> conventional LEDs, can be emitted by LUCOLEDS."  For the
> invention of the single chip white emitting LED the research
> team at the IAF was awarded the 1997 Fraunhofer Prize.

>     This simple but innovative and low cost process,
> developed in close cooperation with Siemens AG, will enable
> mass production of white emitting LEDs.  Siemens plans to
> start up production of white light single chip LEDs in 1998.

App. Br. 57–58 (citing Fraunhofer-Gesellschaft: Research News Special

1997) (Exhibit 5) (emphasis added).

As correctly recognized by the Examiner, these praises and

acknowledgements are directed to the invention of others, i.e., Nichia and

Siemens AG, and not Appellant's invention.  Ans. 176.  To the extent

Appellant intends to argue these belated praises and press releases are

directed to Appellant's invention filed in the PTO two (2) years earlier, we

see these press releases and praises as strong evidence of obviousness, rather

than non-obviousness—in view of blue LEDs available from Dr.

Nakamura—the entire industry was adopting the known "down-conversion"

process via phosphors to create white light.

### (4) Licensing

Licensing alone is insufficient for purposes of commercial success.

See EWP Corp. v. Reliance Universal, Inc., 755 F.2d 898 (Fed. Cir. 1985)

Appeal 2014-007890
Reexamination Control No. 90/010,940
Patent No. 6,600,175 B1

(evidence of licensing is a secondary consideration which must be carefully appraised as to its evidentiary value because *licensing programs may succeed for reasons unrelated to the unobviousness of the product or process*, e.g., license is mutually beneficial or less expensive than defending infringement suits) (emphasis added). When a license of a patent is presented as evidence of the success of a patent, the patentee must provide additional evidence of the importance of the claimed invention within the license. *Id.* Without a showing of nexus, "the mere existence of . . . licenses is insufficient to overcome the conclusion of obviousness" when there is a strong prima facie case. *SIBIA Neurosciences, Inc. v. Cadus Pharm. Corp.*, 225 F.3d 1349, 1358 (Fed. Cir. 2000). Moreover, evidence of license agreements can also be disregarded if the terms of the licenses or the circumstances under which they were granted are not disclosed. *See Iron Grip Barbell Co., Inc. v. USA Sports, Inc.*, 392 F.3d 1317, 1324 (Fed. Cir. 2004).

Appellant relies on two (2) Declarations of Dr. George R. Brandes under 37 C.F.R. §1.132 (Brandes Decl. II—Exhibit 2) (Brandes Decl. IV—Exhibit 4) to show the patentee, Cree's licensing and cross-licensing programs as evidence the recognition of the '175 patent by major companies in the optoelectronics and illumination products industry, e.g., Nichia Corp. (Exhibit 2B), Toyota Gosei (Exhibit 2C), Osram GrmbH (Exhibit 2D), Philips (Exhibit 2E), and the royalty-bearing license agreements involving the '175 patent with various companies, including: Aurora Energie, Horner APG, Ledzworld Technology, Vexica Technology, and Wyndsor Light (Exhibit 2A) as well as Stanley, Rohm, Kingbright Electronics Co., Ltd., and

Appeal 2014-007890
Reexamination Control No. 90/010,940
Patent No. 6,600,175 B1

Seoul Semiconductor, Inc.  App. Br. 58–60 (citing Brandes Decl. II—
Exhibits 2A–E).

    However, we note Exhibits 2A–2E are nothing more than press
releases and media reports regarding the licensing and cross-licensing
between the patentee, Cree and these companies to allow access to each
other's patented LED chip and packaged LED technology, including white
LED technology without fear of future litigation.  Appellants do not show
these licensing programs are directed to the subject matter of the '175 patent.
In fact, none of these license agreements makes any specific reference to the
'175 patent, except for the license issued to Cotco Holdings requiring the
mark "Powered by Cree®, U.S. Patent No. 6,600,175" on products produced
pursuant to the license.  Brandes Decl. IV ¶ 7.  Nevertheless, Dr. Brandes
testifies that confidential provisions prevent disclosure of particular
provisions of these license agreements.  *Id.* ¶¶ 7–8.

    In the absence of the specific terms of these licenses or the
circumstances under which they were granted, we do not see how these
licenses are probative of non-obviousness of the '175 patent claims at issue,
as correctly observed by the Examiner.  Ans. 178–180.  As such, we are not
persuaded by Appellant's arguments regarding his licensing programs.

### (5) Commercial Success

    Appellant bears the initial burden of proving that there is a nexus
between the claimed invention and the commercial success.  *Ormco Corp. v.
Align Tech., Inc.*, 463 F.3d 1299, 1311–12 (Fed. Cir. 2006).

Appeal 2014-007890
Reexamination Control No. 90/010,940
Patent No. 6,600,175 B1

Appellant relies on a 3rd Declaration of Dr. George R. Brandes under 37 C.F.R. §1.132 (Brandes Decl. III – Exhibit 3) to show commercial success of the invention, via market research data of LED/white light products. App. Br. 60–61 (citing Brandes Decl. III ¶¶ 21–22). Appellant further attempts to show the nexus between the claimed invention and the commercial success, via Dr. Brandes' own characterization of "nexus." *Id.* at 62–65 (citing Brandes Decl. III ¶¶ 24–40).

However, market research data of LED/white light products is not actual sale data; rather, potential sale data. Even if market research data were sale data, such sale data is hardly indicative of the commercial success of the subject matter disclosed in the '175 patent. As correctly recognized by the Examiner, market research data or even sale data does not, in and of itself, establish a nexus between the claimed invention and commercial success. For such a nexus to exist there must be evidence that it was the claimed invention that caused the increased sale. Ans. 181. Dr. Brandes' Declaration does not show a correlation between the claimed invention and the sales numbers, much less that the licensing of the '175 patent had anything at all to do with commercial success. *Id.*

Likewise, Dr. Brandes' own characterization of "nexus" is nothing more than an allegation or a conclusory statement in the form of an affidavit and, as such, does not take the place of *factual* evidence. *See, e.g.*, *In re Lindner*, 457 F.2d 506, 508 (CCPA 1972) ("The affidavit and specification do contain allegations that synergistic results are obtained with all the claimed compositions, but those statements are not supported by any factual evidence . . . . [M]ere conclusory statements in the specification and

46

**A47**

Appeal 2014-007890
Reexamination Control No. 90/010,940
Patent No. 6,600,175 B1

affidavits are entitled to little weight when the Patent Office questions the efficacy of those statements.").

We find Appellant's arguments unpersuasive and proffered evidence of commercial success not commensurate in scope with the claims. We also find the evidence is insufficient to exclude the possibility of commercial success due to other factors, and Appellant provides only market research data and does not show commercial success absent evidence as to market share. In our view, the record is completely silent on whether the commercial success was caused by the subject matter of the '175 patent as distinct from the prior art.

Because the evidence of secondary considerations in support of nonobviousness does not outweigh the strong evidence of obviousness, we sustain the Examiner's rejection of claims 118, 134, and 140 under 35 U.S.C. § 103(a) based on Stevenson, Pinnow, and Nakamura. "[E]vidence of secondary considerations does not always overcome a strong prima facie showing of obviousness." *Asyst Techs., Inc. v. Emtrak, Inc.*, 544 F.3d 1310, 1316 (Fed. Cir. 2008).

### *§ 103(a) Rejection of Claims 135, 136, and 140 based on Stevenson, Pinnow, Nakamura, and Tadatsu*

Dependent claim 135 further requires the "luminophoric medium dispersed in a polymer" on the single-die GaN-based blue LED. Alternatively, dependent claim 136 requires the polymer as "contiguous to the die side surface" of the single-die GaN-based blue LED. Claim 140 further requires the single-die LED "arranged to *directly impinge* radiation on the polymer" (emphasis added).

Appeal 2014-007890
Reexamination Control No. 90/010,940
Patent No. 6,600,175 B1

The Examiner further relies on Tadatsu for disclosing additional
features of claims 135, 136, and 140 in the context of using LEDs to create
white light via "down-conversion" phosphors.  Ans. 18–29 (citing Tadatsu
¶ 3 and Fig. 2).

Fig. 2 of Tadatsu is reproduced below.



Fig. 2 of Tadatsu shows a luminophoric medium dispersed in a polymer (5)
that is positioned <u>on</u> the single-die LED (11) and such a LED (11) is
arranged to *directly impinge* radiation to the polymer (5).

Based on these factual findings, the Examiner concludes such features
would have been obvious to an artisan of ordinary skill.  Ans. 19–20.

Appellant argues Tadatsu only discloses a GaN-based LED that is
surrounded by a resin mold that contains a fluorescent dye or pigment that
absorbs short wavelength light and emits light having a longer wavelength.
App. Br. 37 (citing Tadatsu ¶¶ 7–9).  According to Appellant, Tadatsu is
about creating a primary color blue LED from a violet LED, which is not
perceived well by the human eye.  *See* Redwing Decl. ¶¶ 12, 39.

However, we find Appellant's arguments are not commensurate in
scope with claims 135, 136, and 140.  Appellant's claimed "luminophoric
medium dispersed in a polymer" encompasses the fluorescent dye or
pigment included in the resin mold that is positioned directly on the single-

Appeal 2014-007890
Reexamination Control No. 90/010,940
Patent No. 6,600,175 B1

die LED and such a single-die LED is able to directly impinge radiation to the polymer in the manner recited in Appellant's claims 135, 136, and 140.

For the reasons set forth above, Appellant has not persuaded us of any error in the Examiner's rejection of claims 135, 136, and 140. Accordingly, we sustain the Examiner's rejection of claims 135, 136, and 140 based on Stevenson, Pinnow, Nakamura, and Tadatsu.

*§ 103(a) Rejection of Claims 138 and 140 based on
Stevenson, Pinnow, Nakamura, and Tabuchi*

Dependent claim 138 further requires the polymer as "laterally spaced relationship" to the die side surface of the single-die GaN-based blue LED. Again, claim 140 further requires the single-die LED "arranged to *directly impinge* radiation on the polymer" (emphasis added).

The Examiner further relies on Tabuchi for disclosing additional features of claims 138 and 140 in the context of using LEDs to create white light via "down-conversion" phosphors. Ans. 20–22 (citing Tabuchi 3–5, and Fig. 1).

Figure 1 of Tabuchi is reproduced below with additional markings for illustration.

49

**A50**

Appeal 2014-007890
Reexamination Control No. 90/010,940
Patent No. 6,600,175 B1



Fig. 1 of Tabuchi shows a luminophoric medium dispersed in a polymer (1) that is positioned in a lateral spaced relationship to side die surface of a single-die LED (4) and such a LED (11) is arranged to *directly impinge* radiation to the polymer (5).

Based on these factual findings, the Examiner concludes such features would have been obvious to an artisan of ordinary skill.  Ans. 21–22.

Appellant argues Tabuchi only teaches a phosphor layer that coats the inside surface of the cover and converts UV light emitted to visible light. App. Br. 38 (citing Tabuchi ¶ 2).  However, we disagree and adopt the Examiner's finding and response well-stated on pages 139–143 of Examiner's Answer.  For the reasons set forth therein, we sustain the Examiner's rejection of claims 138 and 140 based on Stevenson, Pinnow, Nakamura, and Tabuchi.

*§ 103(a) Rejection of Claims 118 and 134 based on*
*Stevenson, APA, Wanmaker, Nakamura, Tabuchi, and Martic*

Appeal 2014-007890
Reexamination Control No. 90/010,940
Patent No. 6,600,175 B1

Claims 118 and 134, as discussed above, are directed to light emission devices that include a blue light-emitting diode in combination with a down-converting luminophoric medium to produce a white light.

Appellant reiterates the same arguments presented against claims 118 and 134 based on deficiencies of Stevenson. App. Br. 38–41. In addition, Appellant argues impermissible hindsight based on the large number of references cited. *Id*. at 41.

We remain unpersuaded. As correctly noted by the Examiner, reliance on a large number of references in a rejection does not, without more, weigh against the obviousness of the claimed invention. *In re Gorman*, 933 F.2d 982, (Fed. Cir. 1991). Moreover, APA is simply cited as an alternative to the teachings of Pinnow, i.e., the same "down-conversion" process via phosphors. Ans. 44–46.

As such, and for the same reasons discussed in connection with the combination of Stevenson, Pinnow, and Nakamura, we also sustain the Examiner's rejection of claims 118 and 134.

CONCLUSION

On the record before us, we determine that Appellant has failed to demonstrate any error in the Examiner's determination that an artisan of ordinary skill would have found it obvious to use a blue LED to create white light via down-conversion, and that the relied upon rebuttal evidence is insufficient to outweigh the evidence in support of obviousness. Accordingly, we conclude that the Examiner has not erred in rejecting: (1) claims 118, 134, and 140 under 35 U.S.C. § 103(a) as being unpatentable

Appeal 2014-007890
Reexamination Control No. 90/010,940
Patent No. 6,600,175 B1

over Stevenson, Pinnow, and Nakamura; (2) claims 135, 136, and 140 under 35 U.S.C. § 103(a) as being unpatentable over Stevenson, Pinnow, Nakamura, and Tadatsu; (3) claims 138 and 140 under 35 U.S.C. § 103(a) as being unpatentable over Stevenson, Pinnow, Nakamura, and Tabuchi; (4) claims 118 and 134 under 35 U.S.C. § 103(a) as being unpatentable over Stevenson, APA, Wanmaker, Nakamura, Tabuchi, and Martic.


## DECISION

As such, we AFFIRM the Examiner's final rejection of claims 118, 134–136, 138, and 140.  Because we have affirmed at least one ground of rejection with respect to each claim on appeal, the Examiner's decision is affirmed.  *See* 37 C.F.R. § 41.50(a)(1).

Our affirmance is dispositive as to claims 118, 134–136, 138, and 140.  It is not necessary, therefore, to address the other, cumulative grounds of rejection entered by the Examiner, including: (1) whether claims 118, 134, 138, and 140 are patentable under 35 U.S.C. § 103(a) over Tabuchi, APA, Wanmaker, Nakamura, and Martic; (2) whether claims 118, 134, 138, and 140 are patentable under 35 U.S.C. § 103(a) over Tabuchi, Pinnow, and Nakamura; and (3) whether claims 135 and 136 are patentable under 35 U.S.C. § 103(a) over Tabuchi, Pinnow, Nakamura, and Tadatsu.  *See In re Hyon*, 679 F.3d 1363, 1367 (Fed. Cir. 2012) (noting that affirmance of rejection of all claims under § 103(a) made it unnecessary to reach other grounds of rejection); *Beloit Corp. v. Valmet Oy*, 742 F.2d 1421, 1423 (Fed. Cir. 1984) (holding that by deciding a single dispositive issue, the ITC was not required to review other matters decided by the presiding officer).

Appeal 2014-007890
Reexamination Control No. 90/010,940
Patent No. 6,600,175 B1

Requests for extensions of time in this *ex parte* reexamination

proceeding are governed by 37 C.F.R. § 1.550(c).  *See* 37 C.F.R. § 41.50(f).

<u>AFFIRMED</u>

bar

Appeal 2014-007890
Reexamination Control No. 90/010,940
Patent No. 6,600,175 B1

For Patent Owner:

Peter M. Dichiara, Esq.
Heather M. Petruzzi, Esq.
Wilmer Cutler Pickering Hale and Dorr LLP
60 State Street
Boston, MA 02109

For Third Party Requester:

Michael E. Hilton, Esq.
Harness, Dickey & Pierce, P.L.C.
P.O. Box 828
Bloomfield Hills, Michigan 48303

# TAB 2


US006600175B1

(12) **United States Patent**
Baretz et al.

(10) **Patent No.:**    **US 6,600,175 B1**
(45) **Date of Patent:**    *Jul. 29, 2003

(54) **SOLID STATE WHITE LIGHT EMITTER AND DISPLAY USING SAME**

(75) Inventors: **Bruce Baretz**, West Milford, NJ (US); **Michael A. Tischler**, Danbury, CT (US)

(73) Assignee: **Advanced Technology Materials, Inc.,** Danbury, CT (US)

( * ) Notice: This patent issued on a continued prosecution application filed under 37 CFR 1.53(d), and is subject to the twenty year patent term provisions of 35 U.S.C. 154(a)(2).

Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 1212 days.

(21) Appl. No.: **08/621,937**

(22) Filed: **Mar. 26, 1996**

(51) Int. Cl.[7] ............................................. **H01L 33/00**

(52) U.S. Cl. .......................... 257/100; 257/88; 257/98; 257/99

(58) Field of Search ............................. 257/88, 98, 99, 257/100

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | | |
|---|---|---|---|---|---|
| 3,593,055 | A | * | 7/1971 | Geusic | 257/98 |
| 3,763,405 | A | * | 10/1973 | Mitsuhata | 257/98 |
| 3,932,881 | A | * | 1/1976 | Mita | 257/98 |
| 4,992,704 | A | | 2/1991 | Stinson | 315/312 |
| 5,126,214 | A | * | 6/1992 | Tokailin | 257/99 |
| 5,208,462 | A | * | 5/1993 | O'Conner | 257/98 |
| 5,405,709 | A | | 4/1995 | Littman et al. | 428/690 |
| 5,583,349 | A | * | 12/1996 | Norman | 257/88 |
| 5,660,461 | A | * | 8/1997 | Ignatius | 257/88 |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| JP | 60170194 | 9/1985 |
| JP | 04289691 | 10/1992 |

| | | | | |
|---|---|---|---|---|
| JP | 5-152609 | * | 6/1993 | 257/98 |

OTHER PUBLICATIONS

Sato, Y. et al, "Full–Color Fluorescent Display Devices Using a Near–UV Light Emitting Diode", *Jpn. J. Appl. Phys.* vol. 35 (1996) pp. L 838–L839.

J.I. Pankove and E.R. Levin, "Scanning Electron Microscopy Studies of GaN" J. Appl. Phys. vol. 46, (1975), pp. 1647–1652.

I. Akasaki, et al., "Photoluminescence of Mg–doped p–type GaN and Electroluminescence of GaN p–n Junction LED" *J. Lumion.*, vol. 48–49, (1991) pp. 666–670.

H. Amano et al., UV and Blue Electroluminescence from Al.GaN:Mg/GaN LED treated eith Low–Energy Electron Beam Irradiation (LEEBI), *Inst. Phys. Conf. Ser.* vol. 106, (1990), pp. 725–730.

Munch et al, "Silicon Carbide Light–Emitting Diodes with Epitaxial Junctions" *Solid State Electronics*, vol. 19, (1976) p. 871.

Zhang Jin Chao et al., White Light Emitting Glasses, Journal of Solid State Chemistry, 93, 17–29 (1991), pp. 17–29.

(List continued on next page.)

*Primary Examiner*—Jerome Jackson
(74) *Attorney, Agent, or Firm*—Steven J. Hultquist; Margaret Chappuis

(57) **ABSTRACT**

A light emitting assembly comprising a solid state device coupleable with a power supply constructed and arranged to power the solid state device to emit from the solid state device a first, relatively shorter wavelength radiation, and a down-converting luminophoric medium arranged in receiving relationship to said first, relatively shorter wavelength radiation, and which in exposure to said first, relatively shorter wavelength radiation, is excited to responsively emit second, relatively longer wavelength radiation. In a specific embodiment, monochromatic blue or UV light output from a light-emitting diode is down-converted to white light by packaging the diode with fluorescent organic and/or inorganic fluorescers and phosphors in a polymeric matrix.

**26 Claims, 3 Drawing Sheets**



**A56**

**US 6,600,175 B1**

Page 2

OTHER PUBLICATIONS

Shosaku Tanaka, et al., Bright White–Light Electrolumines-cence Based on Nonradiative Energy Transfer in Ce– and Eu–doped SrS Thin Films, Appl. Phys. Lett. 51 (21), Nov. 23, 1987, pp. 1661–1663.

M. Berggren et al., White Light From an Electroluminescent Diode Made From poly[3(4–octylphenyl)–2,2'–bithiophene] and an Oxadiazole Derivatives, J. Appl. Phys. 76 (11), Dec. 1, 1994, pp. 7530–7534.

J. Kido et al., White Light–Emitting Organic Electrolumi-nescent Devices Using the poly(N–vinylcarbazole) Emitter Layer Doped with Three Fluorescent Dyes, Appl. Phys. Lett., 64 (7) Feb. 14, 1994, pp. 815–817.

N. El Jouhar et al., White Light Generation Using Fluores-cent Glasses Activated by $Ce^{3+}$, $Tb^{3+}$ and $Mn^{2+}$ Ions, J. De Physique IV, Colloque C2, supplement au j. de Physique III, vol. 2, Oct. 1992, pp. 257–260.

* cited by examiner

# FIGURE 1



# FIGURE 2



# FIGURE 3



# FIGURE 4



# FIGURE 5



# FIGURE 6

US 6,600,175 B1

1

# SOLID STATE WHITE LIGHT EMITTER AND DISPLAY USING SAME

## FIELD OF THE INVENTION

This invention relates to solid state light emitting devices such as light emitting diodes and more particularly to such devices which produce white light.

## BACKGROUND OF THE INVENTION

Solid state light emitting devices, including solid state lamps including LEDs are extremely useful because they potentially offer lower fabrication costs and long term durability benefits over conventional incandescent and fluorescent lamps. Due to their long operation (burn) time and low power consumption, solid state light emitting devices frequently provide a functional cost benefit, even when their initial cost is greater than that of conventional lamps. However, because large scale semiconductor manufacturing techniques can be used, many solid state lamps can be produced at extremely low cost. One such device is the solid state light emitting diode (LED) which has low fabrication costs, long operational lifetimes and low maintenance costs.

Light emitting diodes (LEDs), and similarly constructed super luminescent diodes and semiconductor diode lasers, are commercially available and a wide variety of designs and manufacturing techniques have been developed. In addition to applications such as indicator lights on home and consumer appliances, audio visual equipment, telecommunication devices and automotive instrument markings, such LEDs have found considerable application in indoor and outdoor informational displays. But until recently, LEDs have produced light only in the red, green or amber ranges and have not been generally suitable for replacing, for example, incandescent bulbs, with normally a white luminescence, in a wide variety of display applications. The recent introduction of a bright blue LED, however, allows white light LED systems to be realized and thus has the potential to open the display market to LEDs by providing a practical means to achieve both full color and white light illumination.

The practical advantages of LED displays over those using incandescent bulbs are many. The operational lifetime (in this case, defined as continual illumination) of a LED is on the order of ten years or over 50,000 hours, whereas incandescent bulbs often burn out in the order of 2000 hours, thus leaving an empty pixel in the display message. Such recurrent failures make a display unreadable and, therefore, not useful. These conditions (i.e., broken or missing pixels) require constant repair leading to a significant maintenance problem for providers of display signs based on incandescent illumination devices. With the long operational lifetime of a LED-based sign board, the pixels rarely burn out and the illuminated message remains legible over long operational periods.

Similarly, LED lamps are considerably more robust. When exposed to stress, mechanical shocks, or temperature variations often encountered in an outdoor environment they are less likely to fail than incandescent lamps. This attribute is especially important when the signage is utilized in an environment such as vehicular traffic, e.g., roadway signage to mark highway construction sites, bridges, tunnels, or traffic control markings, in which perishable filaments used in the incandescent lamps frequently break due to constant vibrational motion. Further, incandescent and fluorescent lamps are constructed with fragile glass exterior casings

2

whose breakage makes the lamp useless, and by extension, the message on the sign board illegible. Due to severe environmental conditions on roadways, glass breakage of incandescent and fluorescent lamps is an all too frequent mishap. The solid state LED lamp has no filaments to break and is housed within a durable plastic casing, as the primary device envelope or package (typically being of considerable thickness), thereby exhibiting a high level of imperviousness to extreme outdoor environmental stresses. With respect to outdoor signage applications, displays can contain up to 1 million or more pixels or lamps. Thus the maintenance costs related to replacement of non-operational incandescent lamps or miniature fluorescent (or neon) lamps are high and unfortunately, continual.

Hence, an emerging trend in the manufacturing and marketing of informational displays or signage, especially for outdoor usage, is to utilize solid state LED lamps as replacement for more conventional incandescent bulbs. The major end user benefits are the lower power consumption costs and the longer operational lifetime (hence, reducing maintenance costs). A further benefit is the rapid relaxation times of a solid state device affording an opportunity to display rapidly changing information messages incorporating video or lifelike animation.

Given the desirability of white light displays (e.g., commercial bank "time and temperature" message boards, stadium scoreboards), considerable effort has been expended to produce white light LEDs. Although the recent availability of the blue LED makes a full color, and by extension a white light display realizable, conventionally it has been considered that such a display would require multiple LEDs. The multiple LEDs would be then incorporated into complicated and expensive LED modules to obtain the required broad band illumination necessary to provide white light. Even if a discrete LED lamp were constructed that provides white illumination (as opposed to the utilization of a multitude of single die, single color discrete LED lamps in a module or sub-assembly), the current state of the art requires the utilization of multiple LED dies and typically at least four electrical leads to power these dies. U.S. Pat. No. 4,992,704 issued to Stinson teaches a variable color light emitting diode having a unitary housing of clear molded solid epoxy supporting three LED dies characterized as producing clear hues of red, green and blue, respectively. There have been some recent introductions of commercial "full-color" LED lamps, that are essentially discrete lamps which afford a means of producing white light. All currently available examples of such lamps contain a minimum of three LED dies (or chips)—one red, one green and one blue, encapsulated in a single epoxy package. The chips are powered via at least 4 electrical leads. These complicated multiple die, variable color devices provide an expensive and complicated method of offering white light illumination. Furthermore, these multiple die white lamps are rather inefficient in the present state of the art, offering luminosity far below that realized by existing monochromatic light emitting diode lamps, even when a very large quantity of dies are functionally incorporated into the discrete lamp assembly.

The utility of solid state lamps that offer white light illumination is clear. However, at present there is a very limited number of such solid state lamps available. In signage applications where a small pixel of light is frequently required to offer the highest possible resolution of the message or video image, the most practical solid state lamps for display applications are the LED lamps. The LED lamp can have very narrow angles of irradiance and are very small in size when compared with other means of providing

US 6,600,175 B1

<table>
<tr><td>3</td><td>4</td></tr>
</table>

a radiant surface. However, the methods of fabricating white LED lamps are limited. A conventional approach is to fabricate a large cluster of red, green and blue LED discrete lamps, housed in multiple lamp (up to 30) subassemblies or modules. By providing multiple power sources to control all of the discrete lamps, these large modules can appear, from a distance, to provide white light by the spatial mixing of blue, green and red sub-pixels of light given off by the individual discrete LED lamps that comprise the module. While the lamps that make up the modules may be individually addressable, and hence, offer the opportunity to, selectively and individually, provide red, green and blue light (or combinations thereof), such modular systems are complex and costly means of providing white light for a solid state display. Further, as these modules are rather large, the ultimate resolution of the display will always be lower than that of a conventional single lamp pixel display.

Whereas multiple discrete LED dies housed within a single polymeric matrix (as taught by Stinson) may provide a discrete LED lamp such that the illumination could appear white to an observer, the individual LED dies would still need to be individually powered and the lamp would require multiple leads in order to effect the simultaneous emission of multiple wavelength light. Thus, this multiple die LED lamp would be rather expensive to fabricate, and would require expensive and complicated circuitry to power and control in an outdoor display. Despite these problems, both methods point to the utility of generating white illuminance.

It would thus be highly desirable to develop a simple solid state LED lamp, with a minimum of power leads, (i.e., 2) exactly as practiced in single color LED lamps, such that three domains of red, green and blue light are generated and yet the white light emission is apparent to an observer, all while offering significantly reduced die costs (one versus three) and low fabrication costs in the design of corresponding displays and signage, high medium resolution (small pixel or lamp size), rapid switching to the on and off states (to enhance live video imaging), and with a high luminous efficiency.

It is well known that so-called fluorescent lamps provide white light illumination. In a fluorescent lamp, the Hg vapor in the vacuum tube is excited by an electrical discharge. The excited Hg atoms emit light, primarily in the ultraviolet region (e.g., 254 nm, 313 nm, 354 nm), which is absorbed by the inorganic phosphors coating the inside walls of the tube. The phosphors then emit light. These inorganic phosphors are designed as such to offer white light emission by "down-converting" (i.e., transforming a higher frequency, shorter wavelength form of energy to a lower frequency, longer wavelength form of energy) the ultraviolet emissions of the excited states of atomic Hg into a broad spectrum of emitted light which appears as white to the observer. However, these light emitting devices are not solid-state, and miniaturization of these fluorescent bulbs to provide suitable pixel resolution for display applications has never been practically accomplished. In fact, the primary application of miniature fluorescent lamps (with long operational lifetimes, but unfortunately high power consumption when compared with solid state LED lamps) in displays is to provide back lighting to liquid crystals that are individually addressed at the pixel level. Furthermore, these miniature fluorescent lamps remain fragile light emitting devices by virtue of their glass housings and are unsuitable for use in display applications in which the lamps are exposed to extreme environmental stresses. Such stresses can not only break the glass housing, but effect delamination of the powder coatings from the interior wall of the glass housing. It would be

desirable to generate white light by radiative energy transfer, where the luminescent centers are an integral part of the assembly such that a thick, difficult-to-fracture housing structure (plate or bulb) could provide white illumination from the interior thickness of such housing structure, and not from a semi-permanent powder coating placed on one side of a housing surface.

In a further example of generating white light, in the absence of phosphor coatings, it was disclosed in Chao, et al., "White Light Emitting Glasses," Journal of Solid State Chemistry 93, 17–29 (1991) (see also El Jouhari, N., et al.,"White light generation using fluorescent glasses activated by $Ce^{3+}$, $Tb^{3+}$ and $Mn^{3+}$ ions," Journal de Physique IV, Colloque C2, supplement au Journal de Physique III, Volume 2, October 1992, C2-257 to C2-260), that vitreous materials are capable of generating white light by simultaneous emission of blue, green and red emitting fluorescent centers in $B_2O_3$-based glass that simultaneously contain $Ce^{3+}$, $Tb^{3+}$, and $Mn^{2+}$ as activators. These glasses provide white illumination by offering the blue emission of $Ce^{3+}$ as well as by the transfer of excited state energy from the $Ce^{3+}$ to $Te^{3+}$ and $Mn^{2+}$, whose luminescence occurs respectively in the green and red parts of the visible light spectrum.

Mixed rare earth borates can be used to provide white light illumination, via down conversion, with excitation of the borate powders with a primary (ultraviolet) radiation between 250 nm and 300 nm. Similarly, for cathode ray applications, white light-emitting mixed fluorescent materials can be made by careful formulation of green fluorescent materials (48 to 53% w/w), red fluorescent materials (37 to 40% w/w) and blue fluorescent materials (10 to 13% w/w).

While the devices in the above examples vary in concept and construction, they demonstrate the utilization of red, green and blue fluorescent materials, all inorganic in composition, which when excited by photons or electron beams, can release multiple wavelengths of secondary light emission (luminescence of either fluorescent or phosphorescent character) to exhibit white light to the observer. This is generally true, even if microscopic domains of discrete colored light emission can be observed on the Lambertian surface of the light emitting device.

Tanaka, S., et al., "Bright white-light electroluminescence based on nonradiative energy transfer in Ce- and Eu-doped SrS films," App. Phys. Lett. 51 (21), Nov. 23, 1987, 1662–1663, describes the generation of a white-light emitting thin-film electroluminescent (EL) device using Ce- and Eu-doped strontium sulfide (SrS) inorganic phosphors. In the EL excitation of the SrS:Ce,Eu device, nonradiative energy transfer from the $Ce^{3+}$ luminescent center to the $Eu^{2+}$ luminescent center plays an important role in generating broad EL emission extending from the blue to the red, thereby generating white light.

Similarly, some recent discussions of AlGaN electroluminescent systems with Zn and Si dopants have indicated that some white light can be generated. While it is useful for a single device to be constructed in which dopants offer a multitude of luminescent wavelengths, dopants invariably alter the electrical and lattice structures of semiconductors and as such, the performance of these devices are considerably poorer than for corresponding semiconductors free of dopant that emit monochromatic irradiation, as a result of being dopant-free.

Until recently, most light emitting diodes have been semiconductor-based and most electroluminescent devices have been inorganic based. While organic materials have been utilized to prepare certain thin-film electroluminescent

US 6,600,175 B1

5

devices, no organic based LEDs are commercially available. Further, organic-based LEDs are at present plagued by extremely short operational lifetimes due to degradation of the organic charge-transfer materials. In all of these systems, the organic materials, used in thin films on conducting inorganic substrates such as ITO, are actively participating in the electron-hole recombination necessary to generate an excited state, and, by subsequent radiative decay, light.

Recently, the literature has discussed approaches directed to fabricating organic LED or electroluminescent devices and in certain cases, white light emission has been observed from these experimental designs. As an example, white light from an electroluminescent diode made from poly[3(4-octylphenyl)-2,2'-bithiophene] and an oxadiazole derivative have been reported. Spectroscopic analysis indicates that the apparent white light is composed of blue (410 nm), green (530 nm),and red-orange (520 nm) luminescent centers. Electroluminescent devices incorporating the red fluorescing material Rhodamine onto an inorganic substrate have been effective in yielding some white light as well.

White light emission from thin film organic electroluminescent cells based on poly(vinylcarbazole PVK) thin films on ITO-coated glass has also been recently reported. The cell has the construction of Mg:Ag:Alq:TAZ:doped PVK:ITO-:Glass where the conducting ITO layer injects holes into the organic based PVK thin film layer which has high hole drift mobilities. Simultaneously, electrons are injected by the tris(8-quinolato) aluminum (III) complex layer Alq, into the hole blocking electron transporting layer composed of the organic molecule 3-(4'tert-butylphenyl)-4-phenyl-5-(4'-biphenyl)-1,2,4-triazole, TAZ. At the interface of the organic poly(vinlycarbazole) layer with the TAZ layer, recombination of holes and electrons take place which excites the organic, aromatic, carbazole pendant moiety that comprises the polymer. It is well known that the excited carbazole moiety within the polymer aggregates in the excited state leads to blue excimer emission, in the absence of quenchers or dopants. In the example of the organic Mg:Ag:Alq:TAZ:doped PVK:ITO:Glass electroluminescent device, the quenchers of excimeric emission, are the dopants blue emitting 1,1,4,4-tetraphenylbuta-1,3-diene (TPB), green emitting 7-diethylamino-3-(2'benzothiazoyl)coumarin (Coumarin-6), and red emitting dicyanomethylene-2-methyl-6-p-dimethylaminostyryl-4H-pyran (DCM-1).

U.S. Pat. No. 5,045,709 issued Apr. 11, 1995 to J. E. Littman et al.disclose a white light emitting internal junction organic electroluminescent device comprising an anode, an organic electroluminescent medium and a cathode. The organic electroluminescent medium further comprises a hole injecting and transporting zone contiguous with the anode, and an electron injecting and transporting zone contiguous with the cathode. The electron injecting and transporting zone further comprises an electron injecting layer in contact with the cathode. The portion of the organic electroluminescent medium between the electron injecting layer and the hole injecting and transporting zone emits white light in response to the hole-electron recombination, and comprises a fluorescent material and a mixed ligand aluminum chelate.

Japanese Patent Publication 04289691 of Mitsubishi Cable Industries, Ltd., published Oct. 14, 1992, discloses an electroluminescent device comprising a fluorescent dye-fixed silica layer coated with a transparent electrode layer, a luminescing (light-emitting) layer containing a phosphor, a backside electrode layer, a water-sorbing layer, an encapsulating film, and an insulating layer.

In the Mitsubishi patent publication, the silica layer may be formed by a sol gel process using metal alkoxides in a

6

solvent such as ethanol, isopropanol, or dimethyl ether. A Rhodamine 6G-doped silica layer is described to exhibit white luminescence. The luminescing layer may be for example on the order of 15 microns in thickness, and is formed by a sol gel technique yielding ZnS or ZnCdS doped with a dopant such as copper, aluminum, manganese, chlorine, boron, yttrium, or rare earth dopant. The luminescing layer may also contain scattered phosphor material. The average grain size of grains in the luminescing layer is generally greater than 10 microns, and preferably is in the range of from 15 to 40 microns. The luminescing layer may for example contain from 30 to 80% phosphor. A disclosed advantage of the foregoing structure is that one can change the phosphor in the luminescing layer, and thereby change the color of the whole material.

Japanese Patent Publication 60170194 of Sony Corporation, published Sep. 3, 1985, discloses a white light-emitting electroluminescent device with a luminescent layer containing a mixture of a blue-green-emitting phosphor and Rhodamine S. Since Rhodamine S strongly fluoresces orange by excitation with a bluish-green light, a white light of high luminosity may be obtained even at low voltage. This reference discloses a phosphor emitting blue-green light, in which ZnS is doped with Cu and Cl, as well as a phosphor emitting yellow light, in which ZnS is doped with Cu and Mn. ZnS may also be doped with Cu and Br to produce green light.

The Sony patent publication discloses a multilayer electroluminescent article, including sealing layers of protective film of a material such as Aclar polymer, a polyester layer, a transparent electrode formed of indium tin oxide (ITO), a light-emitting layer, and a backside electrode. The light-emitting layer may comprise 50–95% by weight of ZnS doped with the aforementioned dopant species (e.g., 0.045% wt. Cu, and 0.020% wt. Cl) and 5–50% wt. Rhodamine S.

Not withstanding the progress made in using organic fluorescers as luminescent sites within either electron-transport or hole-transport layers and affording thin-film interfacial hole-electron recombination, the current state of the art finds it difficult to generate organic based LED dies with reasonable operational lifetimes. By their very nature, these donor-acceptor complexes are prone to reaction with the surrounding medium. As a result, many of these organic molecules degrade under constant excitation to the excited state and consequently the organic-based LEDs fail. Those fluorescers with extremely high quantum yields of fluorescence, which by definition necessitate short excited state lifetimes and are unlikely to be quenched or degraded by oxygen or other reactants, do not have sufficient electron or hole transport properties to allow for device-wide localized hole-electron recombination in the ground state. However, their proximity to the holes, as dopants in a hole transporting layer, as an example, may make the excited states of the luminophors more easily oxidized than would normally be the case. This would be especially true for excited state species, even if the ground state of the luminophors are stable to the holes in the hole-transporting layer. Similarly arguments regarding excited state reduction would be applicable for dopants sequestered within an electron-transport layer.

It would be most desirable, then, if a white light emitting LED device could be fabricated that took advantage of the simultaneous emission of red, green and blue luminescent centers, using both inorganic and organic fluorescers or phosphors without requiring theses species to be in proximate contact with the transporting layers.

It is the purpose of the present invention to provide white light solid state luminescent devices using a single die,

**A63**

7

which initially provide monochromatic radiation and wherein the monochromatic radiation is converted to polychromatic white light, thus providing a solid state illumination device with white illuminance, without the need for multiple power leads or for more than one discrete LED lamp.

## SUMMARY OF THE INVENTION

The present invention relates broadly to a light emitting assembly comprising a solid state device which is suitably joined by circuit-forming means to a power supply, constructed and arranged to power the solid state device and induce the emission from the solid state device of a first, relatively shorter wavelength radiation. The solid state device is structurally associated with a recipient downconverting luminophoric medium which when impinged by the first, relatively shorter wavelength radiation is excited to responsively emit a radiation in the visible white light spectrum.

In accordance with a specific embodiment of the present invention, an LED operative to emit, for example, monochromatic blue or ultraviolet (UV) radiation is packaged along with fluorescent organic and/or inorganic fluorescers and phosphors in an insulating polymeric matrix. The monochromatic blue or UV radiation output of the LED is absorbed and then down converted by the fluorphore or phosphor to yield longer wavelengths to include a broad spectrum of frequencies which appear as white light.

This use of fluorescers and/or phosphors to effect down conversion of light from an LED in a solid state light emitting device using a packing dye material is a significant departure from prior art teaching. In addition to allowing for the generation of white light from a blue or ultraviolet emitting LED die with a typical p-n junction construction, devices in accordance with the invention can be variously constructed to provide an essentially infinite series of colored (visible) light emissions, of either narrow or broad spectral distribution, from one single p-n junction construction. The concept can be extended to any solid-state light emitting device, including super luminescent diodes, diode layers, electroluminescent cells, electroluminescent displays, organic and polymer based light emitting diodes and/or devices, even those not requiring semiconductor p-n junctions, providing an insulating matrix or housing can be attached to or incorporated within the device.

As used herein, the term "solid state device," used in reference to the device for generating the primary radiation which subsequently is down-converted to a longer wavelength radiation in such visible white light spectrum, means a device which is selected from the group consisting of semiconductor light emitting diodes, semiconductor lasers, thin film electroluminescent cells, electroluminescent display panels, organic based light-emitting diodes, polymericbased light-emitting diodes, and internal junction organic electroluminescent devices.

As used herein, the term "luminophoric medium" refers to a material which in response to radiation emitted by the solid state device emits light in the white visible light spectrum by fluorescence and/or phosphorescence.

Other aspects, features and embodiments of the invention will be more fully apparent from the ensuing description and claims.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a schematic elevational cross-sectional view of a down-converting solid state device assembly for producing white light according to one embodiment of the present invention.

8

FIG. 2 is a schematic elevational cross-sectional view of a another white light generating assembly according to another embodiment of the invention.

FIG. 3 is a schematic elevational cross-sectional view, in enlarged scale, of a portion of the device of FIG. 1.

FIG. 4 is a schematic representation of a display which may usefully employ the device of FIGS. 1 and/or 2.

FIG. 5 is a schematic elevational view of an electroluminescent cell device according to another embodiment of the invention.

FIG. 6 is a schematic representation of the generalized light emitting assembly of the present invention.

## DETAILED DESCRIPTION OF THE INVENTION, AND PREFERRED EMBODIMENTS THEREOF

The present invention is based on the discovery that a highly efficient white light emitting device may be simply and economically fabricated utilizing a solid state light emitting device for generating a shorter wavelength radiation which is transmitted to a luminophor (fluorescent and/or phosphorescent solid material) for down conversion by the luminophor of the radiation from the solid state light emitting device, to yield white light.

White light LED solid state devices may be made by the method of the present invention, utilizing a down conversion process whereby the primary photon generated in the active region of the diode is down converted with primary blue emission and/or secondary blue fluorescent or phosphorescent centers, as well as green and red fluorescent or phosphorescent centers. Such an LED device is able to downconvert the relatively monochromatic light, typical of all heretofore colored LED dies and lamps, to a broader emission that provides white light from red, green, and blue emission centers. Such a device for white light emission, based on down-conversion, requires the primary light to be either blue or ultraviolet emission, such as is available using blue or ultraviolet LED dies and lamps. It is an important element of this consideration that both inorganic and organic fluorescent or phosphorescent materials can be utilized to down-convert the primary ultraviolet or blue light emission to a mixture of blue, green and red luminescent emissions. A significant advantage of organic luminescent materials is their relatively broad emission bandwidth which offers the maximal overlap of photon wavelengths to most readily generate a white illumination. Further, it is most desirable to utilize organic fluorescent materials with extremely short radiative lifetimes, less than 50 nanoseconds, to preclude non-radiative energy transfer (to the lowest energy emitter).

As discussed above, there have been disclosures regarding the generation of white light in solid state illumination devices using radiative or non-radiative energy transfer and these examples use primarily inorganic dopants in the active layers of electroluminescent cells or display systems, but none are known that apply the principles of the present invention to semiconductor based p-n junction LED lamps.

Referring now to the drawings, FIG. 1 shows a white light emitting diode assembly 10 constructed in accordance with the invention. This assembly comprises an enclosing wall 7 defining a light-transmissive enclosure 11 having an interior volume therewithin. The enclosure 11 may be formed of any suitable material having a light-transmissive character, such as a clear or translucent polymer, or a glass material. The light-transmissive enclosure 11 houses in its interior volume a light emitting diode (LED) die 13 positioned on support 14. First and second electrical conductors 16 and 17 are

US 6,600,175 B1

| 9 | 10 |

connected to the emitting and the rear faces **18** and **19** of LED die **13**, respectively, and with the emitting face **18** of the LED die coupled to the first electrical conductor **16** by lead **12**. The enclosure is filled with a suitable down-converting material **20**, e.g., a down-converting medium comprising fluorescer and/or phosphor component(s), or mixtures thereof, viz., a luminophoric medium, which functions to down convert the light output from face **18** of LED **13** to white light.

In one embodiment, LED **13** comprises a leaded, gallium nitride based LED which exhibits blue light emission with an emission maximum at approximately 450 nm with a FWHM of approximately 65 nm. Such a device is available commercially from Toyoda Gosei Co. Ltd. (Nishikasugai, Japan; see U.S. Pat. No. 5,369,289) or as Nichia Product No. NLPB520, NLPB300, etc. from Nichia Chemical Industries, Ltd. (Shin-Nihonkaikan Bldg. 3-7-18, Tokyo, 0108 Japan; see Japanese Patent Application 4-321,280). The down-converting material in this embodiment comprises a blue fluorescer (Lumogen® F Violet 570—substituted napthale-netetracarboxylic diimide), a green-yellow fluorescer (Lumogen® F Yellow 083—substituted perylenetetracar-boxylic diimide) and a red fluorescer (Lumogen® F Red 300—substituted perylenetetracarboxylic diimide). A composition comprising such blue, green-yellow, and red fluo-rescent materials, all organic based, as incorporated in an insulating epoxy polymer, is available commercially from Pacific Polytech (Pacific Polytech, Incorporated, 15 Commercial Blvd., Novato, Calif. 94949-6135).

Both gallium nitride and silicon carbide LEDs are suitable for generating light at appropriate wavelengths and of sufficiently high energy and spectral overlap with absorption curves of the down-converting medium. The LED preferably is selected to emit most efficiently in regions where luminescent dyes may be usefully employed to absorb wavelengths compatible with readily commercially available fluorescers and/or phosphors for down conversion to white light.

The luminophoric medium utilized in the light emitting assembly of the present invention thus comprises a down-converting material which may include suitable luminescent dyes which absorb the radiation emitted by the LED or other solid state device generating the primary radiation, to thereby transfer the radiation energy to the fluorescer(s) and/or phosphor(s) for emission of white light. Alternatively, the luminophoric medium may comprise simply the fluorescer(s) and/or phosphor(s), without any associated mediating material such as intermediate luminescent dyes, if the fluorescer(s) and/or phosphor(s) are directly excitable to emit the desired white light.

Such a light emitting assembly is shown in FIG. 2, wherein the same general structure is shown as in FIG. 1 (with the same reference numerals of corresponding parts for ease of reference), but in place of the luminophoric medium 20 shown in the embodiment illustrated in FIG. 1, the assembly of FIG. 2 utilizes a fluorescer associated with the light-transmissive housing 11. The fluorescer in such embodiment may be either dispersed in the wall 7 of the housing structure, and/or coated as an interior film 9 of the fluorescer on the interior wall surface of the housing wall 7. Alternatively, the fluorescer may be coated on an exterior wall surface of the housing of the assembly (not shown), if the housing is ultimately deployed in an environment where such exterior coating may be satisfactorily maintained in an operable state (e.g., where it is not subject to abrasion, or degradation). The fluorescer material may for example be dispersed in the polymer or glass melt from which the

housing subsequently is formed, so as to provide a homogeneous composition of the housing wall providing light output from the entire area of the housing.

Comparing the structures of the FIGS. 1 and 2 assemblies, it is seen that the luminophoric medium in the FIG. 1 embodiment is contiguously arranged about the LED die structure in the interior volume of the housing, while the luminophoric medium in the FIG. 2 embodiment is disposed in spaced relationship to the LED die structure. It will be apparent that the specific arrangement of the solid state device such as LED **13**, relative to the down-converting medium of the assembly, may be widely varied in the broad practice of the invention, it being necessary only that the solid state device functioning as the source of the primary shorter wavelength radiation be in transmitting relationship to the recipient luminophoric medium, so that the latter functions in use to down-convert the transmitted radiation from the solid state device and responsively thereto emit white light.

An ultraviolet LED light source suitable for use in the structure of FIG. 1 may comprise: aluminum gallium indium nitride; aluminum gallium nitride; indium gallium nitride; gallium nitride or any other ultraviolet emitting diode. A blue LED light source may be based on: indium gallium nitride; silicon carbide; zinc selenide; or any other blue light emitting diode source.

TBP, Coumarin-6 and DCM-1, as described by Kido et al. in European Patent EP 647694, are suitable materials for down conversion of the output of gallium nitride or silicon carbide LEDs. Gallium nitride and its alloys can emit in the spectral range covering the blue and ultraviolet extending from wavelengths of 200 nanometers to approximately 650 nanometers. Silicon carbide LEDs emit most efficiently in the blue at wavelengths of around 470 nanometers.

If gallium nitride emitters are employed, preferred substrates for the emitters include silicon carbide, sapphire, gallium nitride and gallium aluminum indium nitride alloys, and gallium nitride-silicon carbide alloys, for achieving a proper lattice match.

With ultraviolet or blue light LEDs, aromatic fluorescers may be employed as down-converting emitters. By way of example, suitable fluorescers could be selected from:

A) blue luminescent compositions—9,10-diphenylanthracene; 1-chloro-9,10-diphenylanthracene; 2-chloro-9,10-diphenylanthracene; 2-methoxy-9,10-diphenylanthracene; 1,1,4,4-tetraphenyl-1,3-butadience (TPB), Lumogene® F Violet 570 (a substituted naptha-lenetetracarboxylic diimide); Alq2OPh (were Al is aluminum, q is 8-hydroxyquinoline, and Ph is phenyl);

B) green-yellow luminescent compositions—9,10-bis (phenylethynyl) anthracene; 2-chloro-9,10-bis (phenylethynyl)-anthracene; Coumarin-5 (7-diethylamino-3-(2'benzothiazoyl-)coumrin); Lumogen® Yellow 083 (a substituted perylenetetracar-boxylic diimide); and Mq3 (where M is a Group III metal, such as Al, Ga or In, and q is 8-hydroxyquinolate); and

C) red-orange luminescent materials—DCM-1; Lumogeng® F Red 300 (a substituted perylenetetracar-boxylic diimide); Lumogen® F Orange 240 (a substituted perylenetetracarboxylic diimide); tetraphenyl-napthacene; zinc phthalocyanine; [benzoythiazoylidene) methyl]squaraines; tris(bipyridine-ruthenium (2+); and [3]-catenand complexes with copper.

The amount of dyes or fluorescers specifically formulated into the luminophoric medium, which may for example

US 6,600,175 B1

11                                                                      12

include a polymeric matrix or other matrix material in which the dyes and/or fluorescers are soluble or dispersable, is not specifically limited, and suitable amount(s) of suitable material(s) for such purpose can be readily determined without undue experimentation, to provide good white light emission (of virtually any tint or hue), as well as a virtually infinite series of chromaticity for all visible hues.

The concentrations of the fluorescers may suitably be determined by both their luminescence quantum yields and spectral distribution, as required to define a particular color by its respective chromaticity coordinates, as well as, in the case of radiative energy transfer (but not Forster energy transfer), the absorption extinction coefficients of the associated fluorescer(s). Such fluorescers may for example be blue light fluorescers used with a blue-emitting semiconductor-based LED die, or ultraviolet light fluorescers used with a UV-emitting semiconductor-based LED die. While the concentrations of the various dyes may be suitably adjusted to realize the required colors, the range of dye concentrations typically will be between $10^{-3}$ to 10 mole per cent for each individual fluorescent component.

FIG. 3 shows the LED structure of LED die 13 of FIG. 1 in an enlarged scale, as comprising substrate 21 mounted on support 14, and coupled in conducting relationship with second electrical conductor 17. The substrate comprises a surface layer 22 formed in accordance with well understood techniques. Referring back to FIGS. 1 and 2, the light emitted from LED 13 is absorbed by a down-converting dye in the luminophoric medium 20 contained within enclosure 11 (FIG. 1), or by a down-converting dye in the interior film 9 on the interior wall surface of housing wall 7 (FIG. 2), to responsively produce white (or full color) light.

FIG. 4 illustrates the use of white light emitting diode device assemblies 10 of a type as shown in FIGS. 1 and 2, arranged in an array comprising a regular pattern of such assemblies, as components of a display 30, or alternatively for a back light illumination panel for a structure such as a liquid crystal display. The individual assemblies 10 may be selectively illuminated, by imposing a desired turn-on voltage across the first and second electrical conductors 16 and 17 (not shown in FIG. 4; see FIGS. 1 and 2), to display a message or design in a manner well understood in the art.

The selective illumination of the component light emitting assemblies 10 of the FIG. 4 display is suitably controlled by a controller 31 in response to user input. The individual light emitting assemblies 10 of FIGS. 1 and 2 are connected electrically with suitable electrical circuitry (not shown) in display 30, in a manner analogous to that used for displays utilizing fluorescent or incandescent lamps. Alternatively, all of the component light emitting assemblies 10 may be illuminated simultaneously for back lighting applications.

The light-emitting assemblies shown in FIGS. 1 and 2 may be made in any suitable size and dimensional character. In application to displays, such light-emitting assemblies will generally be of a size commensurate with the size of fluorescent or incandescent lamps used in similar displays.

FIG. 5 is a schematic elevational view of an electroluminescent cell apparatus 40 according to another embodiment of the invention. This apparatus 40 comprises end wall members 48, top wall member 49, and bottom wall member 47, which cooperatively with front and rear wall members (not shown for clarity), form an enclosure defining interior volume 61 therewithin. The top wall member 49 is formed of a light-transmissive material of construction.

The interior volume 61 of the electroluminescent cell apparatus 40 contains a white light-emitting polymer 63

which is responsive to down-convert the radiation produced by the LED array in the interior volume. The LED array comprises a conductive substrate 42 of a suitable material on which are arranged a mulitplicity of LED dies 41, each in electrical contact at its bottom face with the substrate 42. The substrate 42 in turn is joined to a lead 44 which passes exteriorly of the cell apparatus via a feedthrough in bottom wall member 47, and is joined in circuit-forming relationship to a suitable power supply means (not shown). The LED dies 41 at their top faces are joined in series with one another by connection wires 43.

The top contact of the LEDs, joined by connecting wires 43, are electrically coupled by means of electrode 46 to the lead 45 which also passes exteriorly of the cell apparatus via a feedthrough in bottom wall member 47, for joining to the aforementioned power supply also joined to lead 44. Lead 45 is electrically isolated from lead 44.

In operation, the electrical energization of the LED die array comprising LED dies 41 effects radiation emission at a first relatively shorter wavelength which in transmission to the contiguously arranged light-emitting polymer 63 causes the polymer to responsively emit white light at a second relatively longer wavelength in the visible white light spectrum.

FIG. 6 is a schematic representation of a generalized light emitting assembly 80 according to the present invention. In such assembly, the primary radiation generating device 82, comprising a solid state device which may include one or more, singly or in combinations of different devices of the group consisting of semiconductor light emitting diodes, semiconductor lasers, thin film electroluminescent cells, electroluminescent display panels, organic based light-emitting diodes, polymeric-based light-emitting diodes, and internal junction organic electroluminescent devices. Preferably, the solid state device is selected from the group consisting of semiconductor lights-emitting diodes and semiconductor lasers, and most preferably the solid state device is a semiconductor light emitting diode.

The solid state light radiation emitting device 82 as shown is suitably joined by circuit-forming wires or leads 84 and 86 to a power supply 88, constructed and arranged to power the solid state device and induce the emission from the solid state device 82 of shorter wavelength radiation 94, preferably in the wavelength range of blue to ultraviolet. The solid state device 82 is structurally associated with a recipient down-converting luminophoric medium 90 (the structural association being schematically represented in FIG. 6 by the dashed line 92, and which may take the form of a contiguous relationship in a conjoint or unitary structure, or a spaced relationship therebetween in a same structure, as for example is shown in the illustrative embodiment of FIG. 2 herein).

The luminophoric medium 90 when impinged by the radiation 94 of a shorter wavelength, is excited to responsively emit a radiation 96 having a wavelength in the visible light spectrum. The radiation 96 may be emitted in a range of wavelengths which combine to produce light perceived as white.

It will be apparent from the foregoing that the light-emitting assembly of the present invention may be variously configured with a number of solid state light-emitting devices, which emit shorter wavelength radiation, and transmit such radiation to a luminophoric medium which down-converts the applied radiation to yield a white light emission from the luminophoric medium.

Further, while the invention has been described primarily herein in reference to the generation of white light, it will be

**A66**

13    14

apparent that the scope of the invention is not thus limited, but rathers extends to and encompasses the production of light of other colors than mixed white light, utilizing solid state primary radiation emitters, and down-converting luminophoric media.

Thus, while the invention has been described with reference to various illustrative embodiments, features, aspects, and modifications, it will be apparent that the invention may be widely varied in its construction and mode of operation, within the spirit and scope of the invention as hereinafter claimed.

What is claimed is:

1. A light emitting device, comprising:

at least one single-die semiconductor light-emitting diode (LED) coupleable with a power supply to emit a primary radiation which is the same for each single-die semiconductor LED present in the device, said primary radiation being a relatively shorter wavelength radiation outside the visible white light spectrum; and

a down-converting luminophoric medium arranged in receiving relationship to said primary radiation, and which in exposure to said primary radiation responsively emits radiation at a multiplicity of wavelengths and in the visible white light spectrum, with said radiation of said multiplicity of wavelengths mixing to produce a white light output.

2. A light-emitting device according to claim 1, comprising a two-lead array of single-die semiconductor LEDs.

3. A light-emitting device, comprising:

a semiconductor laser coupleable with a power supply to emit a primary radiation having a relatively shorter wavelength outside the visible light spectrum; and

a down-converting luminophoric medium arranged in receiving relationship to said primary radiation, and which in exposure to said primary radiation responsively emits polychromatic radiation in the visible light spectrum, with different wavelengths of said polychromatic radiation mixing to produce a white light output.

4. A light-emitting device according to claim 3, wherein said semiconductor laser includes an active material selected from the group consisting of III–V alloys and II–VI alloys.

5. A light-emitting device, comprising:

at least one single-die semiconductor light-emitting diode (LED) coupleable with a power supply to emit a primary radiation which is the same for each single-die LED present in the device, said primary radiation being a relatively shorter wavelength radiation; and

a down-converting luminophoric medium arranged in receiving relationship to said primary radiation, and which in exposure to said primary radiation, is excited to responsively emit a secondary, relatively longer wavelength, polychromatic radiation, with separate wavelengths of said polychromatic radiation mixing to produce a white light output.

6. A light-emitting device according to claim 5, wherein said at least one single-die semiconductor LED and said down-converting luminophoric medium are associated with one another in a unitary structure.

7. A light-emitting device according to claim 5, further comprising a housing member formed of a light-transmissive material, said housing member defining therewithin an interior volume, with said at least one single-die semiconductor LED and said down-converting luminophoric medium being disposed in said interior volume.

8. A light-emitting device according to claim 7, further comprising first and second electrical contacts extending through said housing member and coupleable to a power supply which is constructed and arranged for imposing a voltage on said at least one single-die semiconductor LED, to induce emission of said primary radiation.

9. A light-emitting device according to claim 8, wherein said down-converting luminophoric medium is contiguously arranged at said interior volume of said housing in relation to said at least one single-die semiconductor LED.

10. A light-emitting device according to claim 8, wherein said down-converting luminophoric medium is arranged in spaced relation to said at least one single-die semiconductor LED in said interior volume of said housing.

11. A light-emitting device according to claim 5, wherein each single-die semiconductor LED present in the device includes a substrate and a multilayer device structure, and wherein said substrate comprises silicon carbide.

12. A light-emitting device according to claim 5, wherein each single-die semiconductor LED present in the device includes a substrate and a multilayer device structure, and wherein said substrate comprises a material selected from the group consisting of sapphire, SiC, and InGaAlN.

13. A light-emitting device according to claim 12, wherein said multilayer device structure includes layers selected from the group consisting of silicon carbide, aluminum nitride, gallium nitride, gallium phosphide, germanium carbide, indium nitride, and their mixtures and alloys.

14. A light-emitting device according to claim 5, wherein said primary radiation emitted by said at least one single-die semiconductor LED comprises ultraviolet light and said down-converting luminophoric medium comprises a material selected from the group consisting of: perylene tetracarboxylic diimide fluorescent dye; napthalene tetracarboxylic diimide fluorescent dye; 9,10-bis(phenylethynyl) anthracene fluorescent dye; substituted 9,10-diphenylanthracene dyes; and tetraphenylbutadiene (TPB) fluorescent dye.

15. A light-emitting device according to claim 5, wherein said primary radiation emitted by said at least one single-die semiconductor LED comprises ultraviolet light and said down-converting luminophoric medium comprises a napthalene tetracarboxylic diimide fluorescent dye, to provide blue light emission, and substituted perylene tetracarboxylic diimide dyes to provide green (or green-yellow) and red light emissions.

16. A light-emitting device according to claim 5, wherein said primary radiation emitted by said at least one single-die semiconductor LED comprises blue light and said down-converting luminophoric medium comprises a material selected from the group consisting of: a napthalene tetracarboxylic diimide fluorescent dye, to provide greater luminosity of the color hue blue; a 9,10-diphenylanthracence, to provide greater luminosity of the color hue blue; a substituted 9,10-diphenylanthracence, to provide greater luminosity of the color hue blue; 1,1,4,4-tetraphenylbutadiene (TPB) to provide greater luminosity of the color hue blue; a perylenetetracarboxylic diimide to provide greater luminosity of the color hues green and red; a perylenetetracarboxylic diimide to provide greater luminosity of the color hue red, and 9,10-bis(phenylethynyl)athracence to provide greater luminosity of the color hue green; a perylenetetracarboxylic diimide to provide greater luminosity of the color hue red[,] ; and halogen-substituted 9,10-bis(phenylethynyl) athracence to provide greater luminosity of the color hue green.

17. A light-emitting device according to claim 5, wherein said down-converting luminophoric medium comprises a perylenetetracarboxylic diimide and a napthalenetetracar-

US 6,600,175 B1

15

16

boxylic diimide, and wherein each perylenetetracarboxylic diimide is formulated with a concentration between $10^{-3}$ and 5 mole percent, and wherein each napthalenetetracarboxylic diimide is formulated with a concentration between $10^{-2}$ and 10 mole percent.

**18.** A light-emitting device according to claim **5,** wherein said primary radiation is down-converted to at least two distinct and separable regions of red and/or green and/or blue light, with said at least two regions of red and/or green and/or blue light mixing to produce a different colored output.

**19.** A light-emitting device according to claim **5,** wherein said primary radiation is down-converted to between 2 and 10 distinct and separable regions of white light and light of the color hue red, green or blue light.

**20.** A display according to claim **18,** further comprising a user-responsive controller for selectively illuminating specific ones of said light-emitting devices.

**21.** A light-emitting device according to claim **5,** wherein each single-die semiconductor LED present in the device comprises a single: die, two-lead semiconductor LED.

**22.** A light-emitting device according to claim **5,** wherein each single-die semiconductor LED present in the device comprises a single-die two-lead semiconductor LED.

**23.** A light-emitting device according to claim **5,** comprising a two-lead array of single-die semiconductor LEDs.

**24.** A liquid crystal display, including:

a backlight member including a multiplicity of light-emitting devices, each light-emitting device comprising:

at least one single-die semiconductor light-emitting diode (LED) coupleable with a power supply to emit a primary radiation which is the same for each single-die LED present in the device, said primary radiation being a relatively shorter wavelength radiation, and

a down-converting luminophoric medium arranged in receiving relationship to said primary radiation, and which in exposure to said primary radiation responsively emits a secondary, relatively longer wavelength, polychromatic radiation, with separate wavelengths of said polychromatic radiation mixing to produce a white light output.

**25.** A display, including:

a viewable panel including a multiplicity of light-emitting devices, each light-emitting device comprising:

at least one single-die semiconductor light-emitting diode (LED) coupleable with a power supply to emit a primary radiation which is the same for each single-die semiconductor LED present in the device, said primary radiation being a relatively shorter wavelength radiation, and

a down-converting luminophoric medium arranged in receiving relationship to said primary radiation, and which in exposure to said primary radiation responsively emits a secondary, relatively longer wavelength, polychromatic radiation, with separate wavelengths of said polychromatic radiation mixing to produce a white light output.

**26.** A light-emission device, comprising:

a single-die, two-lead semiconductor light-emitting diode emitting radiation; and

a recipient down-converting luminophoric medium for down-converting the radiation emitted by the light-emitting diode, to a polychromatic white light.

\*    \*    \*    \*    \*

# TAB 3

*Ex Parte* Reexamination Control No. 90/010,940                    Docket No.: 0111597.00128US1
Patent Owner's Appeal Brief dated March 20, 2014

## VI.    CLAIMS APPENDIX

118.            (Previously Added) <u>A light-emission device, comprising a single-die, two-lead gallium nitride based semiconductor blue light-emitting diode emitting radiation; and a recipient down-converting luminophoric medium for down-converting the radiation emitted by the light-emitting diode, to a polychromatic white light, wherein the luminophoric medium is dispersed in a polymer that is on or about the single-die, two-lead gallium nitride based semiconductor blue light-emitting diode.</u>

134.            (Previously Added)  <u>A light-emitting device, comprising: at least one single-die gallium nitride based semiconductor blue light-emitting diode (LED) coupleable with a power supply to emit a primary radiation which is the same for each single-die LED present in the device, said primary radiation being a relatively shorter wavelength radiation; and a down-converting luminophoric medium arranged in receiving relationship to said primary radiation, and which in exposure to said primary radiation, is excited to responsively emit a secondary, relatively longer wavelength, polychromatic radiation, with separate wavelengths of said polychromatic radiation mixing to produce a white light output, wherein each of the at least one single-die gallium nitride based semiconductor blue light-emitting diode in interaction with luminophoric medium receiving its primary radiation produces white light output, and wherein the luminophoric medium is dispersed in a polymer that is on or about the single-die gallium nitride based semiconductor blue light-emitting diode.</u>

135.            (Previously Added) <u>The light-emitting device of claim 134, comprising the luminophoric medium dispersed in a polymer that is on the single-die gallium nitride based semiconductor blue light-emitting diode.</u>

*Ex Parte* Reexamination Control No. 90/010,940                      Docket No.: 0111597.00128US1
Patent Owner's Appeal Brief dated March 20, 2014

136.        (Previously Added)  The light-emitting device of claim 135, comprising the single-die gallium nitride based semiconductor blue light-emitting diode comprising die side surface, and wherein the polymer is contiguous to the die side surface.

138.        (Previously Added)  The light-emitting device of claim 134, comprising the single-die gallium nitride based semiconductor blue light-emitting diode comprising die side surface, and wherein the polymer is in laterally spaced relationship to said side die surface.

140.        (Previously Added)  The light-emitting device of claim 134, comprising the single-die light-emitting diode being arranged to directly impinge radiation on the polymer

## CERTIFICATE OF SERVICE

I hereby certify that, on this 22nd day of May, 2015 I filed the foregoing

Brief for Appellant Cree, Inc. with the Clerk of the United States Court of Appeals

for the Federal Circuit via the CM/ECF system, which will send notice of such

filing to all registered CM/ECF users.


/s/ William F. Lee
WILLIAM F. LEE
WILMER CUTLER PICKERING
   HALE AND DORR LLP
60 State Street
Boston, MA  02109
(617) 526-6000

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(C), the undersigned hereby certifies that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and Circuit Rule 32(b).

1.      Exclusive of the exempted portions of the brief, as provided in Fed. R. App. P. 32(a)(7)(B), the brief contains 13,975 words.

2.      The brief has been prepared in proportionally spaced typeface using Microsoft Word 2010 in 14 point Times New Roman font.  As permitted by Fed. R. App. P. 32(a)(7)(C), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.

/s/ William F. Lee

WILLIAM F. LEE
WILMER CUTLER PICKERING
   HALE AND DORR LLP
60 State Street
Boston, MA  02109
(617) 526-6000

May 22, 2015